**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FRIENDS OF THE HEADWATERS,**<br>**17456 Half Moon Rd**<br>**Park Rapids, MN 56470** | |
| | **Case No.** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF** |
| **UNITED STATES ARMY CORPS OF**<br>**ENGINEERS; COL. KARL JANSEN,**<br>**District Engineer, St. Paul District,** | |
| **Defendant.** | |

Plaintiff FRIENDS OF THE HEADWATERS for its Complaint alleges and states as follows:

**INTRODUCTION**

1.      This is a civil action alleging violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, and the Clean Water Act ("CWA"), 33 U.S.C. § 1344.

2.      Friends of the Headwaters seeks declaratory and injunctive relief under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

3.      This complaint challenges permits issued by Defendants United States Army Corps of Engineers ("Corps") and its St. Paul District Engineer Col. Karl Jansen in late 2020 allowing Enbridge Energy, Limited Partnership ("Enbridge") to construct a new crude oil pipeline running across northern Minnesota ("the Line 3 oil pipeline") for 338 miles to Superior, Wisconsin.

4.      On November 23rd, 2020, the Corps issued its "Decision Document." The document includes the environmental assessment (EA) undertaken by the Corps evaluating the impacts of

those portions of the Line 3 oil pipeline project the Corps chose to consider, its finding of no

significant impact (FONSI), that there are no significant environmental impacts from those

portions of the project, its public interest review, and its reasons for issuing the permits Enbridge

requested. This Decision Document is attached as Exhibit A to this Complaint.  Exhibit A,

Decision Document, Nov. 23, 2020.

5.      The decision document was not made available until December 9, 2020 when the

Corps responded to a Freedom of Information Act request.

6.      The construction of the Line 3 oil pipeline will have significant adverse

environmental impacts on rivers, lakes, streams, and wetlands in the Headwaters of the

Mississippi River region and along its route.

7.      The construction of the Line 3 oil pipeline will have significant adverse

environmental impacts on Lake Superior and its watershed.

8.      The construction of the Line 3 oil pipeline will require trenching through or tunneling

under 227 waterbodies and over 800 protected wetlands along its route in Minnesota.

9.      The Defendant Corps nonetheless issued permits for the Line 3 oil pipeline without

conducting an Environmental Impact Statement ("EIS") as required by NEPA.

10.     The Defendant Corps found in its decisional documents that the portions of the Line 3

oil pipeline project the Corps chose to consider would have no significant environmental

impacts.

11.     The Defendant Corps' permits failed to comply with the CWA "404(b)(1)

Guidelines," 40 C.F.R. pt. 230.

12.     The Corps improperly deferred to decisions made by state utility regulators instead of

doing its own environmental analysis under the NEPA and the CWA.

13.     Enbridge was responsible for the massive spill of more than 1 million gallons of Canadian "tar sands" oil from its "Line 6B" oil pipeline into the Kalamazoo River near Marshall, Michigan on July 25, 2010, which created extensive ecological, wildlife, environmental and property damage, and kept the River closed for two years.

14.     Enbridge's Line 6B oil spill required a cleanup effort over many years that cost billions of dollars.

15.      In 2016, Enbridge was fined $61 million as part of an overall $177 million settlement with the U.S. Environmental Protection Agency and U.S. Department of Justice for Enbridge's massive 2010 oil spill into the Kalamazoo River.

16.     The Corps did not consider less environmentally damaging practicable alternatives in approving permits for the Line 3 oil pipeline across Minnesota.

17.     The Corps did not consider the risks of a catastrophic Line 3 oil spill like Enbridge's massive 2010 Line 6B oil spill into the Kalamazoo River in Michigan.

18.     The Corps did not consider the potential lifecycle climate impacts from putting the Line 3 oil pipeline into service.

19.     These Corps permits fail to comply with the requirements of both NEPA and the CWA.

20.     The Corps' decision to issue the permits was thus arbitrary and capricious, and contrary to law.

21.     Therefore, the Court must vacate the Corps permits, and must enjoin Enbridge from proceeding further with construction of its Line 3 oil pipeline.

## JURISDICTION AND VENUE

22.     This Court has federal question jurisdiction under 28 U.S.C. § 1331, as this action presents a controversy under federal laws including NEPA and the CWA, and their implementing regulations, and the APA.

23.     The court also has jurisdiction under 28 U.S.C. § 1346 because the United States is the Defendant.

24.     The relief requested is authorized by 28 U.S.C. §§ 2201(a) (declaratory) and 2202 (injunctive), and by the APA, 5 U.S.C. § 706.

25.     Venue is appropriate in this district under 28 U.S.C. § 1391(e) because the Defendant Corps' headquarters is located in this district.

## PARTIES

26.     Plaintiff Friends of the Headwaters is a not-for-profit membership-based organization under section 501(c)(3) of the Internal Revenue Code dedicated to informing and educating citizens about the environmental risks of Enbridge's proposed oil pipelines, and the threats posed by the Line 3 oil pipeline in the Headwaters of the Mississippi River region.

27.     The Line 3 oil pipeline creates risks and threats of environmental harm to lakes, streams, wetlands, wild rice (*zizania palustris; z. aquatica*) stands, drinking water supplies, and wildlife in northern Minnesota's "Land of 10,000 Lakes."

28.     Friends of the Headwaters' organizational mission has been impaired by Defendant Corps' failure to conduct and complete an EIS under NEPA and a permitting review that fully and fairly assesses potential environmental impacts, evaluates less environmentally damaging alternatives, considers potential mitigation measures, and addresses whether the project is in the public interest.

29.     Friends of the Headwaters' members live, work, and enjoy recreational activities near the Line 3 oil pipeline's proposed route, and they are and will be suffering loss of property values and loss of recreational opportunities from both construction and operation of the Line 3 oil pipeline if it is built.

30.     Construction and operation of the Line 3 oil pipeline would permanently alter the hydrology of numerous wetlands and change the character of the natural environment in the Headwaters of the Mississippi River region.

31.     Many Friends of the Headwaters members are avid hikers, hunters, anglers, skiers, bird watchers, and naturalists who use the outdoors for recreational activities and enjoy the aesthetics of the environment of the Headwaters of the Mississippi River region through which the Line 3 oil pipeline is planned to be sited.

32.     The trenching, tunneling, and clear-cutting required to construct the Line 3 oil pipeline, and the presence of the oil pipeline, once built, will irreparably alter the natural environment of rivers, streams, wetlands, and wildlife habitats that Friends of the Headwaters members use and enjoy for recreational activities.

33.     These areas will also be at greater risk of contamination from an oil spill or leak if the Line 3 oil pipeline is built.

34.     Many Friends of the Headwaters members draw their drinking water supplies from aquifers, lakes, and rivers that the Line 3 oil pipeline will cross, trench through, or bore under. These drinking water resources will be at greater risk of contamination, both from construction and from potential oil spills and leaks if the Line 3 oil pipeline is built.

35.     Many Friends of the Headwaters members have spent their lives in Northern Minnesota, raised their families there, and intend to keep living there.

36.     The following Declarations of Friends of the Headwaters' members are incorporated by reference and attached as exhibits pursuant to Fed. R. Civ. P. 10(c): Exhibit B Decl. of Lowell Schellack, December 19, 2020; Exhibit C, Decl. of Elizabeth Baker Knutilla, December 19, 2020; Exhibit D, Decl. of Maurice Spangler, December 21, 2020; Exhibit E, Decl. of Douglas Rasch, January 5, 2021; and Exhibit F, Decl. of Richard Smith, January 14, 2021.

37.     Friends of the Headwaters members' recreational and aesthetic interests in Headwaters of the Mississippi River region, and their interest in safe clean drinking water, cannot be adequately protected in the Corps permitting process for the Line 3 oil pipeline without a thorough independent scientific review of the potential environmental and socioeconomic risks, consideration of less environmentally damaging practicable alternatives, evaluation of potential mitigation measures, and the required public interest review.

38.     Defendant United States Army Corps of Engineers is an agency within the executive branch of the federal government.  Defendant Col. Karl Jansen is the district engineer for the Corps' St. Paul District, which processed the permits at issue in this case.

39.     Defendant Corps is authorized by section 404 of the CWA to grant permits allowing discharges of dredged or fill material into waters of the United States, and under section 10 of the Rivers and Harbors Act of 1899 for work in navigable waters.

40.     Defendant Corps must comply with the environmental review provisions of NEPA and all applicable NEPA regulations before making any permitting decisions for the Line 3 oil pipeline.

## FACTUAL AND PROCEDURAL BACKGROUND

41.     In 2010, Enbridge was responsible for the largest inland oil spill in United States history when its Line 6B oil pipeline burst open and spilled into the Kalamazoo River near Marshall, Michigan, causing substantial environmental, ecological harms, and property damage.

42.     Enbridge's Line 6B oil pipeline spill cost more than $1 billion to clean up, and that environmental remediation took many years.

43.     Enbridge is now proposing to build a new 36-inch-diameter crude oil pipeline over 338 miles from the northwest corner of Minnesota to a terminal in Clearbrook, Minnesota, then south past Itasca State Park where the Headwaters of the Mississippi River are located, then to Park Rapids, Minnesota, and then east on a new route to Enbridge's oil terminal in Superior, Wisconsin just across the state border and near the shore of Lake Superior.

44.     This map shows the proposed route of the Line 3 oil pipeline in Minnesota:



MINN. PUB. UTIL. COMM'N., ENBRIDGE LINE 3 REPLACEMENT PROJECT: PROJECT SUMMARY INTERACTIVE MAP, https://mn.gov/puc/line3/summary/.

45.     About half of the Line 3 oil pipeline in Minnesota will be routed on a new corridor away from Enbridge's existing Mainline pipelines.

46.     The Line 3 oil pipeline will mostly carry heavy, high-sulfur "diluted bitumen" ("dilbit") from the "tar sands" area in northern Alberta, Canada.

47.     The Line 3 oil pipeline's capacity will initially be approximately 760,000 barrels per day ("bpd'), with an ultimate "nameplate" design capacity of 1,016,000 bpd.

48.     Almost all of the oil through the Line 3 oil pipeline will go to refineries and export terminals outside of Minnesota.  From the Superior, Wisconsin oil terminal, almost all of the heavier dilbit oil will then be moved through other Enbridge pipelines south through Wisconsin into Illinois. Then, some of the dilbit will go to refineries east of Chicago or in Ontario, while most of the dilbit will go to refineries and export terminals along the U.S. Gulf Coast and shipped to global markets.

49.     Construction of the Line 3 oil pipeline will require trenching through or tunneling under 227 waterbodies and more than 800 protected wetlands in Minnesota.  Those construction activities will cause additional suspension of solids, sedimentation, altered hydrology, and erosion.

50.     Where Enbridge proposes to use "horizontal directional drilling" to tunnel under waterbodies or wetlands, there is also the risk that materials used to keep the tunnel open will "frac out" and be released into and contaminate the environment, as has happened in previous Minnesota pipeline projects.

51.     Contamination from construction activities on the Line 3 oil pipeline will likely impair fish, wildlife, and plant habitats along the proposed oil pipeline route.

52.     Construction activities and resulting contamination also threaten surface and groundwater resources used for drinking water, particularly in the sandy shallow aquifer region in Minnesota.

53.     In addition, the Line 3 oil pipeline will require: clear-cutting trees along a 95 to 125-foot wide right-of-way; stockpiling of pipe segments in sensitive habitats; heavy equipment on narrow rural roads; construction of ancillary and temporary facilities; road construction; and permanent cutting and control of vegetation along a 50-foot right-of-way along the Line 3 oil pipeline's entire route.

54.     Once operation commences, any resulting crude oil spill—and particularly spills of diluted bitumen—could devastate entire ecosystems, cost billions of dollars to remediate, and pose a significant threat to human health.

55.     A spill from the Line 3 oil pipeline at any of the waterbody or wetland crossings could cause serious and irreparable environmental and wildlife damages.

56.     A spill from the Line 3 oil pipeline that reaches the Mississippi River or Lake Superior could cause catastrophic and irreparable ecological, economic, and environmental damages.

57.      Diluted bitumen is heavier than many other crude oils and more likely to sink to the bottom of waterbodies, adhere to suspended particulates, stick to lakebed and lakeshore surfaces, and harm fish, wildlife, and plants.

58.     Remediation of diluted bitumen oil spills is very difficult and very costly.

59.     If built and put into operation, the Line 3 oil pipeline will also facilitate increased extraction and consumption of Canadian tar sands oil, which will increase greenhouse gas emissions.

60.     Minnesota and its citizens are currently harmed by the impacts of global climate change, including increased severe flooding, increased risk of severe drought, habitat loss for native plants and animals, and agricultural yield reductions.

61.     These potential adverse environmental impacts attributable to the Line 3 oil pipeline threaten members of Friends of the Headwaters with imminent and irreparable injury to their aesthetic, recreational, ecological, and property interests.

62.     The potential adverse environmental impacts from construction and operation of the pipeline will change the natural environment in which Friends of the Headwaters members recreate and diminish the value of their property due to the risk of an oil spill.

63.     The potential adverse environmental and climatic impacts will negatively affect the fish that members catch and eat, the water they drink, and the value of their property along the proposed Line 3 oil pipeline route.

64.     On September 21, 2018, Enbridge applied to the Corps for permits under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act to allow construction of the Line 3 oil pipeline through Minnesota.

65.     In January 2020, Enbridge submitted additional application materials to the Corps.

66.     Enbridge's application materials contained almost no information about potential alternatives including repair and enhancement of Enbridge's existing "Mainline" pipeline system, or less environmentally damaging alternative routes that would pose much less harms, risks, and threats to lakes, wetlands, rivers, and other fragile freshwater resources.

67.     Enbridge's application materials did not explain its choices of methods for each water crossing.

68.     Enbridge's application materials did not establish that the methods chosen were the least environmentally damaging options and alternatives available.

69.     The Corps acknowledged that it relied on the information provided by Enbridge.

70.     The Corps did not do any independent evaluation of reasonable alternatives or of Enbridge's construction choices.

71.     The Corps did not do any independent evaluation of less environmentally damaging alternatives to Enbridge's construction choices.

72.     The Corps did not prepare an Environmental Impact Statement for the Line 3 oil pipeline or any part of it.

73.     On November 23rd, 2020, however, the Corps announced that it was granting Enbridge its requested section 404 and section 10 permits.

74.     The Corps prepared a document it called an "Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings" for the Line 3 oil pipeline (the "Decision Document").

75.     The Corps did not make this Decision Document available until December 9, 2020, when it responded to a Freedom of Information Act request.

76.     The Corps conceded that its review did "not extend to the entire pipeline construction, or operation" because it claimed it did "not have sufficient control and responsibility over the entire project."  Decision Document at 13-14.

77.     The Corps stated that its "public interest" review contained in the EA was sufficient to satisfy the requirements of NEPA but the Corps relied on data that Enbridge provided rather than conduct its own public interest analysis.  Decision Document, Appx. A, at 6.

78.     The Corps' review was limited to only certain water crossing segments of the Line 3 oil pipeline.

79.     The Corps did not fully and fairly analyze all direct and indirect impacts of the Line 3 oil pipeline.

80.     The Corps did not fully and fairly analyze the cumulative environmental impacts of the Line 3 oil pipeline when added to all other past, present, and reasonably foreseeable future actions.

81.     The Corps' review of wetland impacts was limited to the acreage to be directly trenched or excavated.

82.     The Corps did not review direct or indirect impacts on hydrologically connected trout streams, wild rice, lakes, wetlands, or waters of high or outstanding biological significance, beyond those in the acreage to be directly trenched or excavated.

83.     The Corps did not consider the potential of oil spills from the Line 3 oil pipeline, alternatives to limit the risk of oil spills, or potential mitigation of oil spill risks, other than to note that oil spills from railcars or trucks occur more often but at considerably lower volumes than pipeline spills.  Decision Document at 20, 25-26.

84.     The Corps stated that consideration of potential oil spills was beyond the scope of its regulatory authority.  Decision Document, Appx. A, at 3.

85.     The Corps stated that it "does not regulate the overall construction or operation of pipelines, nor does it regulate the siting of any type of pipeline/utility line, or any substance within a pipeline."  Decision Document, Appx. A, at 4.

86.     The Corps claims the "social costs of carbon pollution are not within the Corps' regulatory authority."  Decision Document, Appx A, at 4.

## FIRST CAUSE OF ACTION:
## NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

87.     Plaintiff realleges each of the allegations in the preceding paragraphs.

88.     The National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.,* requires that all federal agencies, including the Corps, take a "hard look" at environmental consequences before taking a major federal action.

89.     The Corps' approval of a permit for the Line 3 oil pipeline is a major federal action.

90.     The NEPA "hard look" requires that federal agencies "have available, and carefully consider, detailed information concerning significant environmental impacts" before approving a project.  *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

91.      NEPA requires that federal agencies "guarantee [] that the relevant information [on environmental impacts] will be made available to the larger audience," including the general public and organizations such as Friends of the Headwaters, so they may play a meaningful "role in the decision-making process and the implementation of the decision."  *Id.*

92.     Before taking any "major Federal actions significantly affecting the quality of the human environment," federal agencies, including the Corps, must prepare a "detailed statement"

on "the environmental impact of the proposed action" and "any adverse environmental effects

which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C).

93.     To determine whether a permit or other federal action may significantly affect the

environment, and therefore require that a full EIS be conducted, a federal agency must consider

ten factors. 40 C.F.R. § 1508.27 (2019).[1] These factors include the degree to which:

   a.    The proposed action affects public health or safety;
   b.    The possible effects on the human environment are likely to be highly
         controversial;
   c.    The possible effects on the human environment are likely highly uncertain or
         involve unique or unknown risks;
   d.    The action may establish a precedent for future actions with significant effects or
         represents a decision in principle about a future consideration;
   e.    The action is related to other actions with individually insignificant but
         cumulatively significant impacts; and
   f.    The action may adversely affect an endangered or threatened species or its
         habitat.

94.     In Environmental Impact Statements, agencies including the Corps must consider all

direct, indirect, and cumulative impacts, and a "range of actions, alternatives, and impacts." 40

C.F.R. § 1508.25 (2019); 33 C.F.R. § 325, App. B(7)(b)(2)(iv)(C)(3).

---

[1] The Council on Environmental Quality (CEQ) revised its NEPA regulations after Enbridge submitted its application in this case. *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43, 304 (July 16, 2020). This complaint cites to the rules that were in effect during most of the Corps' environmental review in this case. Without express statutory authority to the contrary, rules do not apply retroactively. *Bower v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988). The Corps has incorporated the CEQ requirements by reference in its own regulations. 33 C.F.R. § 325, App. B (2). Notwithstanding the fact the Corps must apply the rules in effect when its decision was made, President Biden recently ordered the CEQ to update its guidance on consideration of greenhouse gas emissions from federal actions within the purview of NEPA. EXECUTIVE ORDER ON PROTECTING PUBLIC HEALTH AND THE ENVIRONMENT AND RESTORING SCIENCE TO TACKLE THE CLIMATE CRISIS, Executive Office of the President, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/, (Jan. 20, 2021). There is indication that more changes to the regulatory structure requiring deeper consideration of environmental impacts are forthcoming.

95.     "Direct" impacts are effects "caused by the action and occur[ring] at the same time and place."  40 C.F.R. § 1508.8(a) (2019).

96.      "Indirect" impacts are effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

97.     "Cumulative" impacts "result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.

98.     The agency's cumulative impact analysis serves to assess impacts that might be "individually minor, but collectively significant" over a period of time.  40 C.F.R. § 1508.7.

99.     "A meaningful cumulative impacts analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from those other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1319 (D.C. Cir. 2014).

100.     NEPA also requires consideration of "connected" actions in a single NEPA review. These are actions that "cannot or will not proceed unless other actions are taken previously or simultaneously" and "are interdependent parts of a larger action and depend on larger action for their justification."  40 C.F.R. § 1508.25 (2019).

101.     The Defendant Corps' regulations require that the NEPA analysis must "address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project

over which the district engineer has sufficient control and responsibility to warrant Federal review."  33 C.F.R. § 325, App. B(7)(b)(1).

102.    The Corps must analyze oil spill risks from pipelines as part of its permitting process. *E.g. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,* 255 F.Supp.3d 101, 133-34 (D.D.C. 2017).

103.    The Line 3 oil pipeline could not go forward in Minnesota unless and until the Corps approved Enbridge's requested permits.

104.    The Corps' analysis of direct impacts foresees that all impacts on wetlands will be temporary and reparable.  The Corps reached these conclusions, not based on its own expertly collected data and analysis, but by deferring to state utilities regulators' analysis.

105.    There are numerous direct impacts that may go unconsidered if the Corps is permitted to delegate its duty to analyze the environmental impacts of the project to state agencies with less specific expertise in water regulation.

106.    The Corps unlawfully segmented its NEPA review by separately considering various parts of the Line 3 oil pipeline.

107.    The Corps did not assess the indirect impacts of the Line 3 oil pipeline, including but not limited to the indirect impacts on waterbodies and wetlands beyond the specific areas being trenched or tunneled under.

108.    The Corps' cumulative impacts analysis focused solely on environmental impacts from construction at individual crossings.

109.    The Corps thus did not conduct a legally sufficient cumulative impacts analysis.

110.    The Corps failed to fully and fairly evaluate the risks and impacts of oil spills along the Line 3 oil pipeline route, especially at waterbody and wetland crossing points.

111.    The Corps failed to quantify or adequately evaluate the cumulative impacts on climate change, including the likelihood of increased lifecycle greenhouse gas emissions and their social costs from increased extraction and consumption of Canadian oil likely to result from approval of the Line 3 oil pipeline and connected actions.

112.    The social costs of climate change include increased flooding in Minnesota causing damage to property owned by members of Friends of the Headwaters and many other people, agencies and organizations, and the diminishment of habitat for animals that the members of Friends of the Headwaters and many other people hunt, fish, and watch for recreational and aesthetic purposes.

113.    The Corps did not prepare an Environmental Impact Statement for the Line 3 oil pipeline permits in Minnesota.

114.    The Corps' decision to not prepare an Environmental Impact Statement, but instead make a "finding of no significant impact," or "FONSI" (Decision Document at 128), violated NEPA because the Corps failed to fully and fairly consider all direct, indirect, and cumulative impacts from construction and operation of the Line 3 oil pipeline in reaching its decision.

115.    The Corps violated NEPA by failing to analyze all reasonable alternatives to accomplish the purpose and need of the proposed agency action, as required by 40 C.F.R. § 1502.14.

116.    The Corps did not consider alternatives such as expanding the capacity of Enbridge's existing Mainline pipelines, alternative routes that would avoid putting important and fragile freshwater resources at risk, or other pipeline projects underway or under consideration to transport crude oil from Alberta to global markets with fewer environmental risks.

117.     The Corps did not evaluate the "purpose and need" for the Line 3 oil pipeline project in light of current and projected reduced consumer demand for refined petroleum products, or in light of anticipated public policies to reduce reliance on fossil fuels.

118.     The Corps unlawfully concluded that it could defer to Minnesota state utility regulators to avoid having to independently consider need or any alternatives to the proposed route.

119.     The Corps' decision to make a finding of no significant impact and to not prepare an Environmental Impact Statement for the large Line 3 oil pipeline project through some of the most high-value freshwater resources in the United States violated NEPA and applicable NEPA regulations.

120.     The section 404 permits issued to Enbridge by the Corps to construct the Line 3 oil pipeline are invalid because such permits were not preceded by an environmental review process that complied with NEPA.  The Corps' granting of those permits was therefore arbitrary, capricious, and not in accordance with the law, in violation of the APA.  5 U.S.C. § 706.

**SECOND CAUSE OF ACTION:**
**CLEAN WATER ACT**

121.     Plaintiff realleges the allegations in the preceding paragraphs.

122.     The purpose of the Clean Water Act ("CWA") is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

123.     To meet that goal, the CWA prohibits the discharge of dredged or fill material into waters of the United States absent the Corps' issuance of a permit under section 404 of the CWA.  33 U.S.C. § 1344.

124.     The Corps may not grant a section 404 permit before taking "all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States."  40 C.F.R. § 230.91(c)(2).

125.     The Corps may not grant a section 404 permit if there is a "practicable alternative" to the project that would have less impact on the aquatic ecosystem.  40 C.F.R. § 230.10(a).

126.     If a project is not "water dependent," because it "does not require access to proximity to or siting within the special aquatic site in question to fulfill its basic purpose," then the availability of a less environmentally damaging practicable alternative must be presumed.  40 C.F.R § 230.10(a)(3).

127.     To determine the practicability of an alternative, the Corps must determine the "overall project purpose." 40 C.F.R. § 230.10(a)(2).

128.     The "overall project purpose" may not be defined so narrowly that it precludes the consideration of reasonable alternatives.

129.     While the Corps may consider the purpose of the project as stated by the applicant, the Corps "has a duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project."  *E.g., Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997) (citing 33 C.F.R. Pt. 325, App. B, §§ (9)(b)(5), (4)).

130.     The Corps must view the purpose of the project holistically because the alternatives consideration is not merely about preservation of the purpose of the project, but also about minimizing adverse impacts to the waters of the United States. 40 C.F.R. § 230.10(a).

131.      Enbridge's claimed purpose for the Line 3 oil pipeline project was to improve the safety of oil transportation through Minnesota by replacing the "old" Enbridge Line 3 with a "new" Line 3.  Decision Document at 16.

132.    The "old" Line 3 carries only lighter grades of oil, but the "new" Line 3 will carry predominantly heavy high-sulfur diluted bitumen.

133.    The "old" Line 3 carries up to 390,000 barrels per day, but the "new" Line 3 will carry 760,000 bpd with the ability to expand to over 900,000 bpd.

134.    The "old" Line 3 follows the route of Enbridge's other "Mainline" pipelines, but almost half of the "new" Line 3 will follow a new route and put additional natural resources at risk.

135.    The actual "overall project purpose" of the "new" Line 3 oil pipeline project is to increase the amount of Canadian "tar sands" oil that will reach global markets.

136.    Nevertheless, the Corps simply agreed that the purpose of the project was to "increase safety" of transporting crude oil.  Decision Document at 17.

137.    The Corps did not analyze alternatives including repair and replacement of sections of other existing Enbridge pipelines, or other pipeline projects transporting Canadian diluted bitumen to the Gulf Coast and other ports, or routing any new pipelines away from fragile and vital freshwater resources.

138.    The Corps did not conduct its own independent evaluation of the Line 3 oil pipeline project's purpose and need, and, instead, deferred to the decision of the Minnesota Public Utilities Commission ("PUC") to grant Enbridge a "Certificate of Need" under state law.

139.    The Corps did not consider Line 3 oil pipeline route alternatives other than the one permitted by the PUC.

140.    By failing to fully and fairly consider and evaluate potentially less environmentally damaging practicable alternatives to Enbridge's proposed Line 3 oil pipeline and its route, the Corps violated the CWA and its own implementing regulations.

141.    Before issuing a section 404 permit, the Corps must determine that the project is in the "public interest," based on "an evaluation of probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."  33 C.F.R. § 320.4(a).

142.    The Corps' review must be "independent."  33 C.F.R. § 320.4(q).

143.    The Corps did not conduct a lawful public interest review of the proposed Line 3 oil pipeline.

144.    The Corps considered Enbridge's claimed benefits of the Line 3 oil pipeline as a whole.

145.    The Corps, however, limited the scope of its consideration of adverse impacts to water resources at specific water crossings, and the Corps failed to consider the adverse environmental impacts of the Line 3 oil pipeline as a whole.

146.    The Corps failed to consider the additional lifecycle greenhouse gas emissions likely to result from the Line 3 oil pipeline.

147.    The Corps failed to consider the social costs of the resulting climate change from these greenhouse gas emissions.

148.     The Corps' public interest review violated the CWA and its implementing regulations.

149.    For these reasons, the Corps permits were contrary to law, arbitrary and capricious, and, therefore, violated the APA.  5 U.S.C. § 706.

## **REQUESTED RELIEF**

**WHEREFORE Plaintiff respectfully requests that this court issue an Order granting the following relief.**

1.      Declaring that the permits granted by the Defendant Corps for the Line 3 oil pipeline violate NEPA, the CWA, the Corps' regulations, and the APA;

2.      Vacating the Defendant Corps' permits for the Line 3 oil pipeline;

3.      Preliminarily and permanently enjoining construction of the Line 3 oil pipeline;

4.      Remanding the case to the Defendant Corps and ordering the Corps to conduct a full Environmental Impact Statement for the Line 3 oil pipeline project before considering any permit applications;

5.      Awarding Plaintiff's reasonable fees, costs, and expenses, including attorneys' fees, in connection with this litigation; and

6.      Granting such other and further additional relief as the Court deems just and equitable.


Respectfully submitted this January 21, 2021


/s/Howard A. Learner
Howard A. Learner
IL Bar # 3127346; DC Bar ID: IL0027
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org

*/s/ Scott Strand*
Scott R. Strand
MN Bar #0147151
[*Pro Hac Vice Application Pending*]
Environmental Law and Policy Center
111 4th Ave. N. #305
Minneapolis, Minnesota 55401
T: (612)-386-6409
sstrand@elpc.org