**EXHIBIT A**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE HEADWATERS, | |
| Plaintiff, | Case No. |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | |
| Defendant. | |

**CORPS DECISION DOCUMENT AND APPENDIX**



**US Army Corps of Engineers ®**
St. Paul District

# Enbridge Line 3 Replacement Project

## Department of the Army Environmental Assessment and Statement of Findings

## November 23, 2020



**US Army Corps
of Engineers** ®

St. Paul District

# Department of the Army Environmental Assessment and Statement of Findings for the Enbridge Line 3 Replacement Project

This document constitutes the Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for the Enbridge Line 3 Replacement project and is referred to as the Decision Document for this project.

| | |
|---|---|
| Lead Federal Agency: | U.S. Army Corps of Engineers |
| Applicant: | Enbridge Energy, Limited Partnership |
| Applicant Reference Number: | MVP-2014-01071-CLJ |
| Responsible Official: | COL Karl Jansen<br>District Commander<br>180 East Fifth Street, Suite 700<br>St. Paul, MN 55101 |
| For Information Contact: | Chad Konickson<br>Regulatory Division Chief<br>180 East Fifth Street, Suite 700<br>St. Paul, MN 55101<br>(651) 290-5364 |

## SUBJECT

Department of the Army Environmental Assessment and Statement of Findings for the Above-Referenced Standard Individual Permit Application

This document constitutes the Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for the subject application

Due to multiple agency approvals needed for this Project, the Corps and other regulatory agencies worked collaboratively to leverage expertise and information, and to maximize consistency in regulatory requirements where allowed by respective agency policies to assist in minimizing impacts to aquatic resources as well as reduce duplication in regulatory requirements.

## 1.0   INTRODUCTION AND OVERVIEW

Information about the proposal, subject to one or more of the Corps' regulatory authorities, is provided in Section 1. Detailed evaluation of the activity is found in Sections 2 through 11 and findings are documented in Section 12 of this decision document. Further, summary information about the activity including administrative history of actions taken during Project evaluation is attached (ORM2 Summary) and incorporated in this memorandum.

## 1.1   ACTIVITY LOCATION

The proposed Enbridge Line 3 Replacement Project (Project) route crosses multiple waterways in Minnesota and in North Dakota. The designated route crosses portions of Kittson, Marshall, Pennington, Polk, Red Lake, Clearwater, Hubbard, Wadena, Cass, Crow Wing, Aitkin, St. Louis, and Carlton Counties in Minnesota, and a portion of Pembina County in North Dakota. The corridor for the Designated Route is located in the following Public Land Survey System (PLSS) locations:

| Township | | Range | Section(s) |
|---|---|---|---|
| 48 | 15 | 31 | |
| 48 | 16 | 19, 27, 28, 29, 30, 34, 35, 36 | |
| 48 | 17 | 6, 7, 8, 9, 13, 14, 15, 16, 17, 22, 23, 24 | |
| 48 | 18 | 1 | |
| 49 | 18 | 6, 7, 8, 16, 17, 21, 22, 26, 27, 35, 36 | |
| 49 | 19 | 1 | |
| 50 | 19 | 7, 8, 16, 17, 21, 22, 26, 27, 35, 36 | |
| 50 | 20 | 1, 2, 12 | |
| 51 | 20 | 19, 20, 21, 27, 28, 34, 35 | |
| 51 | 21 | 19, 20, 21, 22, 23, 24 | |
| 51 | 22 | 19, 20, 21, 22, 23, 24 | |
| 51 | 23 | 22, 23, 24, 27, 28, 29, 30 | |

| | | |
|---|---|---|
| 51 | 24 | 25, 26, 27, 28, 29, 31, 32 |
| 51 | 25 | 31, 32, 33, 34, 35, 36 |
| 51 | 26 | 31, 32, 33, 34, 35, 36 |
| 51 | 27 | 25, 26, 27, 28, 36 |
| 138 | 28 | 6 |
| 138 | 29 | 1, 7, 8, 9, 10, 11, 12, 14, 15 |
| 138 | 30 | 7, 8, 9, 10, 11, 12 |
| 138 | 31 | 5, 6, 8, 9, 10, 11, 12 |
| 138 | 32 | 1, 2, 3, 4, 5, 6 |
| 138 | 33 | 1, 2, 3, 4, 5, 6 |
| 138 | 34 | 1 |
| 139 | 25 | 1, 2, 3, 4, 7, 8, 9 |
| 139 | 26 | 11, 12, 14, 15, 19, 20, 21, 22 |
| 139 | 27 | 13, 14, 15, 19, 20, 21, 22, 24 |
| 139 | 28 | 24, 25, 26, 27, 28, 29, 31, 32 |
| 139 | 34 | 31, 32, 33, 34, 35, 36 |
| 139 | 35 | 5, 6, 7, 18, 19, 30, 31, 32, 33, 34, 35, 36 |
| 140 | 35 | 6, 7, 18, 19, 20, 29, 32 |
| 141 | 35 | 5, 8, 17, 20, 29, 31, 32 |
| 142 | 35 | 5, 8, 17, 20, 29, 32 |
| 143 | 35 | 5, 8, 17, 20, 21, 29, 32, 33 |
| 144 | 35 | 19, 29, 30, 32 |
| 144 | 36 | 2, 11, 12, 13, 24 |
| 145 | 36 | 2, 11, 14, 23, 26, 35, 36 |
| 146 | 36 | 7, 8, 9, 10, 14, 15, 23, 26, 35 |
| 146 | 37 | 2, 3, 11, 12 |
| 147 | 37 | 5, 8, 16, 17, 21, 27, 28, 34 |
| 148 | 37 | 6, 7, 8, 17, 20, 29, 32 |
| 149 | 37 | 29, 30, 32 |
| 149 | 38 | 6, 7, 8, 9, 15, 16, 22, 23, 24, 25 |
| 149 | 39 | 1, 2, 3 |
| 150 | 39 | 19, 28, 29, 30, 33, 34 |
| 150 | 40 | 6, 7, 8, 9, 14, 15, 16, 23, 24 |
| 150 | 41 | 1, 2 |
| 151 | 41 | 19, 28, 29, 30, 33, 34, 35 |
| 151 | 42 | 4, 5, 9, 10, 14, 15, 23, 24 |
| 152 | 42 | 30, 31, 32 |
| 152 | 43 | 4, 5, 9, 10, 14, 15, 23, 24, 25 |
| 153 | 43 | 18, 19, 20, 29, 32, 33 |
| 153 | 44 | 2, 3, 11, 12, 13 |
| 154 | 44 | 18, 19, 20, 28, 29, 33, 34 |
| 154 | 45 | 2, 11, 12, 13 |
| 155 | 45 | 7, 17, 18, 20, 21, 28, 33, 34, 35 |
| 155 | 46 | 1, 2, 3, 4, 12 |
| 156 | 46 | 7, 17, 18, 20, 21, 28, 33 |
| 156 | 47 | 1, 2, 12 |
| 157 | 47 | 6, 7, 8, 16, 17, 21, 22, 26, 27, 35, 36 |

| 157 | 48 | 1 |
| 158 | 48 | 5, 6, 8, 9, 15, 16, 22, 23, 26, 35, 36 |
| 159 | 48 | 31 |
| 159 | 49 | 4, 5, 9, 10, 14, 15, 23, 25, 26, 36 |
| 160 | 49 | 30, 31, 32 |
| 160 | 50 | 4, 5, 9, 10, 14, 15, 23, 24, 25 |



Figure 1.  Line 3 Replacement Project Overview Map

## 1.2   PROJECT DESCRIPTION

The applicant, Enbridge Energy Limited Partnership (Enbridge), seeks a Department of the Army (DA) permit for construction-related activities in waters of the U.S. associated with the proposed Project. The Project involves the replacement of approximately 282 miles of the existing 34-inch-diameter Line 3 pipeline from the Red River valve in North Dakota to the Minnesota/Wisconsin border, with 330 miles of new 36-inch-diameter pipeline and associated facilities along the Project's Designated Route in Minnesota. Construction activities would result in temporary discharges of fill material into 1,049.58 acres of wetlands, 1.13 acres of streambed, and permanent discharges of fill material into 9.97 acres of wetlands. Approximately 130.21 acres of the total acres temporarily impacted would be permanently converted from a forested or scrub-shrub vegetation community to an herbaceous vegetation community.  Permanently converted areas are within the 50-foot permanent easement where the pipeline corridor would be maintained by periodic mowing and clearing activities.  Forested

and scrub-shrub vegetation communities outside of the permanent easement would be allowed to regenerate.

A total of 227 waterbodies would being crossed by the Project.  Ditches account for 95 of the waterbodies, many of which are roadside ditches.  Seventy-four of the ditches would be crossed via a trench method and 21 would be crossed via bore method.   The proposal would cross 132 streams (84 with perennial flow, 16 with intermittent flow, 20 with ephemeral flow, and 12 streams where no flow regime was identified).  Of the streams, 21 would be crossed via Horizontal Directional Drill (HDD) or bore method, and 111 will be crossed via a trench method. Waterbodies described throughout the EA include two navigable rivers subject to Section 10 of the Rivers and Harbors Act (Section 10), and tributaries which includes streams and ditches.

The overall Project features include mainline construction activities, equipment upgrades, construction of temporary workspaces, access roads, cathodic protection systems, and an expansion of the existing Clearbrook Terminal footprint. Additionally, 37 above-ground mainline valves are proposed near major rivers, population centers, at pump stations, and in environmentally sensitive areas along the Designated Route. Four existing pump stations would be expanded and four new pump stations within the permanent pipeline right-of-way are also proposed. Expansion of existing pump stations would occur at Donaldson (Kittson County), Viking (Marshall County), Plummer (Red Lake County) and Clearbrook (Clearwater County), and installation of new pump stations would occur at Two Inlets (Hubbard County), Backus (Cass County), Swatara (Aitkin County) and North Gowan North (St. Louis County).  Of the 37 total mainline valves to be constructed, 13 valve sites include a regulated discharge required for construction of an access road.  In addition, six of the eight pump stations (Donaldson, Plummer, Clearbrook Terminal, Two Inlets, Swatara, and Gowan) include a regulated discharge into waters of the U.S.

The Project would be constructed using typical industry-accepted pipeline construction methods, following a sequential process which includes: survey and staking, clearing and site preparation, pipe stringing, bending, welding, coating, trenching, lowering-in, backfilling, hydrostatic testing, cleanup, and restoration. In most areas, these construction processes would proceed in an assembly-line fashion with construction crews in five independent spreads moving along the construction right-of-way. Construction crews would utilize mats or temporary access roads for ingress/egress to Project workspaces where travel down the right-of-way is not feasible.

Enbridge would permanently deactivate (i.e., permanently remove from service) the existing Line 3 pipeline following construction and commissioning of the Project in accordance with Pipeline and Hazardous Materials Safety Administration (PHMSA) regulations. The EPA-Enbridge Consent Decree arising out of two oil spills that occurred in 2010 from two Enbridge Lakehead System pipelines in Michigan requires Enbridge to purge remaining oil from Existing Line 3 by running a cleaning pig through the line within 90 days after Existing Line 3 is taken out of service. The Consent Decree also requires Enbridge to complete final clean-out and decommissioning of Existing Line 3 within one year thereafter. Once the cleaning process has been completed and passed inspection, the existing pipeline would be physically disconnected from pump station terminals. Mainline valves would be closed and disconnected so that they could not be operated.  Enbridge engineers would then determine if additional segmentation of

the pipeline would be needed to prevent the pipe from acting as a conduit for water or residual oil, either within or outside of the pipe.  The pipeline would be capped on the open ends of the segments.  Enbridge would be required to continue to monitor and maintain the abandoned Line 3 right-of-way in accordance with PHMSA regulations indefinitely. Enbridge notes that this monitoring would enable it to identify and assess impacts to the public or the environment caused by the abandoned Line 3. Enbridge would take measures to mitigate identified potential risks, and cathodic protection would be maintained for the abandoned pipeline to prevent corrosion. In addition to Enbridge's own monitoring, Minnesota Office of Pipeline Safety (MNOPS) is authorized by PHMSA to provide local regulatory oversight. This includes safety inspections of operating pipelines and during decommissioning, as well as inspections during integrity digs. Once deactivation steps have been completed, portions of pipeline may be removed, including exposed segments of the pipeline and segments in areas where landowners have requested removal after the appropriate permits and authorizations have been obtained. Enbridge would consult with the Corps and apply for the appropriate permit(s) to conduct any activities that may include dredge and fill activities within waters of the United States prior to commencing permanent deactivation of existing Line 3.

## 1.3   PROPOSED AVOIDANCE AND MINIMIZATION MEASURES

In April 2015 Enbridge filed separate applications for a certificate of need (CN) and routing permit (RP) for the proposed Project with the Minnesota Public Utilities Commission (MPUC). The MPUC authorized the State of Minnesota Department of Commerce, Energy Environmental Review and Analysis Unit (DOCEERA) to prepare an environmental impact statement (EIS). Details of this process are included in Section 1.5 below.  During the scoping process for the State EIS, Enbridge studied a variety of major route alternatives and minor route variations in developing its preferred route for the Project. In selecting its preferred route, Enbridge considered constraints, opportunities, technical guidelines, potential environmental impacts, and economic feasibility. The geographic requirements necessary to meet Project purpose and objectives are that the Project must cross into Minnesota in Kittson County, make deliveries to and interconnect with other Enbridge and third-party pipelines at the Clearbrook Terminal, and exit Minnesota in Carlton County to connect with the Superior Terminal in Wisconsin. Enbridge selected locations for new pump stations based on the results of their hydraulic studies to optimize pipeline performance. Enbridge also considered and evaluated other location factors that are important in minimizing impacts to the environment and human settlement. Factors considered prior to selection of its preferred route included, but were not limited to, the following:

• Avoiding sensitive areas, such as state forests;
• Avoiding wetlands and/or minimizing wetland impacts where possible;
• Minimizing tree clearing;
• Avoiding close proximity to historic properties, residential areas, and communities;
• Ensuring reasonably level grade;
• Ensuring that the site spacing provides sufficient clearances to allow effective operation and maintenance of all components;
• Ensuring reasonable highway access with minimal upgrading of municipal roads;
• Ensuring reasonable access to suitable power and utilities;
• Ability to locate on the correct side of the mainline corridor to prevent pipe cross-overs for

station suction and discharge lines; and,
• Land availability.

The Environmental Protection Plan (EPP) submitted with the permit application and subsequent revisions provides details regarding minimization of wetland & waterbody impacts from construction activities along the Designated Route. Avoidance and/or minimization measures that are generally applicable to all wetland crossings include the following: construction workspace reductions in wetlands and at waterbody crossings; Right-of-way clearing using low ground-pressure equipment or operated off timber mats to limit disturbance to wetlands; locating additional temporary workspaces (ATWS) outside of wetlands to the extent practicable to minimize the area of disturbance; limit grading to trench areas and minimize mechanized land clearing within construction workspaces to the extent practicable; reduce area of vegetative clearing along the HDD drill path; conduct vegetative clearing at stream banks for the HDD drill path or response to inadvertent release of drilling mud only when needed; maintain roots where vegetative clearing is required to reduce potential for erosion; no grading or stump removal over the HDD path except at limited locations where free-span engineered bridges will be installed, or as needed to assist with staging to respond to an inadvertent release of drilling mud; install and maintain erosion control devices and utilize best management practices to prevent sediment flow into wetlands; and, strip and segregate up to 1 foot of the organic layer and/or topsoil (i.e., "O" and/or "A" horizons) from the trench line and separate from trench spoil to preserve the native seed stock from wetlands in areas without standing water. In standing water wetlands, the Contractor will attempt to segregate as much of the soil surface as possible based on site and saturation conditions.

## 1.4    PROPOSED COMPENSATORY MITIGATION

Enbridge indicated they would provide compensatory wetland mitigation for unavoidable permanent fill and for wetland type conversions and for temporal loss of wetland functions, in accordance with the Corps and EPA Final Rule regarding Compensatory Mitigation for Losses of Aquatic Resources 33 CFR Parts 325 and 332 and 40 CFR Part 230, 33 CFR Part 332 (2008) (Mitigation Rule), and the 2009 Final St. Paul District Policy for Wetland Compensatory Mitigation in Minnesota (District Mitigation Policy).

The agencies developed a collaborative framework to inform the compensatory mitigation requirements necessary to offset unavoidable wetland impacts to wetlands with unique features and functions in accordance with the Federal Mitigation Rule and District Mitigation Policy. The Corps, the Minnesota Pollution Control Agency (MPCA), and the Minnesota Department of Natural Resources (MDNR) recognized a need to augment compensation requirements for impacts to wetlands with unique features.  Consideration was given to wetland and impact type, impact duration and location, and anticipated effects to habitat, biodiversity, and hydrology. Enbridge would secure Corps-approved wetland mitigation bank credits to compensate for unavoidable permanent wetland impacts in watersheds crossed by the Project.  In addition to compensatory mitigation, Enbridge would provide an assurance bond for financial assurances to ensure a high level of confidence that the restoration of wetlands and waters to pre-construction conditions will be successfully completed in accordance with the performance standards.  Final compensatory mitigation is outlined in the L3 Compensatory Wetland Mitigation Plan dated October 2020

Enbridge proposes to conduct post-construction wetland monitoring efforts during the growing season in years 1, 3, and 5 at all wetland locations for the purpose of adaptively managing effects of unanticipated wetland impacts. The initial stage of monitoring would occur to ensure proper maintenance of erosion and sediment control and related site-restoration structures until affected areas stabilize with new vegetation. Enbridge would monitor wetlands for stabilization, crowning, subsidence, restoration of hydrologic features (e.g., ponding or water impoundment), invasive species (e.g., type, density, and distribution as compared to preconstruction conditions), vegetative cover and species composition. The primary focus of the initial monitoring would be on the development of plant communities in affected areas and the restoration of topography to match pre-construction conditions. Enbridge would provide formal reports of the monitoring results to the Corps, MPCA, and MDNR by December 31st of each monitoring year. Specific monitoring details are outlined in the Post-Construction Wetlands and Waterbody Monitoring Plan dated November 2020.

## 1.5   EXISTING CONDITIONS AND ANY APPLICABLE PROJECT HISTORY

The existing Enbridge Line 3 crude oil pipeline is a 34-inch-diameter, 1,097-mile long pipeline that extends from Alberta, Canada to Superior, Wisconsin. Construction of Line 3 began in 1962 as 34-inch parallel loops to Enbridge's Line 2 pipeline to create additional capacity. Enbridge constructed additional loops until a continuous 34-inch line was completed, referred to as Line 3, and then separated from Line 2 in 1968. The crude oil transported in Line 3 has varied over its many years of operation based on type of crude produced, shipper demand, and system operations. When Enbridge originally placed the line into service, it transported only light crude oil. Subsequently, Enbridge used Line 3 to transport medium and heavy crudes as well. It was designed to transport all grades of crude oil, and the type of crude oil transported upon replacement would be based on shipper demand as it is currently and was in the past.

The historic annual average operating capacity of Line 3 was approximately 760,000 barrels per day.Enbridge voluntarily reduced the operating pressure and capacity on Line 3 to 390,000 barrels per day due to pipeline integrity issues, which are discussed below. The actual capacity of the pipeline is dependent on the type of crude oil being transported through the line and the presence or absence of pressure restrictions on the pipeline. Full implementation of the Line 3 Pipeline Replacement Project would restore the line to its historic annual average throughput capacity of approximately 760,000 barrels per day, assuming the pipeline will transport of both heavy and light crudes.

Approximately 90 percent of the Project route would be co-located with other Enbridge pipelines; third-party pipelines or utilities; roads, railroads or highways. The remainder of the route would be new corridor that is not adjacent to existing infrastructure (Greenfield route). The term "Greenfield" refers to land that has not previously been used for another pipeline, utility, road, or railroad right-of-way. The term Greenfield is applied to land that is more than 250 feet away from an existing parallel pipeline, utility, road, or railroad right-of-way.

The history of the environmental review process and of the permit application history for the Project is summarized below.  The summary also includes significant actions related to the Minnesota Public Utilities Commission (MPUC) process in designating the route alignment. The MPUC is the Minnesota unit of government with decision authority over oil and gas pipeline route decisions. The Designated Route approved by the MPUC in its May 1 Order is the corridor within which Enbridge is legally obligated to construct the Project under Minnesota law. The Corps did not select the Designated Route and does not have authority over the entire pipeline. The Corps' Section 404/10 review includes segments of the overall Project comprised of waters where regulated activities would occur as well as nearby uplands where the Corps has sufficient control and responsibility to consider effects due to the relationship of the work in those upland areas to work in waters.

- o April 24, 2015: Enbridge submits applications to the Minnesota Public Utilities Commission (MPUC) for a Certificate of Need (CN) and Route Permit (RP) to construct and operate the Line 3 Project along Enbridge's preferred route. MPUC asks the Minnesota Department of Commerce, Energy Environmental Review and Analysis (DOCEERA) to prepare an Environmental Impact Statement ("EIS") in cooperation with the MDNR and MPCA to facilitate the review of Enbridge's CN and RP applications for the Project, in accordance with Minnesota Administrative Rules Chapter 4410.

- o September 30, 2015: Enbridge submits Section 404/10/408 permit application for the Line 3 Project.

- o November 9, 2015: Enbridge submits additional resource spreadsheets, a tabulated list of property owners, and requests that the Corps not issue a public notice for the permit application at this time.

- o April 11, 2016: DOCEERA Issues Scoping EAW and Draft Scoping Decision Document.

- o April 25, 2016: through May 26, 2016: DOCEERA and MPUC hold 12 public meetings on the scoping EA for the State EIS.

- o November 30, 2016: MPUC approves DOCEERA scoping decision.

- o December 5, 2016: DOCEERA issues final EIS scoping decision document and issues EIS preparation notice for Line 3 Pipeline Replacement Project.

- o February 23, 2017: Segment 18 of Line 3 in Wisconsin between the Minnesota state line and Superior, Wisconsin is authorized under DA permit 2014-00914-RMG.

- o May 15, 2017: DOCEERA issues the State's Draft EIS for the Line 3 Project and conducts Draft EIS informational meetings with comment period ending July 10, 2017.

o August 17, 2017: DOCEERA issues the State's Final EIS (FEIS) for the Line 3 Project.

o September 26, 2017 through October 25, 2017:  MPUC holds 16 public hearings in eight different counties, conducted by an Administrative Law Judge (ALJ) from the MN Office of Administrative Hearings to receive comments on the CN and RP applications for the proposed Line 3 Project.

o November 1, 2017 through November 17, 2017: ALJ conducts evidentiary hearings on certificate of need and route permit matters at MPUC.

o December 7, 2017: MPUC deems the State's FEIS inadequate on the basis of four specific issues.

o December 14, 2017: MPUC issues an order which concluded that the Final EIS could not be found adequate until it contained specific additional information. The Commission requested the Department of Commerce to prepare the additional information and submit to the Commission by February 12, 2018.

o February 7, 2018: Enbridge submits supplemental permit application information for its preferred route.

o February 12, 2018: The DOCEERA issues the revised FEIS.

o April 23, 2018: ALJ issues Findings of Fact, Conclusions of Law, and Recommendation on the Line 3 Replacement Project Certificate of Need and Route Permit applications.

o May 1, 2018: The MPUC issues a written order finding the revised FEIS adequate.

o June 28, 2018: The MPUC grants a CN for the Project, subject to modifications.

o September 5, 2018: The MPUC issues a written Order granting the CN - as modified and requiring filings.

o September 21, 2018: Enbridge submits revised DA permit application for the Designated Route and a separate Section 408 review request for the Lost River crossing.

o October 26, 2018: The MPUC issues a written order granting the RP identifying Enbridge's Preferred Project Route to include two route segment alternatives (RSA-05 and RSA-22) as the MPUC's Designated Route.

o   December 20, 2018: The Corps issues a joint Public Notice for the DA permit application and for the Section 408 request. The PN provides for a 30-day comment period. An accompanying press release is issued.

o   January 18, 2019: The Corps issues a second Public Notice and press release to extend the comment period for the joint Public Notice an additional 30 days, to February 21, 2019. (60 days total)

o   January 31, 2019:  North Dakota Department of Health issues Individual Section 401 Water Quality Certification for portion of project being reviewed by St. Paul District in North Dakota.

o   March 25, 2019: Corps submits Biological Assessment (BA) to USFWS and requests informal consultation seeking concurrence on effect determinations to listed species and habitat within the federal action areas.

o   April 15, 2019: Enbridge submits revisions to the September 2018 permit application (updated tables, workspace revisions, and construction plans)

o   June 3, 2019: The State Supreme Court rules the EIS inadequate for failing to evaluate the consequences of an oil spill within the Lake Superior Watershed. The CN and RP were remanded to the MPUC.

o   July 2, 2019: USFWS concurs with Corps' effect determinations regarding federally-listed threatened and endangered species within the permit areas of the linear Project.

o   September 27, 2019: The MPCA issues a denial (without prejudice) of the Section 401 Certification.

o   October 1, 2019: The MPUC requests the DOCEERA to revise its EIS for the Project to include the potential impact of an oil spill into the Lake Superior watershed. MPUC requested a 60-day suspense date to submit the report.

o   October 8, 2019: Corps requests additional information from Enbridge to address Public Notice comments and questions regarding wetland and impact characterization, construction methods, impact minimization, post-construction monitoring, and compensatory mitigation.

o   November 15, 2019:   Enbridge re-submitted request to MPCA for Section 401 Water Quality Certification.

o   December 6, 2019:  Enbridge submits response to October 8, 2019 Corps request.  Response identifies minor changes in Project workspaces, resulting in reductions to temporary and permanent wetland impacts.  Submittal also included updated tables and maps, Environmental Protection Plan, Compensatory Mitigation Plan, and Post Construction Monitoring Plan (PCMP).

o   December 19, 2019:  MPCA request Corps consider extending the timeframe for decision on the on the Section 401 Water Quality Certification for the Project to August 15, 2020.

o   January 8, 2020:  Corps grants MPCA request, extending Section 401 Water Quality Certification decision timeframe to August 15, 2020.

o   February 3, 2019:  MPUC finds the revised FEIS for the Project to be adequate. Additionally, the MPUC approves and re-issues the CN and RP for the Project.

o   February 4, 2020:  Corps issues Public Notice and press release requesting public comment on the revisions submitted by Enbridge on December 6, 2019. Comment period is 30 days and expires on March 6, 2020.

o   February 26, 2020: MPCA release of draft Section 401 Water Quality Certification for 30 day comment period.

o   May 7, 2020: Letter response from MN State Historic Preservation Office (SHPO) concurring with the Corps' No Adverse Effect finding and National Register of Historic Places eligibility determinations. Coordination with SHPO and responsibilities under Section 106 of the NHPA are complete.

o    June 3, 2020:  MPCA grants contested case hearing after receiving request from Project opponents. MPCA requests an extension of the Water Quality Certification decision to November 14, 2020.  Corps grants extension of certification decision.

o   August 24, 2020:  MPCA contested case hearing concludes.

o   October 16, 2020: ALJ Report and Final Recommendation in the matter of the Line 3 Replacement Draft Section 401 Water Quality Certification issued.

o   November 12, 2020:  Individual Section 401 Water Quality Certification issued by MPCA.

## 1.6   PERMIT AUTHORITY

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), and Section 14 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 408) (commonly referred to as Section 408).

## 2.0   SCOPE OF REVIEW

## 2.1   Determination of scope of analysis for National Environmental Policy Act (NEPA)

The scope of analysis includes the specific activity requiring a Department of the Army permit. Other portions of the Project are included because the Corps does have sufficient control and responsibility to warrant federal review.

When determining whether there is sufficient control and responsibility to include portions of the project beyond the regulated activities in waters, the Corps considered as appropriate the following factors from Appendix B of 33 CFR part 325.

First, almost all regulated activities associated with the overall project comprise separate crossings that are "merely links" in a corridor type project.  In other words, much of the corridor project is located in uplands and does not involve regulated work in waters of the U.S.   A total of 227 waterbodies scattered across approximately 340 miles of the entire corridor are proposed to be impacted by discharge of fill material associated with trenching and construction activities of the mainline. In addition, less than 1% of the overall work in waters (9.97 acres of wetland impact of the total 1059.55 acres of wetland impact) would occur in association with the non-linear aspects of the overall project, to include expanding three pump stations at the following existing facilities: Donaldson (Kittson County), Plummer (Red Lake County), and Clearbrook (Clearwater County); and installing three new pump stations and associated electrical service at the following locations in the new corridor extending south and east of Clearbrook: Two Inlets (Hubbard County), Swatara (Aitkin County), and North Gowan North (St. Louis County).

Second, the Corps considered the extent to which there are aspects of works in uplands in the immediate vicinity of the regulated activity that affect the location and configuration of the regulated activity.  For linear crossings, the distance from each waterbody crossing location to a point in uplands where the pipe can be configured to follow a different alignment reflects the area that affects the location and configuration of the regulated activity.

Third, the Corps considered the extent to which the entire project will be within Corps jurisdiction.  Approximately 24% percent of the overall project comprises activities in waters of the U.S.

**Final description of scope of analysis:**
Based on the above considerations, the Corps concluded that the scope of analysis includes the regulated activities in waters of the U.S. associated with linear crossings as well as uplands adjacent to, and in some cases between, waterbodies where the Corps has sufficient control and responsibility to expand its analysis.  For waters with regulated activities that are distant from one another, the scope extends on either side of those waters to the points in uplands where the pipe could be configured to follow a different alignment.  Some waterbody crossings are in proximity to one another such that alternative alignments cannot be configured in the narrow uplands in between those waters.  In these instances, the scope extends to include

those waterbody crossings and adjacent and in between narrow uplands to the point where alternative alignments can be configured. The Corps also determined the scope includes the waters and uplands to be impacted by pump station construction and the Clearbrook terminal expansion.  This scope for NEPA purposes aligns with the action area for Section 7 of the Endangered Species Act and permit area for Section 106 of the NHPA as further described below.  The scope does not extend to the entire pipeline construction, or operation, because the Corps does not have sufficient control and responsibility over the entire project to warrant an expanded analysis.

## 2.2    Determination of the "Corps action area" for Section 7 of the Endangered Species Act (ESA)

The Corps action area includes all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.   The Federal action being considered is issuance of permit for activities regulated under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.  Direct effects are those effects that are caused by the proposed action (i.e., the regulated activity in waters of the U.S.) and occur at the same time and place.  Indirect effects are those that are caused by the proposed action (i.e., the regulated activity in waters of the United States) and are later in time, but are still reasonably certain to occur.  The action area for this project is coincident with the areas described above for the NEPA scope of analysis.

## 2.3    Determination of permit area for Section 106 of the National Historic Preservation Act (NHPA)

The permit area includes those areas comprising waters of the United States that will be directly affected by the proposed work or structures, as well as activities outside of waters of the U.S. for which all three tests identified in 33 CFR 325, Appendix C(1)(g)(1) have been met. This includes installation of the pipe and access roads in uplands immediately adjacent to the aquatic resource.

1)      *"Such activity would not occur but for the authorization of the work or structures within the waters of the United States"*

But for authorizing the discharge of fill material into the aquatic resources for the installation of the pipe and access roads, the upland activities immediately adjacent to these regulated activities (discharge for permanent or temporary dredge or fill material) to a point where alternative configurations could be proposed would not occur.    Upland activities associated with the expansion of three pump stations and construction of three new pump stations would not occur but for the authorizing of the discharge of dredged and fill material associated with the expansion or construction of the pump stations.

2)      *"Such activity must be integrally related to the work or structures to be authorized within waters of the United States.  Or, conversely, the work or structures to be authorized must be essential to the completeness of the overall Project or program"*

The regulated work in waters associated with the installation of the pipe and temporary access roads is essential to activities in uplands to a point where alternative configurations could be proposed. Work in waters for non-linear features, including the expansion of three existing pump stations and construction of three new pump stations, is essential to the activities in the uplands.

*3)      "Such activity must be directly associated (first order impact) with the work or structures to be authorized"*

The activities in uplands to a point where alternative configurations could be proposed are directly associated with the work in waters of the U.S. to be authorized.  The activities in uplands for the expansion of three pump stations and construction of three new pump stations is directly associated with the work in waters of the U.S. to be authorized.

**Final description of the permit area:**
The permit area includes the regulated activities in waters of the U.S. associated with linear crossings as well as uplands adjacent to, and in some cases between, waterbodies where the Corps have sufficient control and responsibility to expand its analysis.  For waters with regulated activities that are distant from one another, the permit area extends on either side of those waters to the points in uplands where the pipe could be configured to follow a different alignment.  Some waterbody crossings are in proximity to one another such that alternative alignments cannot be configured in the narrow uplands in between those waters.  In these instances, the permit area extends to include those waterbody crossings and adjacent and in between narrow uplands to the point where alternative alignments can be configured. The Corps also determined the permit area includes the waters and uplands to be impacted by pump station construction and the Clearbrook terminal expansion.

In order to determine the Area of Potential Effects (APE), the Corps considered the nature of the activities in the permit area, which are proposed to include primarily temporary construction work in waters of the U.S. and adjacent uplands, such as vegetation clearing, excavation and filling.  Audible or atmospheric effects resulting from activities in the permit area would be temporary and limited in their extent.  Potential for changes in the use or character of a property would also be limited, particularly where pipeline construction is within an existing utility corridor. About 80 percent of the project would be co-located with, or parallel to, existing cleared and maintained corridors of pipelines, roads and electrical transmission lines, or constructed through agricultural areas with little change above ground.  Along these co-located areas, the installation of L3R would result in minimal, if any, visual impacts.  The Corps reviewed an APE that includes the permit area plus an area of 200 feet in all directions for co-located areas.  In areas where there are no existing cleared rights-of-way, the Corps reviewed an APE that includes the permit area plus an area of 500 feet in all directions.  A more expansive APE occurred at the above-ground pump station locations, where viewshed analyses were conducted to consider indirect effects.

The permit areas and APE are described in a letter to the Minnesota SHPO dated March 28, 2017, and the APE is further clarified in a March 22, 2018 letter to the Minnesota SHPO.

Direct effects of the undertaking coincide with the Corps' permit areas, for example ground disturbance directly associated with the regulated activities; indirect effects of the undertaking

on historic properties are considered within the (indirect) APE, should historic properties be present.

# 3.0   PURPOSE AND NEED

## 3.1   Purpose and need for the Project as provided by the applicant and reviewed by the Corps

Through monitoring and ongoing evaluations, Enbridge identified integrity conditions on Line 3 that would make safely maintaining it a challenge in the coming years. Specifically, the Line 3 pipe materials, coating, installation method, operating history, and surrounding environment together have resulted in the largest external corrosion anomaly density on the Enbridge Mainline System. Enbridge has stated that a reduction of operating pressures on the pipeline has slowed the growth of known stress corrosion cracking and long-seam cracking, and has helped avoid releases on Line 3 since pressures were reduced in 2008. Enbridge has asserted that the extensive corrosion, coupled with known stress corrosion cracking and long seam cracking, would require approximately 6,250 integrity digs and repairs to be executed along the existing Line 3 in Minnesota over the next 15 years. Enbridge estimates that the cost of such an extensive dig and repair program is nearly equal to that of replacement and would result in year-over-year impacts to landowners and to the environment. If the dig and repair program were to continue, it would not comprehensively address the pervasive integrity issues present on Line 3, or restore the pipeline capacity needed to reliably serve refiners.

Enbridge has proposed the replacement of Line 3 to ensure the continued safe operation of the Enbridge Mainline System, to restore the capacity needed to meet current and forecasted demands from shippers, and to ensure continued reliable crude oil transportation to refineries in Minnesota through Enbridge's Clearbrook Terminal, as well as continued deliveries to various Midwest, Eastern Canada, and Gulf Coast refineries through the Enbridge Superior Terminal.

Enbridge has stated that the Project is needed to improve public safety and protection of the environment by replacing their existing Line 3, an aging crude oil pipeline operating at reduced capacity with a large number of identified pipe defects and anomalies, with a new pipeline constructed with the latest construction practices, technology, and materials. The L3R would accomplish three goals:

First, the Project would improve public safety and protection of the environment by replacing the existing Line 3, a pipeline with a large number of identified pipe defects and anomalies, with a new pipeline constructed with the latest construction practices, technology and materials. The Project would avoid the large and increasing number of integrity repairs currently forecasted on Line 3 over the next 15 years, thereby reducing the recurring impacts to landowners and the environment.

Second, L3R would enable Enbridge to better meet the demand for crude oil in Petroleum Administration Defense District (PADD) II, including Minnesota, as well as eastern Canada and the U.S. Gulf Coast by allowing Enbridge to more reliably and efficiently transport an economical and secure supply of crude oil. The Project would reduce on-going and forecasted apportionment to the refining industry in PADD II, including the Flint Hills and Northern Tier

Energy refineries in Minnesota, Eastern Canada, and the Gulf Coast by restoring the capacity of the pipeline to its historic operating capacity of 760,000 bpd.

Third, the restored operational flexibility would allow Enbridge to more efficiently operate the Enbridge Mainline System, optimize its pipeline system, and reduce power utilization on a per barrel basis.

The Project would help to ensure the future adequacy, reliability, and efficiency of energy supply to Enbridge's customers, and, as a result, to the people of Minnesota and neighboring states.

## 3.2   Basic Project purpose, as determined by the Corps

Transportation of crude oil.

## 3.3   Water dependency determination

The activity does not require access or proximity to or siting within a special aquatic site to fulfill its basic purpose.  Therefore, the activity is not water dependent. The determination that the activity is not water dependent recognizes that linear Projects such as pipelines must, in most instances, cross waters of the United States to achieve their Project purpose. The Section 404(b)(1) guidelines are applicable to the Corps' review of this Project. However, the range of alternatives is limited to the route corridor designated by the MPUC. The Corps does not regulate the siting of pipelines, nor any substance being transported within a pipeline.

## 3.4   Overall Project purpose, as determined by the Corps

To replace an existing crude oil pipeline to increase safety of transporting crude oil, and to ensure continued reliable crude oil transportation to the refining industry in PADD II, to meet current and forecasted demands.

## 4.0   PUBLIC INVOLVEMENT

## 4.1   OVERVIEW OF PUBLIC INVOLVEMENT

The Project review process took place over several years. Enbridge submitted a revised Department of Army permit application on September 21, 2018, which included a withdrawal request of the September 2015 and February 2018 applications.  The revised application was submitted as a result of changes to designated route and anticipation of MPUC approval of route permit. The application was determined to be complete in accordance with 33 CFR 325 which includes specific information that is necessary to consider an application complete for public posting.  Enbridge was notified of the completeness determination on November 16, 2018.  In response to the December 20, 2018 Public Notice, substantive comments were received and are addressed in this document. The comments received from the public, federally-recognized Tribes, non-governmental organizations, and agencies included many similar topics.  Because of the similar nature of the comments the Corps grouped the comments when possible and responses to those comments and themes are provided below. The administrative record contains all the official comments received. Key issues included wetlands, streams, compensatory mitigation, NEPA document, assessing direct/indirect effects, and alternatives.

## 4.2 FIRST PUBLIC NOTICE COMMENTS AND RESPONSES

The Project was first public noticed for 30 days starting on December 20, 2018 and ended on January 21, 2019.  During the course of the public comment period several commenters requested an extension to the original 30 days. The Corps considered the extension requests and agreed to extend the comment period until February 21, 2019. The extended comment period allowed the commenters additional time to review and comment on the proposal. All comments were forwarded to the applicant on March 13, 2019 providing it an opportunity to respond.  Summary of comments on Public Notice (2014-01071-TJH) from December 20, 2018 through February 2019 are included in Appendix A.

## 4.3 SECOND PUBLIC NOTICE COMMENTS AND RESPONSES

In December 2019, Enbridge provided a revised application which include more detailed mitigation and monitoring plans and minor route changes, mainly for access roads. The revised application resulted in a minor reduction of overall impacts (a permanent fill reduction of 2.3 acres and temporary impacts reduction by 0.8 acres).  A 30-day public notice was issued February 4, 2020 disclosing the changes in the revised application.  All comments were forwarded to the applicant on March 11, 2020 providing Enbridge an opportunity to respond. Summary of comments received from February 4, 2020 through March 6, 2020 is included in Appendix A.

## 5.0   ALTERNATIVES ANALYSIS

An evaluation of alternatives is required under NEPA for all jurisdictional activities.  An evaluation of alternatives is required under the Section 404(b)(1) Guidelines for Projects that include the discharge of dredged or fill material. NEPA requires discussion of a reasonable range of alternatives, including the no action alternative, and the effects of those alternatives; under the Guidelines, practicability of alternatives is taken into consideration and no alternative may be permitted if there is a less environmentally damaging practicable alternative.

## 5.1   OVERVIEW

The Corps completed a review of alternatives commensurate with the impacts for the Project as proposed by the Applicant.  The Applicant considered several alternatives for the Project.  The remainder of this section details the range of alternatives considered.

## 5.2   SITE SELECTION/SCREENING CRITERIA

In order to be practicable, an alternative must be available, achieve the overall Project purpose (as defined by the Corps), and be feasible when considering cost, logistics and existing technology.

Criteria for alternatives as evaluated and determined by the Corps:  Safety, land access or availability, costs, logistics, continuity of service, and impacts to waters of the United States.

## 5.3   NO ACTION ALTERNATIVE

The No Action Alternative would result from the Corps not issuing a DA permit for the discharges of dredged and fill material into waters of the United States; or work in, over, or under a Section 10 water. There would be no additional wetland or stream impacts as a result of this alternative. No action alternatives are listed below:

## 5.3.1 Transportation via Rail

This alternative considers rail as an alternative mode of transport to transfer 760,000 bpd to Enbridge's terminals in Clearbrook, Minnesota, and Superior, Wisconsin. This alternative assumes there would be no Section 404 or Section 10 permit required.  Transporting oil by rail would require an oil storage and rail loading facility near Neche, North Dakota, and could be transported by either the Burlington Northern Santa Fe (BNSF) or the Canadian Pacific rail lines to the Clearbrook and Superior terminals, respectively. There are currently no oil storage facilities, rail loading facilities, or rail access immediately adjacent to the mainline near the international border. In addition, no rail offloading facilities or rail access are adjacent to the Clearbrook terminal. Some rail access and existing rail offloading capacity is currently available at Superior. Transporting crude oil by rail would require loading/offloading facilities and new rail access be developed and existing rail access be upgraded. To implement the rail alternative, oil would be pumped through the existing pipelines to the pump station in Gretna, Canada, near Neche, ND.   Fourteen miles of new rail line would be required to access rail facilities near Emerson, Canada. Transporting 760,000 bpd of oil by rail would require 10 loaded unit trains per day to travel from the pump station in Gretna, Canada, to the Clearbrook and Superior terminals. The analysis in the State EIS assumed 48% of the 760,000 bpd would be delivered to the Clearbrook terminal based on the capacity of refineries in the Twin Cities, and the remaining 52% of the 760,000 bpd would be delivered to the Superior terminal. Under these assumptions, five loaded unit trains would be required to travel from Gretna to the Clearbrook terminal per day, and five loaded unit trains would be required to travel from Gretna to the Superior terminal per day.  Based on the calculations for the number of tank cars needed to deliver the specified volumes per day, the estimated transit times of the unit trains, and the time necessary for loading and offloading the tank cars and for empty trains to make return trips to Gretna, approximately 7,200 new tank cars would be required which would cost approximately $1 billion, assuming a cost of $140,000 per car.  This estimate does not include the cost of constructing the new rail spurs or any associated rail infrastructure needed, railway maintenance, labor costs, fuel, or other associated expenses. Construction of unit train terminal facilities for loading and offloading, would range from approximately $85 to $125 million.

During State of Minnesota proceedings, a general management consulting firm serving the transportation and logistics sectors explained that pipelines are highly efficient at moving large volumes of crude oil and offer "superior" economics compared to rail transportation because: (1) pipeline transport is two to three times less expensive per barrel of oil than rail transport; and (2) pipelines are not subject to certain external factors that impact rail traffic, such as extreme weather or congestion. The firm indicated that the current rail system in Minnesota does not presently have the sufficient surplus capacity required to fully support the increase in crude rail traffic. The added use of rail for crude would increase competition for rail service with other commodities (agricultural products, chemicals, minerals, etc.) and could negatively impact those industries in Minnesota. Trains (and trucks) are more likely to result in small to medium spills when compared to spills from pipelines, typically resulting from human error.  While pipelines

generally have fewer but larger spills, the number of incidents from train spills is higher which results in a higher percentage of the overall volume being spilled when compared to pipelines.

This alternative is not a practicable due to costs associated with the alternative, both from the need to increase infrastructure and additional costs associate with transporting crude via rail compared to pipeline, and logistical issues with competition for rail space as well as potential environmental factors (i.e., extreme weather conditions)  that could delay transportation of crude.

## 5.3.2  Transportation via Truck

This alternative considers truck as an alternative mode of transport to transfer 760,000 bpd to Enbridge's terminals in Clearbrook, Minnesota, and Superior, Wisconsin. This alternative assumes there would be no Section 404 or Section 10 permit required.  As with the rail alternative, transporting crude oil by truck as an alternative to replacing Line 3 would require that oil be pumped through the existing mainline from the Applicant's facilities in Edmonton, Alberta, to an oil storage and truck loading facility at Gretna, Manitoba, adjacent to the existing mainline. Oil would then be loaded into tanker trucks and transported by highway to the Clearbrook and Superior terminals. The analysis assumes that 48 percent of the 760,000 bpd total (360,000 bpd) would be delivered to Clearbrook, Minnesota, based on the approximate capacity of the Twin Cities refineries that the Clearbrook terminal serves. The analysis assumes that the remaining 52 percent (400,000 bpd) would be delivered to Superior, Wisconsin. It also assumes that existing highways would primarily be used.  This alternative would require development of truck loading and offloading facilities and new or upgraded road access to the interstate highway system. Assuming that the Applicant could maximize use of that portion of Line 3 approved for upgrade in Canada, a truck loading facility would likely be located at the Gretna pump station near the U.S. border. From this point, trucks could be routed to Enbridge's Clearbrook and Superior terminals.  Tanker trucks can carry approximately 190 barrels and are generally used to move oil from wellhead locations not served by pipeline gathering systems to aggregation points and storage facilities. They are not typically used to transport the volumes proposed by the Project. Transporting 760,000 bpd of oil by tanker truck would require 4,000 tanker trucks per day to travel from Gretna to the Clearbrook and Superior terminals.  This alternative would add a substantial amount of tanker trucks to roadways.  Although the amount of oil transported per day could vary by demand, the applicant would need to operate a fleet of trucks capable of transporting the full estimated volumes per day. The shortest distances by highway from Gretna to the Clearbrook and Superior terminals are approximately 193 miles and 360 miles, respectively.  Based on the estimated number of tanker trucks needed to deliver the specified volumes per day, estimate of the time necessary for loading and offloading the tanker trucks, and the time necessary for empty trucks to return to Gretna, 12,000 new tanker trucks would be required costing approximately $2.4 billion assuming an estimated cost of $200,000 per truck.   With the mileage the trucks would cover in steady service, the economic life of a truck would be approximately 5 years, resulting in the cost being repeated every 5 years. Trucks (and trains) are more likely to result in small to medium spills when compared to spills from pipelines, typically resulting from human error.  While pipelines generally have fewer but larger spills, the number of incidents from truck spills is higher which results in a higher percentage of the overall volume being spilled when compared to pipelines.  In addition, transport via truck using major roadways presents a greater risk of accidents potentially resulting in injury or death to the operators or members of the public.

This alternative is not a practicable due to costs associated with the alternative, both from the need to increase infrastructure and additional costs associate with renewing the fleet of trucks and transporting crude via truck compared to pipeline, safety concerns with adding a substantial amount of tanker trucks to the roadways, and potential environmental factors (i.e., extreme weather conditions) that could delay transportation of crude.

## 5.4   OFF-SITE ALTERNATIVES

No off-site pipeline alternatives were assessed as alternatives are limited to the corridor designated by the MPUC.  Specific alignments within the designated corridor generally followed existing utility corridors in the interest of reducing environmental impacts.

## 5.5   ON-SITE ALTERNATIVES

The range of on-site alternatives is limited to the route corridor designated by the MPUC. The Corps does not regulate the siting of pipelines, nor any substance being transported within a pipeline. The Line 3 replacement corridor does not follow the existing Line 3 corridor entirely. On-site alternatives focused on avoiding and minimizing impacts to waters of the U.S.

### 5.5.1 Applicant's Preferred Alternative

Enbridge proposes to construct the L3R using modern pipeline design, manufacturing, coating, and installation techniques, as well as wider, thicker pipe. 49 C.F.R. Part 195 contains requirements for new pipelines addressing pipe strength, pipe and associated facility design, and construction-related issues,  such as welding, limitations on pipe bending, pipe installation, and the required depth of cover.  Enbridge proposes to use 36-inch-diameter pipe with a wall thickness of 0.515 inch (as opposed to existing Line 3's 34-inch-diameter pipe with 0.281-inch wall thickness). The wider, thicker pipe has a yield strength 35 percent greater than existing Line 3 and will resist fatigue growth of cracks from pressure cycling.  The applicant's preferred alternative is expected to result in an increase in safety and reliability attributable to the use of new equipment and modern-day technologies, manufacturing, and coating processes; and a reduction in the number of integrity digs required for ongoing maintenance.  The reduction in integrity digs allows for decreased temporary capacity reductions required to ensure safety while working around an exposed pipeline.

The Project will allow Enbridge to operate L3R in heavy, light, and mixed service. Currently, existing Line 3 is transporting predominantly light crude. The Project will also restore historic operating capabilities. The historic annual average operating capacity of existing Line 3 was 760,000 barrels per day (bpd). Enbridge voluntarily reduced the capacity of existing Line 3 to 390,000 bpd for light crude oil. The Project will allow Line 3 to return to an annual average capacity of 760,000 bpd.

Approximately 90 percent of the Project route would be co-located with other Enbridge pipelines; third-party pipelines or utilities; roads, railroads or highways. The remainder of the route would be new corridor that is not adjacent to existing infrastructure (Greenfield route). This proposal would temporarily impact 1049.58 acres of wetland, 227 waterbodies, and result in the permanent loss of 9.97 acres of wetlands. See Enbridge's L3R Compensatory mitigation Wetland Mitigation Plan for a breakdown of temporary and permanent wetland impacts by

wetland type.  The applicant has indicated completing the preferred alternative (including design, permitting, and construction) in Minnesota would cost approximately $2.1 billion.

Enbridge's November 2020 Environmental Protection Plan (EPP) outlines environmental procedures and mitigation measures that the contractor will implement during construction as part of this alternative. The EPP addresses typical circumstances encountered during pipeline construction and meets or exceeds applicable federal, state, tribal, local regulations, and erosion control specifications.  The EPP includes the Summary of Construction Methods and Procedures for Wetland and Waterbody Crossings document, developed by Enbridge, which provides more detailed discussion of the criteria it applies to identify its proposed crossing method for each affected waterbody and wetland feature for this alternative. The document also summarizes and compares the constructability advantages and disadvantages associated with each type of crossing method. This information is Project site-specific and provided in a tabular format that includes the location and brief description of the feature proposed to be crossed by the Project, representative aerial photography to provide visual reference, as well as a justification that may point to the above-listed documents for the type of crossing method proposed. This information was reviewed during interagency coordination. Regional experts within the agencies provide site specific concerns with certain crossings.  This information was provided to the applicant and some crossing methods were changes in the interest of minimizing impacts or reducing potential for impacts to a certain waterbody.  The interagency review also resulted in additional requirements to ensure impacts would be mitigated such as site-specific restoration plans and geo-technical analyses.

## 5.5.2 Maintaining the Existing Line 3

Because the existing Line 3 shares a corridor with the Line 3 replacement corridor for a portion of the Project, this alternative is included as an "on-site" alternative.

When Enbridge's integrity online inspection (ILI) identifies anomalies that require excavation and visual inspection, Enbridge obtains the necessary environmental permits, notifies affected landowners, and identifies all existing utilities in the vicinity of the area to be excavated. Enbridge then excavates around the section of the buried pipe so that it can be cleaned, examined, and repaired, as needed. This is referred to as a dig and repair program; individual digs are referred to as "integrity digs." Repair typically includes cleaning and examining the external surface of the pipe and one, or a combination of the following repair methods: (1) recoating with modern epoxy coating; (2) installing a pressure-containing steel sleeve and recoating the outside of the sleeve with a modern epoxy coating; (3) grind repair to accurately assess the size of the crack and to prevent it from propagating in the future; and (4) cut-out and replacement to remove the anomaly and weld a new piece of pipe in its place.

Integrity digs entail ground disturbance and typically require Section 404 permits if the excavation area, typically 40 feet by 80 feet occur in waters of the U.S.  Additional temporary workspace needed may be much larger.  In Minnesota, maintaining existing Line 3 would require approximately 6,250 integrity digs over the next 15 years.   Within the Chippewa National Forest (CNF) and on the Leech Lake and Fond du Lac Reservations, an estimated 484 digs would be required over the next 15 years. The digs in the CNF, on the Fond du Lac Reservation, and on the Leech Lake Reservation are estimated to impact 13.0, 7.0, and 25.0 acres over the next 15 years, respectively.  Locations and magnitude of all future discharges in waters of the U.S. cannot be determined precisely at this point. The Corps would evaluate each

individual integrity that would result in a regulated discharge under various permitting mechanisms.

The MPUC, during the review of the Certificate of Need, indicated that the existing Line 3 is deteriorating at an accelerating rate and continued operation of the existing Line 3 poses a far greater risk of an accidental release and resulting environmental damage than the applicant's preferred alternative. Since 1990, Line 3 has experienced 15 total failures resulting in over 50 barrels of oil being release during each failure.  Seven of these failures occurred in Minnesota. Maintaining the existing Line 3 does not address defects of the pipeline due to the way the pipe was originally manufactured. The MPUC ALJ report indicated that even with extensive repairs, the long-seam cracking risks inherent to the flash-welded seams on the pipe will continue to exist unless the pipe is fully replaced.  External corrosion and subsequent maintenance excavations would continually occur as long as the line is in service. Enbridge estimates that it would cost $30 to $40 million per year to maintain the U.S. portion of the existing Line 3.

This alternative would require continued maintenance digs which have the potential to impact waters of the U.S., although the magnitude of the impact would not be known until site conditions of the integrity dig were assessed. Continued maintenance of the pipe would cost approximately $30 to $40 million per year and would not eliminate future anomalies due to the type of pipe and construction methods used at time of installation of Line 3 resulting increased potential for accidental releases. As a result, Line 3 would need to remain at the reduced current capacity to reduce the potential for and accidental release.  For these reasons, this alternative is not practicable.

## 5.5.3 In-Trench Replacement

This alternative includes the existing Line 3 pipeline be removed and that a new pipeline be installed in the same trench, allowing the use of the existing pipeline corridor without further expansion. This alternative would minimize the exposure of new areas of the state to pipeline construction and operations, while increasing overall pipeline capacity for deliveries to Superior. However, this alternative would result in interruption of service for shippers on the Enbridge Mainline System, as the existing Line 3 would need to be taken out of service for approximately 16 months to allow for removal and replacement.  From Neche to Clearbrook, Line 3 is one of seven pipelines co-located in a single corridor. From Clearbrook to Superior, the corridor includes six pipelines. Line 3 is in the interior of the multi-pipeline configuration where the pipelines are spaced as close as 10 to 15 feet apart. Unlike constructing a new pipeline along the edge of an existing pipeline corridor, as proposed in the applicant's preferred alternative, removing and replacing the pipeline in the existing trench would require working over the top of existing operating high-pressure pipelines.  To replace Line 3 in the same trench, Enbridge would need to excavate, expose, cut, handle, remove, and then replace the existing pipeline. Because this process would take place between multiple operating pipelines and within a very restricted workspace, there would be an increased risk of damaging an operating pipeline through accidental contact with equipment, overloads on the surface above the pipelines, cave-ins, and adjacent pipe movement due to the varying depths of cover. In-trench replacement would require the following:

- Protection for existing buried pipes – A layer of protective soil, mats, or bridging would be placed over the existing pipelines to protect them during the movement of heavy equipment and materials to the work area along the existing pipeline alignment. This

protective layer would be continuously moved with the construction activity as pipe removal and replacement progressed.

- Additional work space required – Depending on the engineering specifications and environmental factors associated with the adjacent pipelines, such as depth of cover, pipe design, operating pressure, soil types, and ground conditions, the operating pipelines would need to be protected from damage through placement of equipment bridges, additional fill, and mats.  This increase in workspace would increase the overall disturbance to all environmental features.  The presence of the existing pipelines precludes the activities above from occurring adjacent to the Line 3 trench. They would need to be located adjacent to the outermost buried pipeline. This would increase the construction work area from a width of approximately 120 feet for normal construction to approximately 205 feet for removal and replacement.

- Increased time of open trench – The addition of pipeline removal activity would lengthen the time required for maintaining an open trench. Normal construction would include maintaining an open trench for approximately 3 days. Time for pipeline removal and installation of the new pipe would require extending this time. During that time, changing weather conditions such as frost and rain could severely weaken the trench wall and contribute to trench cave-in, and rain could fill the trench with water.  Both circumstances would prevent pipe installation and could result in an even longer period of open trench. Trench cave-ins would result in more time and activity to reconstruct the trench so that pipe may be installed, and collected rainwater/groundwater would need to be discharged out of the trench before installation could occur

In addition to the construction challenges, In-trench replacement also poses greater environmental impacts at wetland and waterbody crossings due to the extended construction period at each crossing.  Installing a new pipeline at these same crossings with open trench methods would further increase the duration of wetland and waterbody crossings, which could increase impacts resulting from sedimentation and aquatic life disturbance.

Along with environmental concerns from increased duration of open trench, this alternative would also cross 158 High Consequence Areas (HCAs).  HCAs, as identified by the Office of Pipeline Safety, are specific locales and areas where a release could have the most significant adverse consequences.  Once identified, operator's area required to devote additional focus, efforts, and analysis in HCAs to ensure the integrity of pipelines.  HCAs include populated areas, drinking water resources, and unusually sensitive ecological areas.

This alternative crosses the Leech Lake Reservation and the Fond du Lac Reservation pursuant to easements that expire in 2029.  This alternative also crosses about 157 acres of the Chippewa National Forest over which the Leech Lake Band has co-management responsibilities with the U.S. Forest Service.  The Leech Lake Band has a memorandum of understanding with the U.S. Forest Service that was entered into to recognize treaty rights of tribes to hunt, fish, and gather wild plants on national forest lands.  Throughout the multi-year permitting process, the Leech Lake Band has consistently opposed granting Enbridge the required easement extension to construct the proposed Project.  This ultimately led to the MPUC to dismiss this alternative from their  Pipeline Routing Permit.

This alternative is not a practicable as it is not available and capable of being done due to Leech Lake Band of Ojibwe's refusal to grant Enbridge the easement extension required for the

Project; and the logistical, safety, operational, and environmental considerations described above.

## 5.5.4 Replacement with 34-inch Pipe

The original Line 3 is 34-inch diameter and was installed in 1968 with peak delivery volumes of 760,000 barrels per day (bpd).  The modern industry standard is now 36-inch pipeline, which is more energy efficient than the 34-inch pipe.  The proposed 36-inch diameter pipeline and the 34-inch diameter pipeline alternative would have the same capacity; either pipeline configuration would be designed with an annual capacity of 760,000 bpd. Construction methods and requirements (i.e., trench width) would be the same for a 34-inch pipe as for a 36-inch pipe. The 34-inch diameter pipeline alternative would have comparable effects to waters of the United States as compared to the 36-inch diameter pipeline. It would require the same construction workspace, topsoil stripping, storage and replacement; would utilize the same equipment and access roads; and would require the same permanent right-of-way.  The 34-inch diameter pipeline poses engineering and logistical constraints. A 36-inch pipeline and associated fittings are standard industry size, whereas a 34-inch pipeline and associated fittings are non-standard sizes. Line-up clamps and automatic welding bands are more common in 36-inch diameter pipes. Enbridge currently has two 36-inch pipelines in Minnesota (Line 67/Alberta Clipper and portions of Line 4). The Wisconsin portion of Line 3, referred to as Segment 18, is a 36-inch diameter pipeline, the North Dakota portion evaluated by the Corps' Omaha District is a 36-inch diameter pipeline, and the Canadian portion of the replacement will also utilize 36-inch pipe, except for a short 14-mile segment at the border crossing. This allows Enbridge to stock common parts and emergency supplies that can be used on multiple lines instead of having to stock maintenance items specifically for a 34-inch diameter pipe. These items would include pigs, sleeves, stopples, valves and additional pipe.  As a result of the non-standard sized pipe and associated equipment, costs would increase.   Additionally, the Project's proposed 36-inch diameter pipeline would result in significant energy savings because the oil moves more slowly in the wider line, reducing friction and the energy required to pump the oil. The proposed 36-inch pipeline in would save 108 gigawatt hours of energy a year in Minnesota and reduce the annual $CO_2$ emissions by 74,000 metric tons assuming an annual throughput of 760,000 bpd.

Because impacts to waters of the United States are comparable with the applicant's preferred alternative and costs would increase with use of non-standard equipment, this alternative was determined to not be practicable.

## 5.5.5 Existing Line 3 Supplemented with Transportation via Rail

This alternative considers continued operation of existing Line 3 with trains transporting additional oil to achieve a total transfer capacity of 760,000 bpd. This alternative assumes existing Line 3 would supply 390,000 bpd to Superior. Assuming that Line 3 would transport the full amount of its daily operating volume (390,000 bpd) to the Superior terminal, 360,000 bpd of oil would be transported by rail to the Clearbrook terminal and 10,000 bpd of oil transported by rail to the Superior terminal.  This alternative would require the ongoing maintenance and repair activities associated with continued use of existing Line 3 as described in the Maintaining the Existing Line 3 Alternative in Section 5.5.2, as well as development of the infrastructure for rail transport described above.  Based on the calculations for the number of tank cars needed to deliver the specified volumes per day, the estimated transit times of the unit trains, and the time necessary for loading and offloading the tank cars and for empty trains to make return trips to

Gretna, approximately 3,500 new tank cars would be required costing approximately $495 million.  As described in Section 5.5.2., Enbridge estimates that it would cost $30 to $40 million per year to maintain the U.S. portion of the existing Line 3.  Also as described in 5.3.1, transportation via rail is subject to environmental factors that would impact the transportation of crude via rail, would compete with other commodities for rail space, and result in a higher number of incidents involving oil spills.

This alternative would include impacts to waters of the U.S. as a result of maintaining the existing line 3, but could also impact additional Waters of the U.S. as a result of constructing new infrastructure.  Additional costs are associated with transporting crude via rail compared to pipeline, logistical issues with completion for rail space as well as potential environmental factors that could delay transportation of crude, safety and spills concerns, and continued maintenance required on the existing Line 3, contribute to this alternative being determined to not be practicable.

## 5.5.6 Existing Line 3 Supplemented with Transportation via Truck

This alternative considers continued operation of existing Line 3 with trucks transporting additional oil to achieve a total transfer capacity of 760,000 bpd. This alternative assumes that existing Line 3 would supply 390,000 bpd to Superior. Assuming that Line 3 would transport the full amount of its daily operating volume (390,000 bpd) to the Superior terminal, 360,000 bpd of oil would then be transported by truck to the Clearbrook terminal and 10,000 bpd of oil transported by truck to the Superior terminal.  This alternative would require the ongoing maintenance and repair activities associated with continued use of existing Line 3 as described in the Maintaining the Existing Line 3 Alternative in Section 5.5.2, as well as development of the infrastructure for truck transport described in Section 5.5.2 above. Transporting 360,000 bpd of oil by truck to the Clearbrook terminal and 10,000 bpd to the Superior terminal would require 1,889 trucks per day to travel from Gretna to the Clearbrook terminal and 58 trucks per day to travel from Gretna to the Superior terminal.  Based on the estimated number of tanker trucks needed to deliver the specified volumes per day, a conservative estimate of the time  necessary for loading and offloading the tanker trucks, and the time necessary for empty trucks to return to Gretna, 6,000 new tanker trucks would be required costing approximately $1.2 billion every 5 years. Also as described in Section 5.3.2, transportation via truck is subject to higher transportation costs and subject to environmental factors that would impact the transportation of crude via truck.  As described in Section 5.5.2., Enbridge estimates that it would cost $30 to $40 million per year to maintain the U.S. portion of the existing Line 3. This alternative would include impacts to waters of the United States as a result of maintaining the existing Line 3, but could also impact additional waters of the United States as a result of constructing new infrastructure.

This alternative is not a practicable due to costs associated with the alternative, both from the need to increase infrastructure and additional costs associate with renewing the fleet of trucks and transporting crude via truck compared to pipeline, and costs associated with continued maintenance required on Line 3.  The alternative also has poses safety concerns with adding a substantial amount of tanker trucks to the roadways as well as higher potential for spills from tanker trucks, and potential extreme weather conditions that could delay transportation of crude. This alternative would also include impacts to waters of the U.S. as discussed in Section 5.5.2.

## 5.6   ALTERNATIVE CARRIED FORWARD IN THE ANALYSIS

The applicant's preferred alternative (described in Section 5.5.1) and the No Action alternatives (described in Section 5.3) were carried forward in the Least Environmentally Damaging Practicable Alternative (LEDPA) analysis.

## 5.7   SUMMARY OF PRACTICABLE ALTERNATIVES

Of the 8 alternatives described above, the only practicable alternative is the Applicant's preferred alternative.

## 5.7.1 CORPS DETEMRINATION OF THE ENVIRONMENTALLY PREFERABLE AND LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERANTIVE

For purposes of NEPA, the Environmental Assessment must identify the environmentally preferable alternative. For purposes of the Section 404(b)(1) Guidelines, the LEDPA must be identified. The LEDPA is usually the alternative with the least aquatic resource impact, but could be an alternative with more aquatic resource impact if the alternative with less aquatic impact has other more damaging environmental consequences. The applicant's preferred alternative (described in Section 5.5.1) and the No Action alternatives (described in Section 5.3) were carried forward in the LEDPA analysis.

As detailed in Section 5 above, the Corps determined that the Applicant's preferred alternative (Section 5.5.1) is the LEDPA.  This is not a determination of compliance with the Section 404(b)(1) Guidelines, which is addressed in Section 6.0, but rather a determination that there are no other less damaging practicable alternatives. The remainder of this EA documents whether this alternative is compliant with the Section 404(b)(1) Guidelines, whether it is or is not contrary to the public interest, and whether it is in compliance with all other applicable laws, regulations and policy.

## 6.0   EVALUATION OF THE DISCHARGE OF DREDGED AND FILL MATERIAL IN ACCORDANCE WITH THE SECTION 404(b)(1) GUIDELINES

## 6.1   FINDING OF PRACTICABLE ALTERNATIVES AND LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE (40 CFR 230.10(a))

Practicable alternatives to the proposed discharge consistent with 40 CFR 230.5(c) are evaluated in Section 5.  In summary, based on the analysis in Section 5.0 above, the no-action alternative, which would not involve discharge into waters, is not practicable.  For those alternatives that would discharge into a special aquatic site and are not water dependent, the applicant has demonstrated there are no practicable alternatives that do not involve special aquatic sites.  It has been determined that there are no alternatives to the proposed discharge that would be less environmentally damaging.  (Subpart B, 40 CFR 230.10(a)). The Applicants

preferred alternative is the practicable alternative with the least adverse impact on the aquatic ecosystem, and it does not have other significant environmental consequences.  This alternative meets the overall Project purpose, and is practicable in consideration of costs, logistics, and existing technology.

## 6.2   CANDIDATE DISPOSAL SITE (40 CFR 230.11(f))

The "disposal site" is the waters where a discharge is proposed. Depth of water, current velocity, direction and variability at the disposal site are considered.

As a result of the Project, a total of 1059.55 acres of wetland (1,049.58 acres of temporary impact and 9.97 acres of permanent loss) would be impacted directly by the discharge of dredge and fill material. See table below showing crossing methods for wetlands throughout the Project.  The discharge of dredged and fill material would also temporarily impact 0.64 acres and 0.49 acres of stream bed for the installation of the pipe and bridges, respectively.  See table below for waterbody crossing methods.

See table 4.0-1 of the L3R Compensatory Wetland Mitigation Plan for impacts by wetland type and duration as well as the Mainline Wetland Impact Table and Access Road/Haul Road Wetland Impact Table for all impacts to wetlands.

A total of 227 waterbodies would be crossed by the Project.  Ditches account for 95 of the waterbodies, many of which are roadside ditches.  Seventy-four of the ditches would be crossed via a trench method and 21 would be crossed via bore method.   The proposal would cross 132 streams (84 with perennial flow, 16 with intermittent flow, 20 with ephemeral flow, and 12 streams where no flow regime was identified).  Of the streams, 21 would be crossed via HDD or bore method, and 111 would be crossed via a trench method. See Line 3 Mainline Waterbody Crossing table included in the administrative record for all waterbodies being crossed, crossing method, flow regime, and impact area of the crossing.

Table 1.

| Corps Jurisdiction Proposed Wetland Crossing Construction Method Summary | | |
|---|---|---|
| Wetland Crossing Construction Method | Number of Proposed Wetland Crossings by Method | Centerline Crossing Length (miles) |
| Trench: Modified Upland Construction Method (Open Cut) | 755 | 74.9 |
| Trench: Push-Pull Method | 5 | 0.4 |
| Trenchless: Bore Method | 82 | 0.6 |
| Trenchless: HDD | 43 | 3.5 |
| **Total** | **885** | **79.4** |

Table 2.

| Corps Jurisdiction<br>Proposed Waterbody Crossing Construction Method Summary | |
| --- | --- |
| **Waterbody Crossing Construction Method** | **Number of Proposed Waterbody Crossings** |
| Trench: Open Cut (Non-Isolated) Method | 0 |
| Trench: Push-Pull Method | 1 |
| Trench: Modified Dry Crossing | 23 |
| Trench: Dry (Isolated) Method | 160 |
| Trenchless: Bore Method | 22 |
| Trenchless: HDD Method | 21 |
| **Total** | **227** |

## 6.3   POTENTIAL IMPACTS ON THE PHYSICAL AND CHEMICAL CHARACTERISTICS OF THE NON-LIVING ENVIRONMENT (40 CFR Part 230)

### 6.3.1  SUBSTRATE

The proposed discharge would temporarily impact the physical substrate to 1,049.58 acres of wetland, 1.13 acres of streambed, and permanently adversely impact physical substrate to 9.97 acres of wetland.  Dredged and fill material would be discharged into wetlands and streams as a result of temporary construction access, temporary side casting of material, backfilling of the trench, installation of mainline valves, and construction of pump stations. Temporary discharges in wetlands as a result of construction matting would minimize rutting and disperse compaction pressure from heavy equipment.  Soils excavated in wetlands would be segregated prior to installation of the pipe in accordance with the method described in Section 1.10.1 of the Environmental Protection Plan (EPP).  Material would then be returned to the trench in the reverse order it was excavated with the segregated top soil being returned last. Streambed materials would not be segregated during excavation of the trench. Negative effects to the substrate are expected to be limited to the duration of construction and a short time after during restoration activities.

### 6.3.2  SUSPENDED PARTICULATES/TURBIDITY

Overall, impacts of suspended particulates and turbidity are not expected to exceed regulatory limits. The primary potential effect of pipeline installation across surface waters would be the potential temporary increase in Total Suspended Solids associated with the removal of riparian vegetation, disturbance of channel bed and banks and temporary resuspension of sediments. The placement of construction mats, ice roads, bridges, or culverts over surface waters may also contribute to the resuspension of sediments during the installation and removal process, and the introduction of sediments as equipment travels across these features. Discharges from installation of the pipe and other attendant structures are subject to the MPCA NPDES/SDS permitting.  The NPDES/SDS permit contains limits on the amount of total suspended solids.

Open trench crossing methods that Enbridge proposes to use for the Project are typically completed in 1-2 days.   Any increase in TSS would occur shortly after initiation of the crossing and would be minimized by best management practices (BMPs) such as erosion and

sedimentation controls, and construction during frozen conditions which reduces potential for sediment release during in-channel work. Dry-crossing methods to re-route flow through the construction area, or crossing waterbodies with low enough flow to facilitate such a crossing would also reduce the potential for sediment releases during the construction activities. Enbridge would only clear 30 feet of vegetation within the 50-foot operational right-of-way along the drill path as shown on Figure 4.5-1 of the Summary of Construction Methods and Procedures, Appendix A of the EPP, except where additional construction workspace is required for the installation of a bridge. This would not generally require removal of vegetation on the stream banks. Where vegetation would be cleared, roots would be maintained which would aid in stabilizing the soils and reducing erosion potential. No grading or stump removal would occur over the HDD path except at limited locations where free-span engineered bridges would be installed, or as needed to assist with staging to respond to an inadvertent release of drilling mud. Restoration of the crossing areas may also result in a temporary increase in TSS, but would also be reduced through use of BMPs. The MPCA has authority for assessing and issuing a water quality certification. Through the issuance of the individual Section 401 water quality certification, the MPCA has determined that the temporary increase in TSS would not violate water quality standards or have long-term water quality effects. The Project is expected to result in negligible effects in the short and long term due to suspended particulates and turbidity. Please see Section 6.3.3 of this document for additional information on water quality.

## 6.3.3 WATER

Pipeline installation and right-of-way access (e.g., bridges, culverts) activities at waterbodies may result in temporary impacts on water quality. The magnitude and extent of potential water quality effects would vary depending on the pipeline installation method or bridge/culvert type. A special condition included in the Section 401 certification would prohibit HDD crossings during frozen conditions, unless otherwise approved by the MPCA and the MNDNR.  This special condition is intended to reduce the risk of undetected inadvertent release of drilling mud and potential water quality concerns with such an event.  The Applicant has considered effects to TSS phosphorous, river eutrophication, dissolved oxygen, and mercury, and provide this information to the MPCA. Affects to water as a result of temporary increases in TSS is described in Section 6.3.2 of this document.  There would be no substantial addition of mercury due to the Project.  Inorganic and organic mercury concentrations could potentially increase through suspension of sediment particles.  Due to the chemical properties of mercury, particles would be expected to resettle prior to any release of mercury.  As result, minor changes might occur in dissolved mercury concentrations. No phosphorous would be added to any water by the construction activities.  Because phosphorous is bound in the sediments, temporary resuspension of sediments could increase phosphorous levels within the water. Any increase in phosphorous would be minor and temporary. Eutrophication occurs when a waterbody becomes over-enriched with nutrients, causing excessive growth of plants and algae. The Project may cause small, temporary, and short-lived increases in phosphorus, which is a nutrient that can lead to eutrophication.  Due to the temporary nature of any potential increase in phosphorous, river eutrophication is not anticipated.  If construction results in increased TSS, the resuspension of sediments has the potential for temporary effects on water-column Dissolved Oxygen concentrations. Any temporary effect to DO as a result resuspension of sediments would be short lived, lasting minutes to hours.

The Corps has considered the information submitted by the applicant and determined that effects to TSS, phosphorous, river eutrophication, dissolved oxygen, and mercury, are anticipated to be temporary and minor in the short term.

## 6.3.4 CURRENT PATTERNS AND WATER CIRCULATION

The vast majority of the Project includes excavation of the trench, installation of the pipe, and backfill and restoration of the trench and construction area.  This temporary impact to wetlands and waterbodies has the potential to impact water circulation, especially in waterbodies where a dry-crossing method has been chosen, but only for a brief period of time.  Most waterbodies being crossed by a trenched method would be impacted for approximately 24 to 48 hours.  These sites would then be restored resulting in no long-term permanent impacts to circulation of water.   Where permanent wetland loss is proposed, all wetland functions would be lost.  Even so, impacts to water circulation are anticipated to be minor throughout the entire Project.

A cross-sectional model was developed to evaluate the effects of the pipe and trench on groundwater flow across the pipeline route at wetland crossings using the U.S. Geological Survey's groundwater flow code, MODFLOW.  Modeling assessed hydrogeologic conditions and range of hydrologic parameter values encountered to evaluate the possible range in groundwater levels and groundwater flows across the pipeline. The entire range of permeability values calculated from the pump-down/slug tests that were performed in the borings at LaSalle Creek, the values were extended to encompass a range typical of peatlands along the pipeline route.  The results indicated a maximum change (increase or decrease) in groundwater levels on either side of the pipeline (upgradient or downgradient) was 0.00005 to 0.003 inch (smaller than the width of three human hairs). These results are entirely consistent with the hydrogeologic settings that are encountered in peatlands along the pipeline route and demonstrate that the pipeline and trench backfill are unlikely to cause measurable changes in groundwater levels and groundwater flow rates across the pipeline and backfilled trench.

Any adverse effects are anticipated to be temporary and minor in the short-term.

## 6.3.5 NORMAL WATER FLUCTUATIONS

As identified in the Section 6.2 above, the Project is dominated by temporary impacts associated with the installation of the pipeline.  These impacts have the potential to affect normal water fluctuation in wetlands and waterbodies during the installation.

Hydrotechnical hazard impact could affect the hydrology which could result in reduction in depth of cover or exposure of the pipe. Enbridge considered the following routing design criteria, when possible, in order to avoid and minimize hydrotechnical hazard impacts on the pipe:

> • Avoid paralleling the pipeline to watercourses to avoid the potential for encroachment;
> • Align the centerline perpendicular to the watercourse and at the shortest crossing location;
> • Avoid placement over meander cutoffs and avoid crossing multiple meander belts;
> • Appropriate placement of buoyancy control; and
> • Use of concrete coated pipe as an extra protection of the pipe against scouring.

Section 2.7 of the Summary of Construction Methods and Procedures (Appendix A of the EPP) describes the minimum federal requirements for the depth of cover between the top of the pipe

and the ground level, road bed, or river bottom.  49 CFR 195.248 requires a minimum depth of cover of 48 inches (4 feet) where crossing any inland bodies of water with a width of at least 100 feet from high water mark to high water mark, and 36 inches at drainage ditches at public roads and railroads. Any other area, including inland bodies of water less than 100 feet from high water mark to high water mark requires a minimum of 30 inches (2.5 feet). The federal depth of cover requirement, administered by the U.S. Department of Transportation, Pipeline Hazardous Materials and Safety Administration, is to provide protection to the pipeline itself by ensuring sufficient cover between the top of the pipe and ground surface to avoid the risk of pipe exposure resulting from stream scour.  To further avoid and minimize effects to water fluctuation and potential subsequent hazard impacts on the pipe, Enbridge also committed to a minimum depth of cover of 48 inches at all surface water crossings (i.e., waterbodies and wetlands). In saturated conditions where there is a floating mat or vegetation over a water layer, the depth of cover would be measured starting at the bottom of the water resource substrate as illustrated in Figure 18 of the EPP. This exceeds the federal mandated depth at inland bodies of water less than 100 feet wide by 18 inches (1.5 feet). Enbridge has also agreed to additional depth of cover greater than its 48-inch standard at some public waters to address MDNR concerns. All waterbodies that are wider than 100 feet would be crossed utilizing the HDD technique which would not result in an alteration of the bed or bank of the waterbody, and would result in the installation of the pipe an average of 30 to 40 feet below the bed of the watercourse, eliminating the potential for impacts to water levels and fluctuation.  In waterbodies where a dry-crossing method has been chosen, water levels may fluctuate from normal levels as a result of the in-channel construction. However, dry-crossings include methods to reduce fluctuations and continue to move water through the waterbody, such as pumps or culverts routing flow either around the crossing or through the crossing.  Most waterbodies being crossed by a trenched method would be impacted for approximately 24 to 48 hours, therefore any water level fluctuations in waterbodies would be short-lived.

Sufficient depth of cover would reduce potential impacts to water levels and fluctuations. Enbridge installed monitoring wells at locations identified by the Agencies (MPCA, MDNR, and Corps) (Table 2.4-1 of the PCMP) in summer 2020 prior to construction. Monitoring wells were installed in nests to allow for the determination of groundwater flow direction and to assess if there are changes in groundwater conditions upgradient and downgradient of the pipeline. Enbridge would continue to collect data on an annual basis during construction and post-construction during the frost-free period or until the performance standards have been met and reviewed by the applicable agencies.  In addition to direct hydrology monitoring, the applicant would conduct long-term vegetative sampling in select wetlands that were determined by the MDNR. The long-term vegetation sampling is intended to assess any potential hydrologic effects, up and down-gradient of the pipeline, through an assessment of changes in vegetation over time.  Protocols for the long-term monitoring are outlined in Section 2.5.3 of the PCMP. The PCMP also identifies potential corrective actions that may be required due to unexpected ponding from peat compaction and alterations to groundwater flow that could result in unexpected drainage or damming.

See Section 6.3.4 for discussion on hydrologic modeling to assess trench and pipe effects to groundwater levels and flow.

Water fluctuation along the Project would be impacted during construction in wetlands and waterbodies; however, the water fluctuations would only occur during the installation of the pipe. Any adverse effects are anticipated to be minor in the short-term.

## 6.3.6 SALINITY GRADIENTS

The Project is not expected to have an appreciable effect on salinity gradients as there are no tidal influenced waters in the Project area.

## 6.4   POTENTIAL IMPACTS ON THE BIOLOGICAL CHARACTERISTICS OF THE AQUATIC ECOSYSTEM (40 CFR 230.30-230.32)

## 6.4.1 THREATENED AND ENDANGERED SPECIES

The Corps of Engineers is the lead federal agency and is therefore responsible for Endangered Species Act Section 7 compliance. In addition to Regulatory permits, other federal actions include permission from the Corps to alter a federal Project (Lost River Flood Control Project) under Section 408 of the Rivers and Harbors Act and issuance of a Right of Way (ROW) Grant by Bureau of Indian Affairs (BIA) to cross tracts of land within the interior boundaries of the Fond du Lac Reservation.

A Biological Assessment (BA) has been prepared for the overall Project (dated February 2019). The BA included a description of the actions to be considered and the specific areas that may be affected by the actions. It also included a description of listed species and critical habitat that may be affected by authorized activities specifically within the Corps' permit areas. Refer to Section 2.2 of this document for a description of the Corps action area. The Corps determined that no indirect effects outside of the jurisdictional permit areas would occur and that broadening the action area, within and outside of the Project corridor, would be beyond the limits of the Corps' regulatory authority.

On March 25, 2019, the Corps initiated informal consultation and submitted the BA to the U.S. Fish and Wildlife Service (USFWS). The consultation requested concurrence with the effect determinations as summarized in the table below. The informal consultation also provided notification of "No Effect" determinations for the Whooping crane (Grus Americana), Rufa red knot (Calidris canutus), Piping plover (Charadrius melodus), Dakota Skipper (Hesperia dacotae), Rusty patched bumble bee (Bombus affinis), and the Western prairie fringed orchid (Platanthera praeclara). Specific information and details on the effects determinations is provided in the referenced BA. The BA and documentation of the consultation is hereby incorporated by reference.

Table 3.

| ESA Determinations for Federally Listed Species and Designated Critical Habitat within the Federal Action Areas for the Line 3 Replacement Project | | | | |
|---|---|---|---|---|
| Scientific Name | Common Name | ESA Status | Counties of Potential Occurrence | ESA Determination [b] |
| *Canis lupus* | Gray wolf – western Great Lakes population | Threatened | Kittson, Marshall, Pennington, Red Lake, Polk, Clearwater, Hubbard, Wadena, Cass, Crow Wing, Aitkin, St. Louis, Carlton | NLAA |
| *Canis lupus* | Gray wolf – western Great Lakes population | Critical Habitat | St. Louis | NE |
| *Lynx canadensis* | Canada lynx | Threatened | Marshall, Clearwater, Aitkin, Cass, St. Louis, Carlton | NLAA |
| *Lynx canadensis* | Canada lynx | Critical Habitat | St. Louis | NE |
| *Myotis septentrionalis* | Northern long-eared bat | Threatened w/ 4d Rule | Kittson, Marshall, Pennington, Red Lake, Polk, Clearwater, Hubbard, Wadena, Cass, Crow Wing, Aitkin, St. Louis, Carlton | May affect, but incidental take is not prohibited [c] |

[a] Species list based on the USFWS's Information for Planning and Consultation website (August 2018); USFWS county lists for Minnesota (August 2018); November 2014, January 2017, and January 2018 meetings with the USFWS; and written communications. Final list of federally listed species and designated critical habitat to the USFWS Minnesota-Wisconsin Field Office on October 9, 2018 that was based on the Designated Route.

[b] NLAA = may affect but is not likely to adversely affect; NE = no effect.

[c] The Applicant is adhering to the conservation measure requirements for no prohibited incidental take as outlined in the species Final 4(d) Rule. Project activities qualify for exemption of prohibited take under the species 4(d) rule.

In letters dated July 2 and August 6, 2019, the USFWS concurred with the Corps' designated action areas and effect determinations, concluding the consultation under Section 7 of the Endangered Species Act.

Based on a review of the above information, the Corps has determined that it has fulfilled its responsibilities under Section 7(a)(2) of the ESA. The Project would comply with this factor of the Guidelines.

## 6.4.2 FISH, CRUSTACEANS, MOLLUSK, AND OTHER AQUATIC ORGANISMS

Potential effects on fish and aquatic macroinvertebrate communities includes changes in physical habitat (including flow), riparian and aquatic connectivity, and water quality. There is no permanent loss of aquatic habitat proposed as part of this Project.

Of the 227 waterbodies that would be crossed by the Project, 95 of the waterbodies are ditches, many of which are roadside ditches. 74 of the ditches would be crossed via a trench method and 21 would be crossed via bore method.  The Project would cross 132 streams ranging from perennial to ephemeral flow regimes, of which 21 would be crossed via HDD or bore method, and 111 would be crossed via a trench method. No impact is anticipated to organisms where the pipe would cross a waterbody via an HDD or bore method.  Impacts to aquatic organisms could occur in these areas if a frac-out (loss of drilling mud) occurs during the drilling process. Enbridge would be required to remove any drilling mud that has reached the surface and restore the area to pre-construction conditions as identified in Enbridge's HDD Inadvertent Release

Response Plan.   The MPCA has also prohibited certain compounds from being used in the drilling mud to reduce potential for toxicity.

Waterbodies being crossed by a trench method would impact aquatic organisms temporarily. Temporary impacts to waterbodies would occur during the duration of trenching, pipe installation, backfilling, and initial restoration. Based on information included in Enbridge's EPP, the anticipated duration for pipe installation through water bodies would typically range from 24 to 48 hours.   Enbridge would restore the streams banks that had been disturbed by construction to as near as possible to pre-construction conditions utilizing civil survey data collected pre-Project.  Unstable banks may require bio-engineering which would be accomplished in consultation with the appropriate agencies.  Restoration of the area impacted by the stream crossing should return any functions lost during the relatively short construction period.   Site specific restoration plans, completed in consultation with the appropriate agencies, as well as post construction monitoring would reduce the potential for any long term effects at waterbody crossing sites and to aquatic organisms at the crossing sites.

Enbridge would undertake additional minimization efforts through excluding construction during certain times when aquatic organisms, mainly fish, could be most susceptible to impacts.  The MDNR has identified waters that would be subject to work exclusion dates for in-channel work. The Project would cross five public waters that are MDNR-designated trout streams.  No in-channel work would be allowed in the Straight River, Spring Brook, and Little Otter Creek from November 1 – March 31.  The MDNR granted an exemption to allow for in-channel work during the exclusion dates for two additional trout streams. In addition, MDNR is applying the trout stream timing restrictions at three public water crossings that are not formally designated as trout streams.  Trout streams are considered Special Waters as defined by the MPCA NPDES/SDS Construction Stormwater General Permit (MNR100001). Enbridge would be required to install and maintain redundant erosion and sediment control measures immediately after clearing and prior to initial disturbance at special waters located within 100 feet of the Project as described in Section 2.2.2 of the EPP.  The MDNR also has in-channel work exclusion dates for cool/warm water fisheries.  Enbridge would not be allowed to work in-channel from March 15 – June 30 in cool/warm water fisheries unless the MDNR provides a site-specific exemption.

Other efforts taken to reduce temporary impacts to aquatic organisms include clear span bridges where feasible and site-specific restoration plans for certain waterbodies that have been approve by State agencies. Aquatic organisms, especially invertebrates, will be impacted during the installation of the pipe.  Installation will generally take less than 24 hours, so any impacts to aquatic organisms would be temporary.  Any loading of TSS and associated effects on mercury, phosphorus, and DO will be temporary, limited to the duration of in-stream construction, and therefore are not anticipated to result in long-term effects to streambed composition or benthic invertebrate and fish communities.

Effects to aquatic organisms are anticipated but they would be minor in the short term

## 6.4.3 OTHER WILDLIFE

The discharge of dredged and fill material would result in the loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem. Wildlife habitats include a variety of vegetation communities that provide foraging opportunities, shelter, overwintering,

migration stopover, and breeding habitats for a wide variety of wildlife.   The State EIS identified 10 broad-scale vegetation cover classes that would be crossed by the Project:  evergreen forest, deciduous forest, mixed forest, shrub/scrub, grassland/herbaceous, hay/pasture, cultivated crops, woody wetlands, emergent herbaceous wetlands, and barren land.  Impacts to wetlands would predominantly be temporary, resulting in a temporary loss of wildlife habitat during construction.  However, some wetland vegetation would be temporarily or permanently lost as a result of the construction.  The full 95 foot workspace would include the removal of vegetation during construction and a 10-foot wide swath would be maintained free of trees and woody shrubs.  Outside of the 10-foot wide swath, 20 additional feet (a total of 30 feet wide over the centerline) would be maintained for trees but other woody vegetation such as shrubs would be allowed to grow. The 20 additional feet outside of the 10-foot wide swath over the centerline includes 107.09 acres of scrub-shrub wetland and 194.81 acres of forested wetland temporarily impacted through the clearing required for mainline workspace and access roads.  This temporarily impacted area would be allowed to revegetate after construction and would be monitored to ensure the wetland restoration is progressing towards forested wetland. It is recognized that these wetland types have longer development time than an emergent type wetland.  Therefore, impacts to wildlife would be longer in duration for wooded type wetlands.  This is also recognized in compensatory mitigation requirements discussed in Section 8.0.   The Project also includes 81.36 acres of scrub-shrub wetland and 148.85 acres of forested wetland that would be permanently converted to an emergent type wetland as a result of maintaining an area over the pipeline to facilitate inspection.  The Project would result in a loss of 4.39 acres of wetland for the construction of pump stations and 5.58 acres of wetland for installation of valves and access to the valves.  See table 4.0-1 of the L3R Compensatory Wetland Mitigation Plan for impacts by wetland type.  The changing composition of vegetation could affect resident wildlife unable to adapt to changing conditions. This could be magnified by the permanent loss of trees and shrubs, habitat fragmentation, and changes in vegetation cover in large tracts of forest habitats within the pipeline right-of-way.

The State EIS identified potential fragmentation effects on wildlife habitat which could include a decrease in total habitat area, amount of interior habitat, biodiversity (richness), and connectivity. Fragmentation may also cause an increase in amount of edge habitat, increase the risk of invasive species spread, and isolate some habitat types. The reduction in habitat connectivity can disrupt behavior and movement of species, alter population dynamics, reduce the chance of recolonization in extirpated island habitats, and decrease genetic diversity. Forest-nesting birds are particularly vulnerable to habitat fragmentation effects resulting from linear construction projects. Habitat fragmentation leads to increased predation, increased competition by generalist species, and changes in microclimate and vegetation which may result in extirpation and reduced reproductive success for area-sensitive species. The majority of the Project is co-located with other pipelines, utilities, or road; however, approximately 38 miles of the Project (11% of the total Project length) would not be co-located with other infrastructure. Habitat crossed in this area includes primarily forested and woody wetland habitats.  Impacts to wildlife from habitat fragmentation, particularly as a result of wetland type conversion, could result in displacement of wildlife that rely on those wetland types.  These impacts would be most pronounced in large undisturbed areas.

For terrestrial wildlife adverse impacts upon wildlife habitat will result from changes in habitat alteration, behavioral disturbance from noise, vehicles and human presence, barriers to movement from Project activities, fluctuations in water levels, water flow and circulation, salinity, chemical content, and substrate characteristics.  Most of these activities and impacts would be short-lived, occurring only during construction.  Aside from areas permanently converted, wildlife habitat should be similar to pre-construction conditions.

For birds, effects during construction and operations include habitat alteration or fragmentation from vegetation removal and permanent conversion of some habitat, including potential nest site loss or disturbance, behavioral disturbance from noise, and from vehicles and human presence.

In some locations, changes in behavior as a result of the Project may not be noticeable because some animals would be expected to remain in the vicinity.  However, the Project may disrupt specific movement habits that could result in noticeable changes to movement patterns. While injury or mortality may occur, population level effects are not expected to be detectable given the surrounding landscape and other suitable habitat in close proximity to the Project. Effects to wildlife may be more pronounced in Greenfield routes as a result of habitat fragmentation; however, wildlife is expected to shift habitat and movement locations as a result of the Project. As indicated above, much of the Project would follow existing infrastructure that may have previously impacted wildlife.

Effects to wildlife are anticipated but they would be minor in the long-term.

## 6.5    POTENTIAL IMPACTS ON SPECIAL AQUATIC SITES (40 CFR SECTION 230 SUBPART E)

The technical evaluation factors discussed in this section address potential impacts on the special aquatic sites (Guidelines Subpart E). The effects described in this subpart were considered in making the factual determinations and the findings of compliance or noncompliance in Subpart B.

## 6.5.1 SANCTUARIES AND REFUGES

Sanctuaries and refuges are designated under state and federal laws to be managed principally for the preservation and use of wildlife and fish. There are no sanctuaries or refuges in the Project area.

## 6.5.2 WETLANDS

Section 6.2 of this document discloses the wetland impacts associated with the Project. The majority of the impacts associated with the Project would be temporary, lasting only during the installation of the pipeline, duration of the temporary access roads, and until initial restoration after the pipeline is installed or access roads are removed.  As result of the construction activities, some wetland types would be converted either temporarily or permanently to a different wetland type. Temporary conversion would occur to 107.09 acres of scrub-shrub wetland and 194.81 acres of forested wetland temporarily impacted through the clearing required for mainline workspace and access roads.  These areas would be allowed to revegetate after construction and would be monitored to ensure the wetland restoration is progressing towards forested wetland.  The Project also includes 81.36 acres of scrub-shrub wetland and 148.85 acres of forested wetland that would be permanently converted to and emergent type wetland as a result of maintaining an area over the pipeline to facilitate inspection.

The agencies recognized some wetlands along the corridor were higher functioning or higher value wetland.  During the Project review, the Corps, MPCA and MDNR developed 10 "special"

wetland categories recognizing the higher functioning or higher value wetlands which may result in more or higher functions being temporarily lost or even restored.  These categories of wetlands warrant higher compensatory mitigation ratios to better reflect the temporal loss of functions and services provided by these wetlands. See Compensatory Mitigation Section below for details on compensatory mitigation. The identification of the Special Wetland Categories ensures that both temporary losses to the functions provided by these aquatic resources, and the additional functions and services are appropriately mitigated after all practicable measures have been taken to avoid and minimize adverse impacts.  The Project would impact approximately 410.10 acres of wetland within the special wetland categories (see table 4.1-1 and 5.2-1 of the L3R Compensatory Wetland Mitigation Plan for impacts by special wetland category and impact duration). The following special wetland categories are also described in further detail in Section 3.1 of the L3R Compensatory Wetland Mitigation Plan:

- Cedar Swamps
- Wetlands with State designated S1, S2, or S3 Native Plant Communities
- Forested Vernal Pools/Seasonal Ponds
- Wetlands Hydrologically Connected to Trout Streams or Tributaries to Trout Streams
- State designated Old Growth Forested Wetlands (both Existing and Candidates)
- State designated High Conservation Value Forested Wetlands
- Wetlands with State designated High or Outstanding Biodiversity Sites Special
- Wetlands Hydrologically Connected to Lakes of State designated High or Outstanding Biological Significance a Special
- Wetlands with Known Occurrences of MDNR State-Listed Species, including Important Habitat for Four-toed Salamanders
- Wetlands Hydrologically Connected to Wild Rice Waters

In addition to the special wetland categories, the Project crosses the Gully 30 calcareous fen in Polk County, Minnesota (Gully 30 Fen) which is afforded additional protections by the State of Minnesota.  Projects impacting Calcareous fens, as identified by a MDNR commissioner's written order, may not be filled, drained, or otherwise degraded, wholly or partially, by any activity, unless the MDNR commissioner, under an approved management plan, decides some alteration is necessary (Minn. Stat. §103G.223). Minn. R. part 8420.0935 provides minimum standards and criteria for identifying, protecting, and managing calcareous fens. A calcareous fen is a peat-accumulating wetland dominated by distinct groundwater inflows. The water is circumneutral to alkaline, with high concentrations of calcium and low dissolved oxygen content. The chemistry provides an environment for specific and often rare hydrophytic plants. The portion of Project that crosses the Gully 30 Fen is co-located with Enbridge's LSr and Alberta Clipper pipelines (Lines 65 and 67 respectively). This minimizes potential additional disturbance to listed plants and environmentally sensitive features that would be associated with a Greenfield crossing location.  On October 19, 2020, the MDNR approved the October 2020 Gully 30 Calcareous Fen Management Plan which details construction, avoidance and minimization, restoration, and mitigation.

Along with standard post construction monitoring for all wetlands, Enbridge would conduct MPCA Rapid Floristic Quality Assessment monitoring at wetlands with State-designated S1, S2, or S3 Native Plant Communities, wetlands with High or Outstanding biodiversity, wetlands with known occurrences of MDNR State listed plant species, and sensitive waters as identified by the State agencies.

Discharges in wetlands would have a minor long-term effect in HUC 8 watersheds. See Section 9.0 for assessment of cumulative effects.

## 6.5.3 MUD FLATS

Mud flats are broad flat areas along the sea coast and in coastal rivers to the head of tidal influence and in inland lakes, ponds, and riverine systems. While the Project area includes shallow and deep marsh habitat, these features do not generally develop mud flats. Therefore, there are no mud flats in the Project area.

## 6.5.4 VEGETATED SHALLOWS

Vegetated shallows are permanently inundated areas that under normal circumstances support communities of rooted aquatic vegetation in freshwater rivers and lakes. The Project does cross perennial streams that contain vegetated shallows. Impacts to vegetated shallows would be temporary, lasting only during installation of the pipe and initial restoration.

## 6.5.5 CORAL REEFS

There are no coral reefs in the Project area.

## 6.5.6 RIFFLE AND POOL COMPLEXES

A total of 132 streams ranging from perennial to ephemeral flow regimes would be crossed by the Project.  See section 6.2 for additional breakdown of streams types.  Of the 132 streams crossed, 21 would be crossed with a HDD or bore method which does not include a disturbance to the stream bed.  The remaining streams would be crossed with a trench method which would temporarily impact the stream bed for the duration of the pipe installation.  The applicant would be required to restore the stream banks and streams bed to preconstruction conditions.  Each waterbody crossing was reviewed during interagency coordination.  The EPP describes general measures that would be taken to restore the stream crossing.  In addition, the MDNR and MPCA have required the applicant to submit site specific restoration plans for 46 streams crossings.  Effects to riffle and pool complexes would be minor in the short-term.

## 6.6   POTENTIAL EFFECTS ON HUMAN USE CHARACTERISTICS (40 CFR SECTION 230, SUBPART F)

## 6.6.1 MUNICIPAL AND PRIVATE WATER SUPPLIES

The State EIS completed by the Department of Commerce identified 98 unverified and 205 verified domestic well locations in Minnesota and 1 in North Dakota.

The applicant's proposed Project crosses the City of Oklee, Sundruds Court, and the City of Wrenshall's Wellhead Protection areas.  The applicant has proposed measures such as water appropriation BMPs, erosion/sedimentation controls, spill prevention and control measures, and HDD monitoring and clean-up procedures.  With adherence to these measures, construction impacts on groundwater in these sensitive areas and wells would be temporary and minor.

## 6.6.2 RECREATIONAL AND COMMERCIAL FISHERIES

A portion of the waterbodies and wetlands could support water-related recreation such as hunting, canoeing/kayaking, as well as other activities.  Impacts to water related recreation would be temporary and would be reduced as a result the winter construction procedures that have been proposed.  Any impacts would be minor and short-lived during construction at the crossing of the wetland or waterbody.

## 6.6.3 WATER-RELATED RECREATION

A portion of the waterbodies and wetlands could support water-related recreation such as hunting, canoeing/kayaking, as well as other activities.  Impacts to water related recreation should be reduced as a result the winter construction procedures that have been proposed.  Any impacts would be minor and short-lived during the duration of the crossing of the wetland or waterbody.

## 6.6.4 AESTHETICS

The majority of the Project is co-located with other pipelines, utilities, or roads; however, approximately 38 miles of the Project (11% of the total Project length) would not be co-located with other infrastructure.  Habitat crossed in this area includes primarily forested and woody wetland habitats.

The duration of potential Project impacts on visual resources along the pipeline rights-of way could range from a couple of days during active construction to permanent (e.g., aboveground facilities or a new cleared corridor through forested areas).  During construction, the greatest impacts would be caused by clearing of vegetation, as well as the presence of workers and construction equipment.  HDD and bores would reduce any potential impacts to aesthesis in the area after the construction is complete.

The effects to aesthetics are expected to be negligible and the Project would comply with this factor of the Guidelines.

## 6.6.5  PARKS, NATIONAL AND HISTORICAL MONUMENTS, NATIONAL SEASHORES, WILDERNESS AREAS, RESEARCH SITES, AND SIMILAR PRESERVES

There are no parks, national and historical monuments, national seashores, wilderness areas or research sites in the Project area. The Project would comply with this factor of the Guidelines.

## 6.7   EVALUATION AND TESTING

The following evaluation was conducted to assess the biological availability of possible contaminants in the dredged and fill material.

Material to be discharged into waters of the U.S. at the Project site would either be material that was excavated from the trench and back-filled, or clean fill material discharged for the construction of the pump stations and mainline valves.  Discharges associated with the

installation of the pipe would be adjacent to the extraction site (side-casting), and is subject to the same contaminants as the extractions site.  Levels of contamination are substantially similar at the extraction site and disposal site and the discharge is not likely to result in degradation of the disposal site and pollutants will not be transported to less contaminated areas.  The material would then be returned to the original extraction site of the pipe is installed. Construction mats would also be placed in waters of the U.S. temporarily to facilitate construction which would be free of any contaminants.   This evaluation indicates that the proposed discharge material meets the testing exclusion criteria for reasons describe above.

## 6.8   ACTIONS TO MINIMIZE ADVERSE EFFECTS (40 CFR 230.70-230.77, SUBPART H)

Total avoidance of all water and wetlands is not a practicable alternative consistent with the Project's purpose. The corridor includes numerous interspersed waters and wetlands. This makes total aquatic ecosystem avoidance impractical as described in Section 5.0 above.

The Applicant has identified numerous measures to minimize adverse impacts. These measures are outlined throughout this EA. Additionally, the Applicant has developed a Compensatory Mitigation Plan that identifies proposed compensatory mitigation for unavoidable wetland and stream impacts. Minimization measures described below are the key measures that relate to the discharge of fill material.

The Corps, as well as State agencies, have reviewed the minimization measures proposed by the Applicant and additional minimizations measures identified by the agencies and accepted by the Applicant.  In addition to the Applicant's proposed mitigation measures, and BMPs, the Corps would require additional conditions and stipulations to further minimize impacts. These conditions are described in Section 10 of this EA.

### Wetland boundaries and environmental avoidance areas

Enbridge would post signs or flag the following environmental features along the construction workspace and improved access roads.  Not all of these are within the Corps' regulatory authority:

- Wetland boundaries and waterbody crossing locations.
- Drainage/drain tiles identified by the counties and the landowners.
- Various trails, canoe routes and water access sites and other recreational areas as required by permit conditions.
- Buffer zones for environmentally sensitive features, including archaeological and historic sites, bald eagle nests, rare plant or ecological communities, and other sensitive wildlife species and/or habitat per agency consultations.
- Areas where typical construction sequence may be delayed due to permit/certification restriction, such as timing or clearing restrictions.  See seasonality minimization measures below.
- Invasive and noxious species locations, including infested waters as identified in Enbridge's Invasive and Noxious Species ("INS") Management Plan.

**Duration of impacts**

- To minimize the duration of temporary impacts as a result of trenching and pipe installation, possibility of significant erosion, and potential discharges to waterbodies caused by weather events, Enbridge would perform the authorized work in segments, referred to as spreads. Enbridge would limit the cumulative amount of excavated open trench within each spread to no more than three days of anticipated welding production, which must not exceed more than 14,000 linear feet. The trailing end of each trench must not be back filled and best management practices (BMPs) must be in place as the leading edge of the trench is opened. Each open spread would be fully staffed and equipped to operate independently of any other open spread. Within each spread, site-specific activities, such as HDDs, bores, road bores, alive work and pumping station construction activities may be performed independent of open trench work

**Seasonality**

MDNR identified six (6) public water crossings where winter construction ("MDNR Priority Crossings") would be particularly important to prevent environmental impacts to sensitive environmental resources, such as sites of biodiversity, high conservation value forests, native plant communities and large wetland/peatland complexes. In its October 2020 Application for a License to Cross Public Waters Enbridge committed to complete the following MDNR Priority Crossings in winter to the extent feasible:

- Water ID No. 41 MP 100.5 Big Swamp Creek – part of a large riparian wetland/peatland complex that flows into a site of high biodiversity.

- Water ID No. 50 MP 1053.4 Unnamed Stream – part of a large riparian wetland/peatland complex that contains a site of moderate biodiversity and State-listed threatened or endangered species.

- Water ID No. 51 MP 1056.6 Moose Lake/Moose Lake Tributary – part of a large riparian wetland/peatland complex that flows into a lake of outstanding biodiversity and is adjacent to a wildlife management area.

- Water ID No. 54 MP 1070.9 Unnamed Stream – trout stream that flows through a large riparian wetland/peatland complex and into a site of high biodiversity.

- Water ID No. 55 MP 1075.5 Unnamed Stream – part of a large riparian wetland/peatland complex that is a site of high biodiversity, connects lakes of high and outstanding biodiversity and has the potential for wild rice.

- Water ID No. 56 MP 1076.9 West Savanna River – part of a large riparian wetland/peatland that is a site of high biodiversity, connects lakes of high and outstanding biodiversity and has wild rice at the crossing.

In those areas where the construction start date allows for winter/frozen conditions construction, Enbridge would adjust typical restoration and stabilization procedures to minimize impacts on the aquatic ecosystem. Examples of these mitigation measures taken form the Winter Construction Plan and the EPP include:

- Where final grading and/or seeding of stream banks is not feasible during winter conditions, Enbridge would temporarily stabilize all exposed areas, including spoil piles, as described in Section 1.9.1 of the EPP. Additional final grading may be performed once soils have thawed and conditions allow. Permanent seeding would proceed after final grading as described in Section 7.0 of the EPP.

- Enbridge has prepared site-specific restoration plans in coordination with MDNR and MPCA for riparian areas that may require specialized seed mixes, plantings of woody vegetation, or other specialized restoration techniques. Some of those measures may not be easily implemented during winter conditions. In these cases, Enbridge would temporarily stabilize these areas, including spoil piles, as described in Section 1.9.1 of the EPP until site conditions permit restoration in accordance with these specialized restoration plans (Winter Construction Plan, Sect. 2.6.2).

- To minimize the potential for introduction and/or spread of invasive and noxious species due to hydrostatic testing activities during frozen conditions, Enbridge would follow the procedures outlined in the INS Management Plan (Appendix B of the EPP).

- As outlined in Sections 7.1.2.1 and 7.3 of the Winter Construction Plan, temporary vegetation should be established at any time between April 1 and October 15 or frozen soil. Enbridge would delay seeding during frozen ground conditions until the applicable spring seeding period or would complete dormant seeding where conditions allow as described in Section 7.3.1 of the Winter Construction Plan.

Enbridge would adhere to the following work-exclusion dates for Minnesota Public Water Inventory cool- and warm-water fisheries that require in-channel work, or would seek a waiver with the MDNR:

- Region 1 (Northwest) Non-Trout Streams: March 15 – June 30;
- Region 1 Lakes: March 15 – June 30; and
- Region 2 (Northeast) Non-Trout Stream and Lakes: March 15 – June 30.

In addition, Enbridge would adhere to the following work-exclusion dates in designated Minnesota trout streams and their designated tributaries that require in-channel work to allow for spawning and migration, or would seek a waiver with the MDNR:

- Region 1 (Northwest): September 1 – June 30;
- Region 2 (Northeast): September 15 – June 30; and
- Region 2 within the Lake Superior watershed: September 15 – June 30.

In addition, Enbridge would not execute the HDD crossing method at waterbodies during frozen conditions (i.e., ice-covered waterbody), unless otherwise approved by the MPCA and MDNR on a case-by-case basis.

In-stream construction activities (specifically trenching, pipeline installation, backfill, and restoration of the streambed contours) for open cut (non-isolated) crossing methods would occur within the following timeframes:

- Minor Waterbodies (all waterbodies less than or equal to 10 feet wide at the water's edge at the time of crossing): 24 hours.
- Intermediate Waterbodies (all waterbodies greater than 10 feet wide but less than 100 feet wide at the water's edge at the time of crossing): 48 hours.
- Major Waterbodies (all waterbodies greater than 100 feet wide at the time of crossing): As specified by Enbridge or in the applicable permits.

In order to protect aquatic life use during sensitive periods, Enbridge would not conduct construction activities in any wetland not permitted for permanent fill from April 11 through June 1 for non-sensitive waters and from April 1 through June 15 for sensitive waters.

Due to the risk of an undetected inadvertent release of drilling mud into a stream that is covered with ice, Enbridge would not conduct HDD stream crossing construction activities during frozen conditions unless otherwise approved by the MPCA and MDNR on a case-by-case basis.

## Actions affecting Wild Rice

- The MPCA Individual Section 401 Water Quality Certification prohibits Enbridge from conducting in-channel work in waters in close proximity to known wild rice waters, identified in Table 5.4-1 in Enbridge's Antidegradation Assessment for Section 401 Water Quality Certification, from April 1 through July 15.

## Actions to reduce area of impact

- Enbridge would reduce (i.e. neck down) the construction workspace from the standard 120-foot width in upland areas to 95 feet in wetlands, waterbodies, and in selected locations near sensitive features. Further reduction of the construction workspace below a minimum width of 95 feet is not a practicable alternative due to equipment and storage logistical requirements to safely install the pipeline and site-specific conditions. See table 2.3-1 below from the November 2020 Environmental Protection Plan.

| Table 2.3-1 Typical Construction Workspace and Permanent Right-of-Way Dimensions for the Line 3 Replacement Project | | | |
| --- | --- | --- | --- |
| Route Segment | Permanent Right-of-Way (feet) | Temporary Construction Workspace (feet) | Total Land Requirements (feet) |
| Co-located with Enbridge Pipeline | 50 (~25 new) | 70 (uplands) | 120 (uplands) |
| | | 45 (wetlands) | 95 (wetlands |
| Co-located with Foreign (Third-Party) Utility | 50 | 70 (uplands) | 120 (uplands) |
| | | 45 (wetlands) | 95 (wetlands |
| Co-located with Foreign Utility in Saturated Wetlands | 50 | 70 (uplands) | 120 (uplands) |
| | | 45 (wetlands) | 95 (wetlands |
| Greenfield | 50 | 70 (uplands) | 120 (uplands) |
| | | 45 (wetlands) | 95 (wetlands |

- To minimize impacts to aquatic resources associated with removal of vegetation, Enbridge would clear no more than 30 feet of vegetation within the 50-foot permanent right-of-way along the HDD drill path. No grading or trenching would occur along the drill path except where free-span engineered bridges would be installed. In addition, to aid in stabilizing soils and reducing erosion potential, Enbridge would minimize removal of vegetation along stream banks and maintain roots of vegetation removed.

## 6.9  FACTUAL DETERMINATIONS (40 CFR 230.11)

The determinations of potential short or long-term effects of proposed discharges of dredged or fill material on the physical, chemical and biological components of the aquatic environment are discussed below. Determinations are based on the information above, including actions to minimize and consideration for contaminants. These "factual determinations" are used to evaluate compliance with Restrictions on Discharges – see Section 6.10 below.

**PHYSICAL SUBSTRATE DETERMINATION**
Based on consideration of the information above in Section 6.3.1 of this document, incorporation of actions to minimize effects and the applicant's compliance with special conditions in Section 12 of this document, the Project would have a minor long-term effect on physical substrate.

**WATER CIRCULATION, FLUCTUATION AND SALINITY DETERMINATIONS**
Based on consideration of the information above in Sections 6.3.3, 6.3.4, 6.3.5, and 6.3.6.of this document, incorporation of actions to minimize effects and the applicant's compliance with special conditions in Section 10 of this document, the Project would have a minor long-term effect on water circulation, fluctuation and salinity.

**SUSPENDED PARTICULATES/TURBIDITY DETERMINATIONS**
 Based on consideration of the information above in Section 6.3.2 of this document, incorporation of the actions to minimize effects and the Applicant's compliance with special conditions in Section 10 of this document, and the Applicant's compliance with the NPDES/SDS permit, the Project would have minor short term effects on suspended particulates and turbidity.

**CONTAMINANT DETERMINATION**
Based on consideration of the information above in Section 6.7 of this document, incorporation of actions to minimize effects and the applicant's compliance with special conditions in Section 10 of this document, and the Applicant's compliance with the Section 401 and Section 402 (National Pollutant Discharge Elimination System) CWA permits, contaminants would not have more than a minor adverse impact. The levels of contamination at the Project would be similar to what is already occurring along the corridor since the majority of the Project would discharge dredged material that has been excavated from the trench.

**AQUATIC ECOSYSTEM AND ORGANISM DETERMINATIONS**
Based on consideration of the information above in Sections 6.4 and 6.5 of this document, incorporation of actions to minimize effects and the applicant's compliance with special conditions in Section 10 of this document, the Project would have a minor short-term effect on the aquatic ecosystem and organisms.

**PROPOSED DISPOSAL SITE DETERMINATION**
Based on consideration of the information above in Section 6.2 of this document, incorporation of actions to minimize effects and the applicant's compliance with special conditions in Section 10 of this document, the Project would have a minor long-term effect on the disposal sites.

**DETERMINATION OF CUMULATIVE EFFECTS ON THE AQUATIC ECOSYSTEM**
Cumulative effects are discussed in Section 9 of this document.
**DETERMINATION OF SECONDARY EFFECTS ON THE AQUATIC ECOSYSTEM**
Secondary effects are discussed in Section 9 of this document.

## 6.10  DETERMINATION OF COMPLIANCE WITH THE SECTION 404(b)(1) GUIDELINES (40 CFR 230.10(a-d) AND 40 CFR 230.12)

This determination of compliance is based on the conclusions of factual determinations and technical evaluation factors of this analysis and takes into account the detailed analysis of impacts on specific physical, chemical, biological and human characteristics of the aquatic ecosystem conducted as part of the EA. Additionally, Subpart H of the Section 404(b)(1) Guidelines (see Section 6.8 above) summarizes key measures that relate to the discharge of fill material into waters of the U.S. to minimize adverse effects.

Based on consideration of the above, it has been determined that the proposed discharge of dredged and fill material would not:

(1) Violate any applicable State water quality standard. The State water quality agency, MPCA, issued its conditioned Section 401 Water Quality Certification for the discharge of fill material into waters in association with the Applicant's proposed Project as described in Section 1.2.

(2) Cause or contribute to violations of any applicable water quality standards and would not violate any toxic effluent standards under section 307 of the CWA.

(3) Jeopardize the continued existence of any species listed as endangered or threatened species under the Endangered Species Act of 1973 (ESA) or their critical habitat. See Section 6.4.1 for species effects determinations.  The USFWS concurred with the Corps' determinations and the Project will have no effect on listed species.

(4) Violate any requirement imposed by the Department of Commerce to protect marine sanctuaries under Title III of the Marine Protection, Research, and Sanctuaries Act of 1972. This is not applicable as there are no marine sanctuaries in the Project area.

Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of waters of the U.S. [40 CFR 230.10(c)]

Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests are required by the Section 404(b)(1) Guidelines under subparts B and C, after consideration of subparts C through F. The discharge shall not be permitted if it:

(1) Causes significant adverse effects through pollutants on human health or welfare, municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites. These factors for the proposed Project have been thoroughly evaluated above.

(2) Causes significant adverse effects through pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems. These factors for the proposed Project have been thoroughly evaluated above.

(3) Causes significant adverse effects through pollutants on aquatic ecosystem diversity, productivity, and stability to the loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy. These factors for the proposed Project have been thoroughly evaluated above.

(4) Causes significant adverse effects through pollutants on recreational, aesthetic, and economic values. These factors for the proposed Project have been thoroughly evaluated above.

No significant adverse effects from pollutants would occur on the resources described in (1)-(4) above provided the Applicant complies with all approved permits including general and special conditions of those permits. The Project is compliant with the Section 404(b)(1) Guidelines.

# 7.0 PUBLIC INTEREST REVIEW

## 7.1 EVALUATION OF GENERAL CRITERIA

The Project includes all practicable measures to minimize impacts to important resources of concern including air, water, fish and wildlife, historic properties and cultural resources. The Corps has determined, after evaluation of the following general criteria (i – iii below) and the factors listed below, that the proposed Project will not be contrary to the public interests long as all measures identified in Section 6.8 of this EA are implemented, and permit special conditions (Section 10.0), are complied with.

i.    The relative extent of the public and private need for the proposed work:

The Applicant's stated need for the proposed Project is to replace an existing crude oil pipeline to meet current and forecasted demands from producers and shippers, and to ensure continued reliable crude oil transportation to refiners.

 This need is driven by domestic and global demand for this product as well as the need to replace the existing line 3 which continues to develop anomalies that require maintenance (integrity digs) due to construction practices and pipe specifications at the time of the installation of line 3.

ii. The practicability of using reasonable alternative locations and/or methods to accomplish the objective of the proposed structure or work:

Overall, the Corps finds that practicable alternatives that do not impact waters of the U.S. and/or special aquatic sites do not exist as a result of geographical and technological constraints of the Project. An analysis of practicable alternatives and the Corps' LEDPA determination is presented in Section 5 of this document.

iii. The extent and permanence of the beneficial and/or detrimental effects that the proposed structures or work may have on the public and private uses which the area is suited:

The majority of the Project is co-located with other pipelines, utilities, or roads; however, approximately 38 miles of the Project (11% of the total Project length) would not be co-located with other infrastructure and would cross numerous land types and land-ownerships, generally including public and private land. As identified below, the Project would have temporary impacts on many factors due to the pipeline installation process.  Once the pipeline is installed, disturbed areas would be restored to preconstruction conditions except where woody vegetation would need to be maintained to facilitate inspection of the pipe.  Negative effects of the Project would include conversion of wetlands types, habitat fragmentation in Greenfield routes, loss of wetland functions temporarily during construction, and permanent loss of wetland functions for installation of mainline valves and pump stations.  Temporary and permanent impacts, including wetland type conversion, are discussed throughout this EA.  Loss of wetland functions associated with the Project would be compensated for through the purchase of wetland mitigation bank credits.  See Section 8.0 below for detailed discussion of compensatory mitigation. Many impacts would be minimized through measures to be implemented by the Applicant, through compliance with required state and federal regulations, and by specific permit conditions imposed by the respective permits.

The beneficial effects would be to employment opportunities and tax revenue as a result of the Project.  As described in Section 7.3 below, the Project is expected to require 4,200 workers which would also have a beneficial effect through taxable income.  This Project will also benefit the communities (from continuing to employ local residents), services provided not related to the Project, and others in the U.S. who would use the products of crude oil.

The Corps has determined that the Project proposed by the Applicant adequately compensates for the aquatic resource functions that would be lost as a result of the Project. Furthermore, the Corps concludes the Project would not have detrimental effects on the public and private uses for which the area is suited.

## 7.2 CONSERVATION (33 CFR 320.4(m) and 320.4(p))

Federal laws, executive orders, and agency regulations and policy guidance frequently address the need for conservation of natural resources. The Corps Regulatory Program, by authority, is focused on conservation of waters of the U.S., including wetlands. As described throughout the other subsections in Section 7, this evaluation discloses that conservation of natural resources would be accomplished by the proposed action. The proposed action would impact land, streams and wetlands, wildlife, aquatic species, vegetation, soils, and air. The effects on these resources are discussed throughout this EA.

Conservation measures have been considered and incorporated into the Project to minimize impacts, including, minimizing construction and additional work space, minimizing vegetative clearing, constructing during frozen conditions, and not constructing in streams during certain periods of the year. Following existing infrastructure for the majority of the Project would limit the amount of new corridor which would reduce habitat fragmentation.  For those areas that would

be impacted, either temporarily or permanently, the applicant would be required to provide compensatory mitigation as is outlined in Section 8.0 of this document.

The Corps has determined the Project would have no adverse impacts on conservation because the compensatory mitigation replaces the lost functions and values of the wetland impacts.


# 7.3 ECONOMICS (33 CFR 320.4(q))

Corps regulations specify that when the applicant is a private enterprise, it is generally assumed that appropriate economic evaluations have been completed, and that the proposal is economically viable, and needed in the marketplace (33 CFR 320.4(q)).

As identified in the State EIS, the Project is anticipated to have positive effects on employment, income, and tax revenue. Direct impacts on employment would be driven by the large number of construction personnel. Although it is not expected that all workers would live in the counties where construction would occur, some would be expected to temporarily relocate to these counties during construction or spend money locally which could result in temporary county-level income changes in supporting industries. Enbridge has indicated that labor agreements in Minnesota require that at least 50% of workers would be expected to be employed from local union halls. Construction of the Applicant's proposed Project is expected to require 4,200 workers across 6 different construction spreads over a 12-month period. Construction workers who relocate to the Project area would spend a portion of their income on local goods and services such as food, gas, and lodging. These expenditures would increase revenues for those types of services for the duration of the construction period in the area of the construction spread. In addition to direct Project-related employment, a large portion of the construction-related expenses would be for construction materials, supplies, equipment, parts, and other goods and services such as fuel, hardware, and parts. The State EIS indicated the Applicant estimated the material costs for construction of its proposed Project in Minnesota to be $438.9 million.

Tax revenues would increase due to the increase in labor income (i.e., taxable income), sales tax on the purchase of goods locally, and property taxes. Construction would also have a temporary indirect influence on economic conditions due to employment and income for service industries supporting construction activities (e.g., the hotel industry, fueling services, and the food service industry).

The State EIS indicates State and county tax revenues would increase due to increased employment payrolls directly associated with construction. Income taxes are generated at the state level and reapportioned to county governments as determined by the state. Table 5.3.4-11 of the State EIS presents the estimated increase in the state income tax that would be appropriated to each county crossed by the Project based on the portion of total length of the pipeline through each county. The State of Minnesota would receive approximately $98 million in income tax receipts, which is less than 1 percent of the amount that Minnesota currently receives in income tax revenue. This positive impact on income tax revenues would be limited to the duration of the construction timeframe.

The Corps has determined that the Project is expected to have a beneficial effect on the local and regional economies.

## 7.4 AESTHETICS (33 CFR 320.4(a))

The majority of the Project is co-located with other pipelines, utilities, or roads; however, approximately 38 miles of the Project (11% of the total Project length) would not be co-located with other infrastructure.  Habitat crossed in this area includes primarily forested and woody wetland habitats.

The duration of potential Project impacts on visual resources along the pipeline right-of-way could range from a couple of days during active construction to permanent (e.g., aboveground facilities or a new cleared corridor through forested areas). During construction, the greatest impacts would be caused by clearing of vegetation, as well as the presence of workers and construction equipment.  HDD and bores would reduce any potential impacts to aesthetics in the area after the construction is complete. Most of the view shed along the Applicant's preferred route contains existing pipelines and transmission lines and the changes in viewshed would decrease over time from revegetation of temporary construction work areas and to a lesser degree the permanent right-of-way.

The Corps has determined the Project would have minor impacts on aesthetics.

## 7.5 GENERAL ENVIRONMENTAL CONCERNS (33 CFR 320.4(a))

General environmental concerns that were identified and are not standard public interest topics include noise and vibration, air quality, hazardous materials and greenhouse gas emissions including contribution to climate change.

The Project would have short term increases in noise and vibration levels above ambient levels as a result of construction activities and equipment required for the initial clearing or the work space, installation of the pipe, access roads, construction of pump stations and mainline valves, and initial restoration. The Applicant is also expected to comply with the noise standards set forth in Minnesota R. 7030.0010 to 7030.0080 at all times during the operation of any emission units. This is a state only requirement.

The State EIS assessed air quality impacts as a result of the construction.  The pipe would be constructed in six separate spreads or sections so emissions would not be concentrated in one location. Dust would be minimized from construction activities by wetting soils on the ROW during dry conditions.  The majority of the construction would occur during winter conditions which should reduce the potential for dust impacts to air quality.  The Applicant has developed a Fugitive Dust Control Plan which outlines the procedures that would be utilized for dust suppression on the construction ROW and access roads.

The main impacts associated with the Project include wetland conversion.  The permanent and temporary ROW would be returned to pre-Project contours after the Project is completed. The permanent ROW would be maintained free of trees and woody scrub-shrub species and the temporary ROW would be allowed to re-vegetate or would be replanted.  See sections 6.5.2 and 7.6 of this document for additional details regarding conversion of wetland types.

Enbridge has also prepared an Environmental Monitor Control Plan (October 2020) to ensure that appropriate systems are in place to achieve compliance with the various L3R plans (including the PCMP and the related Mitigation Plan), permits and authorizations that have been

developed for, or must be issued prior to, Project construction. Independent Third-Party Environmental Monitors (IEMs) involved in Project compliance include agency monitors, Tribal monitors (TMs), and Agricultural Monitors.  Enbridge would fund the IEMs, but they would report directly to and be under the control of agencies (i.e. the Minnesota Department of Commerce, Energy Review and Analysis, MDNR, MPCA, the Minnesota Department of Agriculture) or participating Tribes. The IEMs would focus on compliance with requirements of permits, licenses, and certifications issued by the agencies and would communicate through daily reports submitted to the applicable agencies and/or participating Tribes and Enbridge via the electronic reporting system, as well as through daily communication with Enbridge's Environmental Inspection Team. The IEMs would communicate directly with their respective agency or Tribal Point of Contacts and with Enbridge's EIs.

With respect to hazardous materials, accidental release of these materials during transportation, storage, handling, and/or use at the Project could impact air, water, soil and ecological resources. Section 10.0 of the EPP outlines spill prevention and response for storing, handling, and cleanup of spills of regulated substances. Their handling, storage, and disposal are regulated by a number of state and federal laws. Adherence to these would limit the potential for hazardous material effects on the general environment. Given overall Project design there would be no significant adverse effects from the proposed use or generation of hazardous wastes by the Project.

**Climate Change.** The proposed activities within the Corps' federal control and responsibility likely would result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions. Greenhouse gas emissions have been shown to contribute to climate change. Aquatic resources can be sources and/or sinks of greenhouse gases. For instance, some aquatic resources sequester carbon dioxide whereas others release methane; therefore, authorized impacts to aquatic resources can result in either an increase or decrease in atmospheric greenhouse gas. These impacts are considered de minimis and are negated through compensatory mitigation. Greenhouse gas emissions associated with the Corps' federal action may also occur from the combustion of fossil fuels associated with the operation of construction equipment. The Corps has no authority to regulate emissions that result from the combustion of fossil fuels. These are subject to federal regulations under the Clean Air Act and/or the Corporate Average Fuel Economy (CAFE) Program. Greenhouse gas emissions from the Corps' action have been weighed against national goals of energy independence, national security, and economic development and determined not contrary to the public interest. An analysis of greenhouse gas emissions was conducted by the Minnesota Department of State and included in the State EIS.

In summary, the Corps has determined noise, air, greenhouse gas emissions, and hazardous materials associated with the Project would have negligible to minor impacts on general environmental concerns.

# 7.6 WETLANDS (33 CFR 320.4(b))

Enbridge conducted wetland delineation surveys along 100 percent of the Project between 2013 and 2020 to identify the wetlands that would be affected during Project construction. Wetlands were identified and mapped in accordance with the Great Plains, Midwest, and Northcentral and Northeast Regional Supplements of the 1987 Corps of Engineers Wetland Delineation Manual. As described in earlier sections of this document, 1,049.58 acres of wetland would be temporarily impacted as a result of pipe installation and installation of temporary access roads,

and 9.97 acres of wetland would be permanently loss as a result of construction of mainline valves and pump stations. Of the total temporary impacts, the Project includes 107.09 acres of scrub-shrub wetland and 194.81 acres of forested wetland temporarily impacted through the clearing required for mainline workspace and access roads.  This area would be allowed to revegetate after construction and would be monitored to ensure the wetland restoration is progressing towards forested wetland.  In addition, 81.36 acres of scrub-shrub wetland and 148.85 acres of forested wetland will be permanently converted to an emergent type wetland as a result of maintaining an area over the pipeline to facilitate inspection.  No permanent conversion of emergent type wetlands is proposed.   Section 6.5.2 further describes the effects of the wetland impacts associated with the Project, and Section 9 includes a discussion of these impacts based on 8-digit HUC watersheds.

Monitoring of impacts and restoration sites would be required as outlined in the Post Construction Monitoring Plan, and would generally be conducted for a period of 5 years after construction.  Monitoring would no longer be required once restoration sites have met performance standards outlined in the plan and permit.  Financial assurances would also be required and included in the plan to allow for remediation or mitigation of any unanticipated impacts identified during the monitoring period.  See November 2020 Post Construction Monitoring Plan for details regarding post construction monitoring, performance standards, and financial assurances.

To offset unavoidable loss of wetland functions associated with the Project, the Applicant would purchase a total of 310.12 wetland bank credits. The vast majority of these credits will be purchased from banks in Bank Service Areas (BSAs) in which the impacts occur.  See Table 5.2-1 and Appendix A of the October 2020 L3R Compensatory Wetland Mitigation Plan for a summary of required mitigation bank credits by BSA.  More information on the amount of compensatory mitigation and other details are provided in Section 8.0 of this document.

Enbridge would provide no less than $27,377,298 in financial assurances in a manner acceptable to the Corps, MPCA, and MDNR to ensure a high level of confidence that the restoration of wetlands and waters to pre-construction conditions would be successfully completed in accordance with the performance standards specified in the PCMP. The financial assurances approved by the Agencies would be in place before Enbridge commences any activity permitted by the Corps Section 404 Clean Water Act ("CWA") and Section 10 Rivers and Harbors Act Permit, and the Section 401 CWA water quality certification and applicable MDNR license and leases. The permits, certifications and authorizations or the approved financial assurances instrument would clearly specify the conditions under which the financial assurances would be released to Enbridge and/or other financial assurance provider, including, as appropriate, linkage to achievement of performance standards, adaptive management, or compliance with Corps permit special conditions.

Based on avoidance, minimization and compensation measures to offset impacts to wetland in association with the Project, impacts to wetlands would be minor.

## 7.7 HISTORIC PROPERTIES (33 CFR 320.4(e))

The Project is considered an undertaking as defined in 36 CFR Part 800, the regulation implementing Section 106 of the National Historic Preservation Act (NHPA). The intent of Section 106 is for federal agencies to take into account the effects of a proposed undertaking on historic properties and to consult with the Advisory Council on Historic Preservation (ACHP),

State Historic Preservation Offices (SHPOs), federally recognized tribes, other federal agencies with concurrent undertakings in connection with the Project, local governments, and any other parties with a demonstrated interest in the proposed undertaking and its potential effects on historic properties.

As the lead federal agency, the Corps consulted with numerous tribes and Minnesota SHPO on determinations of National Register of Historic Places (NRHP) eligibility of identified cultural resources in the APE, and on the effects of the Project on historic properties.

The October 2020 Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) was developed to implement the avoidance, minimization, and protection measures for resources identified by Tribes, and tribal monitoring during construction will occur along the entire line. A special condition included in the DA permit will require compliance with the October 2020 AMIP.

The Corps has determined the Project would have minor adverse impacts on historic properties. See Section 11.3 for details of compliance with Section 106 of NHPA, and Tribal coordination and consultation.

## 7.8 CULTURAL VALUES (33 CFR 320.4(e))

The Project traverses territory ceded as part of the 1854 Treaty between the U.S. Government and the Chippewa of the Mississippi and Lake Superior, the 1855 Treaty between the U.S. Government and the Chippewa of the Mississippi, and the 1863 Treaty between the U.S. Government and the Chippewa.

The Chippewa of Lake Superior (Anishinaabe) who reside in the 1854 Ceded Territory are the Fond du Lac, Grand Portage, and Bois Forte Bands of the Minnesota Chippewa Tribe (MCT). The Chippewa who reside in the 1855 Ceded Territory include the Leech Lake Band and the White Earth Band of the Minnesota Chippewa Tribe. The Chippewa who reside in the 1863 Ceded Territory includes the Red Lake Nation/Red Lake Band of Chippewa Indians.

The rights to hunt and fish (gather or take) subsistence resources within Ceded Territories were retained by the Bands on a usufruct basis.

Natural resources and the lands on which they are gathered are important to the Bands for a number of reasons, including cultural, spiritual, and/or historical meanings. The Project would result in direct and indirect environmental effects due to ground-disturbing activities. Construction across waterbodies could result in increased turbidity and sedimentation, stormwater runoff and erosion from cleared vegetation, changes to stream flow due to HDD testing water, or degradation of aquatic habitat from in-stream construction which has the potential to affect wild rice. With implementation of mitigation measures, impacts would be minor and temporary.  See Section 6.3 for details regarding substrate, TSS, and other potential temporary impacts to water and Section 6.8 for actions taken to reduce potential impacts to wild rice.

The Corps consulted with the Bands to understand how the proposed federal actions may impinge on or abrogate treaty rights. See Section 10 for detailed discussion on Tribal coordination and consultation.  A Tribal Cultural Resources Survey (TCRS) of the Project corridor and elder interviews were conducted for the Project, led by the Fond du Lac Band of the Minnesota Chippewa Tribe.  The TCRS allowed tribal members, with representation from

numerous tribes including resident Bands and ancestral Tribes, to walk the entire proposed corridor and to connect, or reconnect, with the land and resources.  Trygg maps identified historic trails that the Project would traverse, and those locations were given additional investigation by tribal survey crews, and were identified as potential Cultural Corridors.  Elder interviews were conducted in a number of tribal communities which added additional information of tribal use of the general area, although little to no specific information concerning the use of natural resources by Bands along the proposed Project corridor.  A small number of resources were identified as significant to tribes during the TCRS; all resources have been avoided through Project re-design (e.g., alignment shifts or alternative route), or potential impacts minimized through proposed minimization and protection measures (e.g., reduce work space, use of HDD).  The Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) was developed to implement the avoidance, minimization, and protection measures for resources identified by Tribes, and tribal monitoring during construction would occur along the entire line. The AMIP supports our effect finding, which was supported by consulting Tribes' tribal historic preservation staff, that the undertaking would have no adverse effect on historic properties and properties significant to Tribes.  A good faith effort was made by the Corps to identify use areas in or adjacent to the Project corridor.

Construction of the Project is not likely to significantly reduce overall availability of 1854 Treaty resources that are typically part of subsistence activities in the 1854 Ceded Territory, 1855 Treaty resources that are typically part of subsistence activities in the 1855 Ceded Territory, or 1863 Treaty resources that are typically part of subsistence activities in the 1863 Ceded Territory.  Some individuals and localized populations may be affected during construction activities, but overall species populations are expected to remain available.

The Project is not anticipated to have long-term effects on 1854, 1855, or 1863 Treaty resources as a result of installation of the pipeline and initial restoration of the ROW occurring quickly.

The Corps has determined the Project would have minor adverse impacts on cultural values.

## 7.9 SCENIC/RECREATIONAL VALUES (33 CFR 320.4(e))

Impacts to scenic values includes aesthetic (visual resources) which are described above in Section 6.6.4. The majority of the Project is co-located with other pipelines, utilities, or road; however, approximately 38 miles of the Project (11% of the total Project length) would not be co-located with other infrastructure (Greenfield route).  This Greenfield route has the potential to impact scenic values for some as a result of opening a new corridor. Enbridge has minimized the ROW and works space to the maximum amount practicable to reduce environmental impacts, including scenic values in this area.

Under the National Scenic Byways Program, the Secretary of Transportation designates scenic byways, recognized as "roadways having outstanding qualities of scenic, historic, cultural, natural, recreational, and archeological qualities".  The State EIS identified scenic byways that would be crossed by the Project. The Project would cross one national byway in Minnesota (Great River Road) twice, once in Clearwater County and again in Aitkin County, and three state designated byways in Minnesota (Lake Country in Hubbard County, Veterans Memorial in Carlton County, and King of Trails). The Project would cross scenic byways using a bore or HDD, which would avoid road closures and any direct impacts on the roads. Therefore, there would be no impacts to scenic byways or recreational values of the scenic byways.

Recreational opportunities are discussed in Sections 6.6.2, 6.6.3, and 6.6.5 above.

The Corps has determined effects of the proposal on scenic and recreational values are negligible.


# 7.10 FISH AND WILDLIFE (33 CFR 320.4(c))

There are no federal or state-listed threatened or endangered fish or macroinvertebrate species known to occur in the Project area. There are other common fish and macroinvertebrate species found in the majority of the waterbodies crossed by the Project, especially natural streams. See sections 6.4.2 and 6.4.3 for discussion of impacts to fish and wildlife.

The following federally listed species are present in portions of the Project corridor:  Gray wolf (Canis lupus), Canada lynx (Lynx canadensis), piping plover (Charadrius melodus), Dakota skipper (Hesperia dacotae), , Poweshiek skipperling (Oarisma poweshiek),  Whooping crane (Grus Americana}, Rufa red knot (Calidris canutus), Rusty patched bumble bee (Bombus affinis), Western prairie fringed orchid (Platanthera praeclara), and Northern long-eared bat (Myotis septentrionalis).

Critical habitats are present in portions of the Project corridor for the following species:  Gray wolf (Canis lupus), Canada lynx (Lynx canadensis), piping plover (Charadrius melodus), Dakota skipper (Hesperia dacotae), and Poweshiek skipperling (Oarisma poweshiek)

The impacts and effects determinations for federally listed species are discussed in detail in Section 6.4.1.

Based on the above discussion the Project would have minor adverse effects on fish and wildlife.  There is unlikely to be a noticeable change in animal population character or quantity as a result of the Project since the majority of the impacts are temporary.

The Corps has determined the Project would have minor adverse impacts on fish and wildlife.

# 7.11 FLOOD HAZARDS (33 CFR 320.4(l))

The State EIS included identified FEMA-designated floodplains that would be crossed by the Project.  Approximately 31 miles (432 acres) of the construction work area along the Applicant's proposed Project would be located within FEMA-mapped 100-year floodplains in the counties for which FEMA mapping has been conducted.  One construction access road (totaling approximately 4 acres) would be located in the 100-year floodplain. No pump stations would be located in a 100-year floodplain, but portions of three mainline valves, including an associated access road, would be located in a designated 100-year floodplain.  These activities would temporarily alter floodplain topography, which could result in minor changes to water flows if a flood event were to occur. These temporary activities are unlikely to block or restrict flows or reduce the area of the floodplain that carries flood waters.  All impacts, including temporary access roads, would be restored to preconstruction conditions as identified in the EPP. This would restore all floodplain flow paths and functions.

The Project would also cross numerous floodplains that are not mapped by FEMA.  However, because the activities described above are temporary, no major long term impacts to floodplains or hazards as a result of construction in the floodplains are anticipated.

The Project would have negligible effects on flooding hazards.

## 7.12 FLOODPLAIN VALUES (33 CFR 320.4(l))

As identified in the State EIS, periodically, rivers, streams, and lakes will overflow their banks and inundate adjacent low-lying floodplains. Functioning of a floodplain can affect stormwater runoff, water quality, vegetative diversity, wildlife habitat, and aesthetic qualities of waterbodies. Because of their proximity to waterbodies, intermittent flooding, rich soils, and wetland complexes, floodplains form diverse and high-quality habitats under natural conditions. In addition, their naturally flat topography has resulted in historical development within these areas. Construction of facilities in a floodplain may affect the ability of the floodplain to store excess water or may raise flood elevations upstream. Flood damage can occur when natural flooding processes are disturbed by altering a watercourse or building inappropriately in the floodplain itself.

Temporary impacts to waterbodies, including their floodplains, would occur during the duration of trenching, pipe installation, backfilling, and initial restoration. Based on information included in Enbridge's EPP, the anticipated duration for pipe installation through waterbodies would typically range from 24 to 48 hours.   Enbridge would restore the waterbodies and floodplains that had been disturbed by construction to as near as possible to pre-construction conditions utilizing civil survey data collected pre-Project. The Project would not alter floodplain topography, change flow patterns of flood waters, block or restrict flows, reduce areas within a floodplain that carries floodwaters, or increase flood elevations upstream.

The Project would have negligible impacts on floodplain values.

## 7.13 LAND USE (33 CFR 320.4(a)(1))

The proposed pipeline ROW would cross land owned by multiple landowners along the route. It is expected that the ROW across all lands would be cleared, pipe trench excavated, fill temporarily side-cast, pipeline constructed, pipeline installed in the trench, and backfill placed over the pipeline. The permanent and temporary ROW would be returned to pre-Project contours after the Project is completed. The permanent ROW would be maintained free of trees and woody scrub-shrub species and the temporary ROW would be allowed to re-vegetate or would be replanted. The pipeline ROW would maintain its wetland functions, however, wooded habitat would be lost in some areas of the permanent ROW.

The effects of this proposal on land use are negligible.

## 7.14 NAVIGATION (33 CFR 320.4(o))

The Project crosses three Section 10 waters or traditionally navigable waters (Red River of the North (Mile Post 801.8), Red Lake River (Mile Post 864.3), and the Mississippi River (Mile Post 1069.7)).  All of these waters will be crossed via the HDD method; therefore, there will be no effects to navigation as a result of the Project.

## 7.15 SHORELINE EROSION AND ACCRETION (33 CFR 320.4(a)(1))

As described above, the Project would have minor changes on the flow and dynamics of streams during installation of the pipeline.  The Applicant will use BMPs to reduce potential for erosion during the installation.  After installation is complete, streambanks would be restored to preconstruction conditions and additional BMPs, such as coir logs or erosion control blankets would be used to ensure stabilization of the streambanks and reduce the potential for erosion. No hard armoring (i.e., rock riprap) will be allowed.  However, other bank stabilization techniques may be used on a case specific basis and in consultation with the regulatory agencies. Enbridge is required to monitor all water crossings after construction to ensure adequate restoration and stabilization.

The Project is not expected to have appreciable impacts on bank erosion or sediment and would have negligible impact on shoreline erosion and accretion.

## 7.16 WATER 11.AND CONSERVATION (33 CFR 320.4(m))

Consistent with Corps policy at 33 CFR 320.4(m), water conservation requires the efficient use of water resources in all actions which involve the significant use of water or that significantly affect the availability of water for alternative uses including opportunities to reduce demand and improve efficiency in order to minimize new supply requirements.

Enbridge would appropriate from surface water features for construction activities such as fugitive dust control, HDD drilling mud, buoyancy control and hydrostatic testing. Enbridge has applied for water appropriation permits for these activities from the MDNR, which included evaluating potential sources based on the sensitivity of the resource and adequate waterbody flow rates and volumes to protect aquatic life and allow for downstream uses. Enbridge would comply with the conditions of those permits and would only use MDNR-approved sources. During appropriation activities, Enbridge would manage the intake hose to minimize sediment intake from the waterbody and to prevent disturbance of the waterbody bed as described in Section 6.1 of the EPP.

The Corps has determined the Project would have negligible impacts on water supplies.

## 7.17 WATER QUALITY (33 CFR 320.4(d))

The Project includes disturbance to wetlands and streams that has the potential for affect water quality during construction.  See Section 6.3.2 and Section 6.3.3 of this document for discussion regarding water quality impacts during construction.

With respect to the discharge of dredged and fill material into waters of the U.S., measures to minimize effects from activities regulated by the Corps are described in earlier sections of this document. These measures would ensure that discharges of dredged and fill material do not adversely impact water quality. On April 15, 2020 the Fond du Lac reservation issued the Section 401 Water Quality Certification for the portion of the Project that crosses the Fond du Lac reservation and on January 31, 2019 the North Dakota Department of Health issued the individual Section 401 Water Quality Certification for the portion of the project within the state of North Dakota that is being reviewed by St. Paul District.   On November 13, 2020, the MPCA

issued a Section 401 Water Quality Certification for the discharge of dredged and fill material into waters. Individual water quality certifications are included in Appendix B of this document. Overall, impacts to water quality are not expected to exceed regulatory limits. Discharges from construction and appropriation are subject to the MPCA NPDES permit.

Effects to water quality are expected during construction; however, these effects are anticipated to be minor and temporary.  Water quality would return to normal after construction and restoration of the impacted areas. The Corps has determined that the Project would have minor adverse effects on water quality

## 7.18 ENERGY NEEDS (33 CFR 320.4(n))

The Project would improve overall safety to the public and environment by providing a safe and efficient means of transporting crude oil.  The Project would support United States consumers' energy demands.  Enbridge has provided detailed information and testimony to the MPUC regarding the need for the Project, demand for petroleum, and benefits of the Project.

Line 3 delivers crude oil to Minnesota refineries through Enbridge's Clearbrook Terminal, as well as deliveries to various Midwest and Gulf Coast refineries through the Enbridge Superior Terminal. The Project would serve the same markets and transport the same products as the existing Line 3 has done throughout its operating history.

The Project would help to ensure the continued delivery of North American crude oil to refineries in Minnesota, other Midwestern states, Eastern Canada, and the Gulf Coast. These refineries convert the crude oil into a variety of products for use in Minnesota and the surrounding regions, including gasoline, diesel, jet fuel, asphalt, and many other petroleum products. Refineries in Minnesota and neighboring states do not produce all of the petroleum products consumed within their borders; demand for refined products in Minnesota's immediate region significantly exceeds refinery production within the region. Refineries located in other Midwestern states act as key suppliers to the region, and the security, adequacy, and reliability of crude oil  supplies to these refineries has a direct bearing on meeting the overall energy needs of Minnesota and neighboring states. Nearly all crude oil refined in Minnesota and its neighboring states is from either the U.S. or Canada. The Project would reduce on-going and forecasted apportionment to the refining industry in the Petroleum Administration for Defense District II (PADD II), including Flint Hills and Northern Tier Energy in Minnesota, Eastern Canada, and the Gulf Coast, by restoring the capacity of the pipeline to its original operating capacity of 760,000 bpd.  By providing access to North American crude oil supply, the Project would provide benefits to the Midwest, including Minnesota, by ensuring that the region continues to have access to affordable energy and other refined products.

Extensive maintenance required to keep existing Line 3 in operation would require temporary shutdowns, decreasing the reliability and efficiency of crude oil supply to Minnesota refiners. Continuing to operate existing Line 3 also increases the risk of an accidental release and disruptions in crude oil supply.

The Corps has determined that the Project would have long term beneficial effects on the Midwest region's energy needs.

## 7.19 SAFETY OF IMPOUNDMENT STRUCTURES (33 CFR 320.4(k))

No permanent impoundment structures would be constructed as part of the Project.  Small dams would be constructed at some stream crossing locations to facilitate a dry crossing. These temporary dams do not require a dam safety permit pursuant to Minnesota Rules.  There are no anticipated safety issues with the temporary dams.

The Corps has determined that the Project would have no effects on safety of impoundment structures.

## 7.20 FOOD AND FIBER PRODUCTION (33 CFR 320.4(a)(1))

The Project is not one that would increase or decrease the production of agricultural crops, forest products, or livestock.  The Project would cross private lands that are in agricultural use that may be temporarily impacted due to installation of the pipeline or access roads. Impacts to agricultural crops would be minimized as construction is proposed for predominantly outside of the growing season.  The use of private property and effects to the private property from the pipeline would be accounted for in easement negotiations between Enbridge and the landowners.  Enbridge has developed an Agricultural Protection Plan that identifies measures that Enbridge would implement to avoid, mitigate, or provide compensation for negative agricultural impacts that may result from pipeline construction.

The Corps has determined that the Project would have negligible effects on food and fiber production.

## 7.21 MINERAL NEEDS (33 CFR 320.4(a)(1))

The Project is not one that would provide minerals or affect the availability of minerals.  This factor is not applicable.

## 7.22 CONSIDERATION OF PROPERTY OWNERSHIP (33 CFR 320.4(g))

Authorization of work in waters of the U.S. under a Corps permit does not convey a property right, nor authorize any injury to property or invasion or infringement of other rights. The Applicant's signature on an application is an affirmation that the Applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. Lands along the Project corridor are in public and private ownership. The use of private property and effects to the private property for a pipeline would be accounted for in easement negotiations between Enbridge and the landowners.  Several aspects of the Project have the potential to impact adjacent or nearby property ownership as described throughout the public interest evaluation, however, many of these impacts should be temporary and occur only during construction and restoration.

As described throughout this section, the Applicant has incorporated measures into the Project to reduce effects on resources of concern including wetlands, streams, water quality, air quality, fish and wildlife resources, and cultural resources. The Project's compliance with all state and federal permits would ensure that there are no appreciable impacts on adjacent properties.

The Corps has determined the Project would have negligible impacts on property ownership.

## 7.23 NEEDS AND WELFARE OF THE PEOPLE (33 CFR 320.4(a)(1))

By providing access to North American crude oil supply, the Project would provide benefits to the Midwest, including Minnesota, by ensuring that the region continues to have access to affordable energy and other refined products.  Agency requirements would ensure environmental impacts would be minimized and temporary.

## 8.0 MITIGATION (33 CFR 320.4(r), 33 CFR Part 332, 40 CFR 230.70-77, 40 CFR 1508.20 and 40 CFR 1502.14)

**Wetland Compensatory Mitigation**

Table 3.0-1 of the L3R Compensatory Mitigation Plan identifies baseline ratios, special wetland category ratios, and replacement multipliers for compensatory mitigation outside of the BSA where the impact occurs, or compensatory mitigation with a different type of wetland (out-of-kind).

As discussed above, in addition to developing initial compensatory mitigation ratios for all wetlands, the agencies recognized some wetlands along the corridor were higher functioning or higher value wetland.  During the Project review, the Corps, MPCA and MDNR developed 10 "special" wetland categories recognizing the higher functioning or higher value wetlands which may result in more or higher functions being temporarily lost or even restored.  These categories of wetlands warrant higher compensatory mitigation ratios to better reflect the temporal loss of functions and services provided by these wetlands.  These ratios, based on wetland type are shown in Table 3.0-1 of the L3R Compensatory Mitigation Plan.  The identification of the Special Wetland Categories ensures that both temporary losses to the functions provided by these aquatic resources, and the additional functions and services are appropriately mitigated after all practicable measures have been taken to avoid and minimize adverse impacts.  The Project would impact approximately 410.10 acres of wetland within the special wetland categories (see table 4.1-1 and 5.2-1 of the L3R Compensatory Wetland Mitigation Plan for impacts by special wetland category and impact duration)

All impacts occur in a service area of an approved mitigation bank. There are no approved in-lieu fee Projects in the BSAs crossed by the Project.  All BSAs contain approved mitigation banks that have the appropriate number of credit with the exception of BSA 1. See below for description of compensatory mitigation for impacts in BSA 1.   Of the four BSAs being crossed, no banks entirely have the appropriate resource type of credits.  This is generally due to a lack of scrub-shrub and forested wetlands type credits.  See below for discussion of out-of-kind compensatory mitigation.

**Compensatory mitigation option(s):**

      ☒ mitigation bank credits

Consistent with the watershed approach and as directed by the Corps, MPCA and MDNR, Enbridge has purchased approved mitigation bank credits within each of the four BSAs the Project crosses: BSA 1 - Great Lakes Basin; BSA 3 - Lower Red River of the North; BSA 5 – Mississippi Headwaters; and BSA 6 - St. Croix River Basin. Table 5.1-1 of the Mitigation Plan provides details for each bank and credit type that Enbridge proposes for Project compensatory wetland mitigation.

The majority of the credits would be purchased from mitigation banks within the BSA in which the impact occurs.  However, due to limited credit availability, 24.66 credits of the 144.66 total credits required for impacts in BSA 1 would come from outside of the BSA. Enbridge has purchased additional wetland bank credits in two BSAs (BSA 5 and BSA 6) adjacent to BSA 1 to cover the deficiency in BSA 1. In addition, not all banks in the BSAs crossed by the Project contain a sufficient amount of the same wetland type credits as the wetland type being impacted.  Of the 310.12 total credits being purchased, 26.32 credits would be out-of-kind. Table 5.2-1 of the L3R Compensatory Mitigation Plan provides an overview of the total number of wetland mitigation bank credits required for the Project based on the special wetland categories, differentiated baseline compensatory wetland mitigation ratios, and mitigation ratio multipliers.

In addition to purchasing wetland mitigation bank credits, Enbridge would provide financial assurances as discussed in Section 7.6 of this document to ensure adequate restoration of wetlands crossed by the Project or to compensate for any unforeseen direct or indirect impacts as a result of the Project through purchase of mitigation bank credits.

Purchasing wetland mitigation bank credits complies with the order of options presented in 33 CFR  332.3(b)(2)-(6).

☐  in-lieu fee program credits
There are no available in-lieu fee programs in the St. Paul District.

☐  permittee-responsible mitigation under a watershed approach
The applicant evaluated mitigation options within the same bank service area identified in the preference hierarchy of purchasing wetlands mitigation bank credits outlined in the Federal Mitigation Rule.

☐  permittee-responsible mitigation, on-site and in-kind

The applicant did not evaluate on-site mitigation options. The Project crosses numerous watersheds and different landownership.  Replacing impacts at each site where the impact occurs would not be practicable for due to landownership and logistical reasons related to having numerous permittee-responsible mitigation sites scattered throughout a long linear project.   Mitigation banks typically involve larger tracts of wetlands/uplands/riparian areas that are more ecologically diverse and resilient than multiple smaller permittee responsible mitigation Projects.

☐  permittee-responsible mitigation, off-site and in-kind

☐  permittee-responsible mitigation, off-site and out-of-kind

**Streams Compensatory Mitigation**

The Project includes temporary impacts to waterbodies during the duration of trenching, pipe installation, backfilling, and initial restoration. Based on information included in Enbridge's EPP, the anticipated duration for pipe installation through water bodies would typically range from 24 to 48 hours which is substantially less time than some of the temporal loss of functions to some wetlands, especially where access roads (matting) need to be left in-place for a longer period of

time to facilitate final restoration.   As identified in Section 2.1 of the EPP, Enbridge would contact the MDNR if any crossings of a public water would take longer than 24 hours.

As identified in the EPP, Enbridge would restore the stream bed and banks that had been disturbed by construction to as near as possible to pre-construction conditions utilizing civil survey data collected pre-Project.  Unstable banks may require bio-engineering which would be accomplished in consultation with the appropriate agencies.  Restoration of the area impacted by the stream crossing should return any functions lost during the relatively short construction period.   Site specific restoration plans, completed in consultation with the appropriate agencies, as well as post construction monitoring (see Section 7.6 for discussion on post construction monitoring) would reduce the potential for any long-term effects at waterbody crossing sites. Financial assurances would be required, as outlined in Section 3.3 of the PCMP, to ensure adequate restoration of the waterbody crossings and prevent impacts that would warrant compensatory mitigation.

# 9.0 CONSIDERATION OF CUMULATIVE AND SECONDARY IMPACTS

(40 CFR 230.11(g) and 40 CFR 1508.7, RGL 84-9)  Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor direct and indirect but collectively significant actions taking place over a period of time.  A cumulative effects assessment should consider how the direct and indirect environmental effects caused by the proposed activity requiring DA authorization (i.e., the incremental impact of the action) contribute to cumulative effects, and whether that incremental contribution is significant or not.

## 9.1   Identify/describe the direct and indirect effects caused by the proposed activity

The purpose of this analysis is to consider the aquatic and forest resources available in the past compared to those present currently, and the effects of reasonably foreseeable future actions. The results of this analysis will provide a context for assessing the cumulative effects on wetlands and waterbodies. Information on the direct and indirect wetland and stream impacts associated with the Project can be found in Section 6 of this document.

**Direct effects**

The direct effects to aquatic waters of the U.S. as a result of the Project include temporary impacts to a total of 1,049.58 acres of wetland, and permanent loss of 9.97 acres of wetland. The project will also cross 227 water bodies which will result in temporary impacts to a total of 0.64 acres of streambed for the installation of the pipe and 0.49 acre of streambed for the installation of bridges.

Temporary impacts, as a result of trench excavation and backfill, and temporary access roads would result in temporal loss of wetland functions during construction and initial restoration. Some of these temporary impacts would result in a temporary conversion of forested and scrub-shrub wetlands.  These areas would be allowed to revert back to their preconstruction wetland type after construction.   However, some areas within the ROW would not be allowed to revert back to their preconstruction wetland type due to required maintenance of the ROW to facilitate inspection and access. This includes 81.36 acres of scrub-shrub

wetland and 148.85 acres of forested wetland that would be permanently converted to emergent type wetland as a result of the ROW maintenance.

Streams banks and beds that would be disturbed by construction would be restored as near as possible to pre-construction conditions utilizing civil survey data collected pre-Project. Restoration of areas impacted by stream crossings should return any functions lost during the relatively short construction period.  Site specific restoration plans, completed in consultation with the appropriate agencies, as well as post construction monitoring would reduce the potential for any long-term effects at waterbody crossing sites and to aquatic organisms at the crossing sites.

**Reasonably foreseeable future actions**

Enbridge is proposing to relocate and replace approximately 10 miles of the existing 48-inch diameter Line 4 pipeline with approximately 10 miles of 36-inch diameter pipeline in the right-of-way adjacent to the existing Enbridge Mainline Corridor, containing Line 3. The Project would be located in portions of St. Louis and Carlton Counties within the boundaries of the Fond du Lac Reservation.

The Project addresses specific concerns raised by the Fond du Lac Band related to an above-grade segment of existing Line 4 pipe installed through the Reservation in the 1970s. Fond du Lac Band has raised concerns that the above-grade Line 4 segment creates a barrier to the natural water flow across the Reservation and, in some areas, impedes land access for the Band members to gather medicinal plants and other culturally important resources.

Enbridge and Fond du Lac Band agreed to relocate and bury the new proposed Line 4 segment within the Reservation adjacent to the current Enbridge Mainline Corridor, containing Line 3. Once the Project is complete and the new relocated Line 4 segment is in service, the existing above-grade Line 4 segment would be deactivated and removed.  Beneficial effects of the Project include removing the physical barrier and enhancing access to Band members who traverse this area and removing the hydrologic barriers to surface flow, allowing future environmental remediation of Fond du Lac Band lands.

The proposal would temporarily impact a total of 94.24 acres of wetland.  Enbridge has designed the proposed Project workspace to overlap with Enbridge's Line 3 Replacement Project workspace to the extent practicable to minimize new disturbance. The proposed Project would only disturb an additional 20 feet of temporary workspace outside of the area disturbed by the Line 3 Replacement Project construction activities.  Enbridge is also proposing to use access roads that have been authorized for the Line 3 Project.

Proposed impacts of the Line 4 relocation are discussed in the respective 8-digt HUC (04010201 and 07030003) watersheds below.

## 9.2   The geographic scope for the cumulative effects assessment

The geographic scope for assessing the proposed action includes 13 8-digit HUC watersheds crossed by the Project. Summary information for each of the watersheds is provided in the next two tables.

Information in the first table includes total watershed area (acres), percent of total watershed area that is wetland, total stream miles, and breakdown of perennial, intermittent and ephemeral

streams (information generated from the Corps' OMBIL Regulatory Module).  Impacts authorized by Section 404 or Section 10 permits from 2010 to 2020 are summarized (obtained from the Corps' OMBIL Regulatory Module).

Table 4.  8-Digit HUC watershed baseline information and Corps authorized fill from period November 1, 2010 to October 31, 2020, and proposed impacts for current pending requests.

| Geographic Scope (HUC 8) | Name | Wetland as % of Watershed Area | Total Watershed Area (acres) | Stream Miles (Total) | % Perennial | % Intermittent | % Ephemeral | Fill (acres)Period 11/01/2010 to 10/31/2020 | Fill (linear feet)Period 11/01/2010 to 10/31/2020 | Required Mitigation (acres) Period 11/01/2010 to 10/31/2020 | Required Mitigation (linear feet) Period 11/01/2010 to 10/31/2020 | Proposed Temporary Impacts (acres) | Proposed Permanent Impacts (acres) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9020311 | Lower Red | 10 | 800391 | 1421 | 5 | 44 | 51 | 69.66 | 14814 | 61.55 | 0 | 0 | 0.00 |
| 9020309 | Snake | 5 | 498128 | 1179 | 15 | 38 | 47 | 39.79 | 1425 | 34.45 | 0 | 0 | 0.00 |
| 9020306 | Red-Grand Marais | 2 | 406283 | 496 | 4 | 20 | 76 | 70.42 | 4401 | 37.70 | 0 | 0 | 0.00 |
| 9020303 | Red Lake | 22 | 856995 | 1639 | 6 | 24 | 70 | 20.39 | 62611 | 17.95 | 0 | 0.34 | 2.13 |
| 9020305 | Clearwater | 16 | 869288 | 1882 | 19 | 44 | 37 | 9.59 | 3711 | 13.21 | 13650 | 0 | 0.00 |
| 7010101 | Mississippi Headwaters | 23 | 1229439 | 1363 | 49 | 23 | 29 | 268 22 | 6384 | 478.29 | 0 | 1.79 | 0.00 |
| 7010106 | Crow Wing | 18 | 1269326 | 1828 | 43 | 20 | 38 | 71.72 | 7332 | 72.55 | 0 | 0 | 0.00 |
| 7010105 | Pine | 20 | 501180 | 558 | 66 | 7 | 27 | 14.60 | 733 | 12.15 | 0 | 0 | 0.00 |
| 7010102 | Leech Lake | 23 | 858412 | 729 | 45 | 19 | 36 | 23.39 | 5850 | 16.27 | 0 | 0 | 0.05 |
| 7010103 | Prairie Willow | 36 | 1333830 | 1881 | 48 | 18 | 34 | 590.40 | 3461 | 672.31 | 122 | 0 | 0.07 |
| 4010201 | Saint Louis | 41 | 1882043 | 7002 | 54 | 12 | 35 | 1731.00 | 369204 | 3408.27 | 1146 | 4.73 | 2.20 |
| 7030003 | Kettle | 33 | 673462 | 1167 | 36 | 38 | 26 | 57.36 | 1297 | 423.20 | 0 | 24 | 0.35 |
| 4010301 | Beartrap-Nemadji | 25 | 176978 | 7888 | 40 | 52 | 8 | 120 21 | 45432 | 132.51 | 0 | 0 | 0.00 |

Table 5.  L3R impacts by 8-digit Hydrologic Unit Code (HUC) watershed.

| 8-Digit HUC | Watershed Name | Pipeline Length in HUC (feet) | PFO Wetland Acres | PSS Wetland Acres | Mainline Impacts | | Mainline Permanent Conversion | | | | Access Roads (Temporary Impacts) | | | | Waterbody Crossings (Temporary Impacts) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Permanent | Temporary | PFO | PSS | Watershed PFO Impact % | Watershed PSS Impact % | PFO | PEM | PUB | PSS | Dredge/Fill | Bridge Fill |
| 9020311 | Lower Red | 223781 | 3822 | 10923 | 0.18 | 17.88 | 0.35 | 0.05 | 0.009 | 0.000 | 0 00 | 0.77 | 0.00 | 0.00 | 0.09 | 0.06 |
| 9020309 | Snake | 92026 | 2638 | 8932 | 0.02 | 17 51 | 0.19 | 0.29 | 0.007 | 0.003 | 0.00 | 0.13 | 0 00 | 0.07 | 0.03 | 0 04 |
| 9020306 | Red-Grand Marais | 14849 | 787 | 235 | 0.00 | 2.66 | 0.00 | 0.00 | 0.000 | 0.000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0 01 |
| 9020303 | Red Lake | 115626 | 47486 | 33840 | 0.00 | 28.15 | 0.64 | 0.16 | 0.001 | 0.000 | 0.00 | 0.08 | 0 00 | 0.02 | 0.07 | 0 07 |
| 9020305 | Clearwater | 286738 | 17781 | 38755 | 3.11 | 118.17 | 6.72 | 4.55 | 0.038 | 0.012 | 0.01 | 0.27 | 0 00 | 0.10 | 0.18 | 0.15 |
| 7010101 | Mississippi Headwaters | 140247 | 128873 | 87470 | 0.06 | 35.67 | 7.96 | 4.85 | 0.006 | 0.006 | 0.02 | 0.21 | 0 00 | 0.00 | 0.02 | 0 01 |
| 7010106 | Crow Wing | 261179 | 33256 | 102789 | 0.00 | 75 25 | 9.86 | 12.48 | 0.030 | 0.012 | 0.06 | 0.73 | 0 00 | 0.34 | 0.05 | 0 03 |
| 7010105 | Pine | 213033 | 30815 | 43182 | 0.00 | 71.73 | 11.23 | 9.08 | 0.036 | 0.021 | 0.30 | 0.78 | 0 00 | 1.37 | 0.03 | 0 02 |
| 7010102 | Leech Lake | 2782 | 70579 | 60656 | 0.00 | 0.44 | 0.45 | 0.00 | 0.001 | 0.000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 00 |
| 7010103 | Prairie Willow | 166160 | 256393 | 174192 | 1.42 | 123.66 | 54.27 | 14.27 | 0.021 | 0.008 | 6.71 | 5.83 | 0 01 | 3.81 | 0.04 | 0 02 |
| 4010201 | Saint Louis | 233664 | 539005 | 208191 | 5.16 | 260.66 | 57.11 | 35.20 | 0.011 | 0.017 | 18 37 | 6.30 | 0.00 | 6.98 | 0.12 | 0 09 |
| 7030003 | Kettle | 8237 | 98719 | 87272 | 0.00 | 10 34 | 0.00 | 0.20 | 0.000 | 0.000 | 0.00 | 0.07 | 0 02 | 0.00 | 0.00 | 0 00 |
| 4010301 | Beartrap-Nemadji | 34111 | 41006 | 21669 | 0.00 | 3.88 | 0.06 | 0.23 | 0.000 | 0.001 | 0.00 | 0.00 | 0 00 | 0.01 | 0.01 | 0 00 |

## 9.3   Affected Environment

The following described the watershed conditions and impacts to wetlands resources as a result of the Line 3 Project in each 8-digit HUC watershed.  Due to the nature of the construction, most direct impacts to wetlands would be temporary.  However, wetland type conversion, mainly forested and scrub-shrub wetland to an emergent type wetland would occur.   The table below includes the compensatory mitigation being provided within each 8-digit HUC.   Details on overall wetland impacts and conversion impacts are included in Section 6 of this document.

**Lower Red (09020311)**

The Project would cross approximately 42.38 miles of the Middle River Watershed.   The watershed is 800,391 acres in size, located in Northwest Minnesota and Northeast North Dakota.  This watershed is located within the Red River Basin Watershed (HUC 0902) and within the Lower Red River of the North Bank Service Area (BSA 3).  The watershed occurs in the Glacial Lake Agassiz Plain Level III Ecoregion and has a poorly defined floodplain and low gradient that combine with extensive drainage, widespread conversion of tallgrass prairie to farmland, and urban/suburban development to leave the basin subject to frequent floods that affect urban and rural infrastructure and agricultural production.  Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Row Crops (80.6%), Wetlands (5.5%), Forest (5.2%), Residential/ Commercial Development (5.1%) and Grass/Pasture/Hay (2.4%).  Land use within the watershed is largely agricultural, accounting for nearly 83% of the overall watershed acres.

Corps permits for the calendar years 2010 through 2020 authorized 69.66 acres of fill and 14,814 linear feet of fill in tributaries.

The projection is that waters of the U.S. will continue to be lost at the current rate.

The Project would result in 0.18 acres of permanent loss of wetland and temporarily impact a total of 17.88 acres of wetland along the mainline in this watershed. Construction of access roads would temporarily affect 0.77 acres of wetland.   Permanent and temporary impacts would represent substantially less than 1% of the total wetland in the watershed.  All temporary impacts to all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Maintenance of the ROW of Line 3 through this watershed would convert 0.35 acres of forested wetland and 0.05 acres for scrub-shrub wetland, which represents less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be very low compared to the amount woody type wetlands.





## Snake Watershed (09020309)

The Project would cross approximately 17.42 miles of the Snake Watershed.   The watershed is 498,128 acres in size, located in Northwest Minnesota.  This watershed is located within the Red River Basin Watershed (HUC 0902) and within the Lower Red River of the North Bank Service Area (BSA 3).  The watershed occurs in the Glacial Lake Agassiz Plains ecoregion. Soils at the mouth of the watershed are clayey soils of the lake plain and the watershed has a poorly defined floodplain and low gradient that combine with extensive drainage, widespread conversion of tallgrass prairie to farmland, and urban/suburban development to leave the basin subject to frequent floods that affect urban and rural infrastructure and agricultural production.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Row Crops (81%), Wetlands (6%), Forest (5%), Residential/Commercial Development (5%), and Grass/Pasture/Hay (3%). Agricultural land use in the basin accounts for approximately eighty four percent of the overall watershed acres.

Corps permits for the calendar years 2010 through 2020 authorized 39.72 acres of fill and 1,425 linear feet of fill in tributaries.

The Project would result in 0.02 acres of permanent loss of wetland and temporarily impact a total 17.51 acres of wetland along the mainline in this watershed. Construction of access roads would temporarily affect 0.20 acres of wetlands.   Permanent and temporary impacts would represent substantially less than 1% of the total wetland in the watershed.  All temporary impacts to all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Maintenance of the ROW of Line 3 through this watershed would convert 0.19 acres of forested wetland and 0.29 acres for scrub-shrub wetland, which represents 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type. Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be very low compared to the amount woody (forested and scrub-shrub) type wetlands.

To compensate for the temporary loss of wetland functions and the permanent conversion, Enbridge would purchase a total of 141.64 wetlands credits in BSA 3 which includes the Lower Red Watershed.  See Section 8.0 of this document for additional discussion on compensatory mitigation.





**Grand Marais – Red Watershed (09020306)**

Approximately 2.81 miles of the Middle River Watershed would be crossed by the Project. The watershed is 406,283 acres in size, located in Northwest Minnesota and Eastern North Dakota.  This watershed is located within the Red River Basin Watershed (HUC 0902) and within the Upper Red River of the North Bank Service Area (BSA 4).  The watershed occurs in the Glacial Lake Agassiz Plain Level III Ecoregion and has a poorly defined floodplain and low gradient that combine with extensive drainage, widespread conversion of tallgrass prairie to farmland, and urban/suburban development to leave the basin subject to frequent floods that affect urban and rural infrastructure and agricultural production.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Row Crops (90.6%), Residential/Commercial Development (5.1%), Open Water (1.8%), Wetlands (1.6%), and Forest (0.8%). Land use within the watershed is largely agricultural, accounting for nearly 92% of the overall watershed acres.

Corps permits for the calendar years 2010 through 2020 authorized 70.49 acres of fill and 4,401 linear feet of fill in tributaries.

Neither construction, maintenance of the ROW, or installation of access roads would permanently or temporarily impacts wetlands in this watershed.  Impacts within this watershed are limited to waterbody crossings and would temporarily impact 0.02 acres of stream bed for installation of the pipe and a temporary bridge.



### Red Lake Watershed (09020303)

Approximately 21.89 miles of the Middle River Watershed would be crossed by the Project. The watershed is 856,994 acres in size, located in Northwest Minnesota.  This watershed is located within the Red River Basin Watershed (HUC 0902) and within the Lower Red River of the North Bank Service Area (BSA 3).    The watershed occurs in the Glacial Lake Agassiz Plain and Northern Minnesota Wetlands Level III Ecoregions, and has a poorly defined floodplain and low gradient that combine with extensive drainage, widespread conversion of tallgrass prairie to farmland, and urban/suburban development to leave the basin subject to frequent floods that affect urban and rural infrastructure and agricultural production.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Row Crops (61%), Wetlands (17%), Forest (10%), Grass/Pasture/Hay (6%), and Residential/Commercial Development (5%). Agricultural land use in the basin accounts for approximately 67 percent of the overall watershed acres.

Corps permits for the calendar years 2010 through 2020 authorized 20.39 acres of fill and 62,611 linear feet of fill in tributaries.

The Project would result in 28.15 acres of temporary wetland impact along the mainline in this watershed. Construction of access roads would temporarily affect 0.10 acres wetlands. Permanent and temporary impacts would represent substantially less than 1% of the total wetland in the watershed.  All temporary impacts to all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 0.64 acres of forested wetland and 0.16 acres for scrub-shrub wetland, which represents less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be very low compared to the amount woody type wetlands.



**Clearwater Watershed (09020305)**

The Project would cross approximately 54.31 miles of the Clearwater Watershed.   The watershed is 869,288 acres in size, located in Northwest Minnesota.  This watershed is located within the Red River Basin Watershed (HUC 0902) and within the Lower Red River of the North Bank Service Area (BSA 3).    The watershed occurs in the Glacial Lake Agassiz Plain, North Central Hardwoods, Northern Lakes and Forests, and Northern Minnesota Wetlands Level III Ecoregions and has a poorly defined floodplain and low gradient that combine with extensive drainage, widespread conversion of tallgrass prairie to farmland, and urban/suburban development to leave the basin subject to frequent floods that affect urban and rural infrastructure and agricultural production.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Row Crops (33%), Forest (24%), Grass/Pasture/Hay (21%), Wetlands (14%), and Residential/Commercial Development (4%). Agricultural land use in the basin accounts for approximately 54% of the overall watershed acres.

Corps permits for the calendar years 2010 through 2020 authorized 8.59 acres of fill and 3,711 linear feet of fill in tributaries.

The Project would result in 3.11 acres of permanent loss of wetland and temporarily impact a total 118.17 acres of wetland along the mainline in this watershed. Construction of access roads would temporarily affect 0.39 acres of wetlands.  Permanent and temporary impacts would represent substantially less than 1% of the total wetland in the watershed.  All temporary impacts to all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 6.72 acres of forested wetland and 4.55 acres for scrub-shrub wetland, which represents approximately 5.20% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.

Permanent conversion of the wetland types within this watershed would still be relatively low compared to the high amount of woody type wetlands.



**Mississippi Headwaters Watershed (07010101)**

The Project crosses through approximately 26.56 miles of the Mississippi Headwaters Watershed.   The watershed is 1,229,438 acres in size, located in Northcentral Minnesota. This watershed is located within the Mississippi River Headwaters Basin Watershed (HUC 0701) and within the Mississippi River Headwaters Service Area (BSA 5).

This watershed is located in the Northern Lakes and Forest ecoregion of Minnesota and is largely forested. Approximately 44% of the land in this HUC is privately owned, and the remainder is tribal, state, county or federally owned public land.
Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes:  Forest (58%), Wetlands (15%), Open Water (14.3%) Grass/Pasture/Hay (6.4%), and Residential / Commercial development (2.9%).
Agricultural land use within the watershed is moderate, accounting for approximately 10% of the available acres.

Corps permits for the calendar years 2010 through 2020 authorized 268.22 acres of fill and 6,374 linear feet of fill in tributaries.

The Project would result in 0.06 acres of permanent loss of wetland and temporarily impact a total 35.67 acres of wetland along the mainline in this watershed. Construction of access roads would temporarily affect 0.23 acres of wetlands.  Permanent and temporary impacts would represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 7.96 acres of forested wetland and 4.85 acres for scrub-shrub wetland, which represents substantially less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.

Permanent conversion of the wetland types within this watershed would still be relatively low compared to the high amount of woody type wetlands.  Construction of access roads would temporarily affect 0.21 acres of emergent wetlands and 0.02 acres of forested wetlands.



**Crow Wing Watershed (07010106)**

The Project would cross approximately 49.47 miles of the Crow Wing Watershed.   The watershed is 1,269,326 acres in size, located in Northcentral Minnesota.  This watershed is located within the Mississippi River Headwaters Basin Watershed (HUC 0701) and within the Mississippi River Headwaters Service Area (BSA 5). The Crow Wing watershed is located in the Northern Lakes and Forest and North Central Hardwoods Forest ecoregions of Minnesota. Approximately seventy two percent of the land in this HUC is privately owned. Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Forest (51%), Grass Pasture/Hay (14%), Wetlands (11%), Row Crops (10%), and Open Water (6.6%). Land use within the watershed is moderately agricultural, accounting for approximately 25% of the available acres.

Corps permits for the calendar years 2010 through 2020 authorized 71.72 acres of fill and 7,332 linear feet of fill in tributaries.

The Project would result in 75.25 acres of temporary wetland impact along the mainline in this watershed. Construction of access roads would temporarily impact 1.13 acres of wetlands. Permanent and temporary impacts would represent substantially less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 9.86 acres of forested wetland and 12.48 acres for scrub-shrub wetland, which represents approximately 4% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.

Permanent conversion of the wetland types within this watershed would be relatively low compared to the high amount of woody type wetlands.





**Pine Watershed (07010105)**

The Project would cross approximately 40.34 miles of the Pine Watershed.   The watershed is 501,180 acres in size, located in Northcentral Minnesota.  This watershed is located within the Mississippi River Headwaters Basin Watershed (HUC 0701) and within the Mississippi River Headwaters Service Area (BSA 5).  This largely forested watershed is located in the Northern Lakes and Forest ecoregion of Minnesota. Approximately fifty six percent of the land in this HUC is privately owned, and the remainder is state, county, or federally owned public land. Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Forest (51%), Wetlands (21%), Open Water (13%), and Grass Pasture/Hay (7.5%). Land use within the watershed is moderately agricultural, accounting for approximately 9% of the available acres.

Corps permits for the calendar years 2010 through 2020 authorized 14.60 acres of fill and 733 linear feet of fill in tributaries.

The Project would result in 71.73 acres of temporary wetland impact along the mainline in this watershed. Construction of access roads would temporarily impact 2.45 acres of wetlands. Permanent and temporary impacts would represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 11.24 acres of forested wetland and 9.08 acres for scrub-shrub wetland, which represents substantially less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be relatively low compared to the high amount of woody type wetlands.





**Leech Lake Watershed (07010102)**

The Project would cross approximately 0.52 miles of the Leech Lake Watershed.   The watershed is 858,412 acres in size, located in Northcentral Minnesota.  This watershed is located within the Mississippi River Headwaters Basin Watershed (HUC 0701) and within the Mississippi River Headwaters Service Area (BSA 5).  This watershed is located in the Northern Lakes and Forest ecoregion of Minnesota and is predominantly forested. Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Forest (44%), Wetlands (24%), Open Water (20%), and Grass Pasture/Hay (7%), and is moderately agricultural, accounting for approximately 8% of the available acres.

Corps permits for the calendar years 2010 through 2020 authorized 33.39 acres of fill and 5850 linear feet of fill in tributaries.

The Project would result in 0.44 acres of temporary wetland impact along the mainline in this watershed. No wetlands would be impacted as a result of construction of temporary access roads.  Permanent and temporary impacts would represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type

Construction and maintenance of the ROW of Line 3 through this watershed would convert 0.46 acres of forested wetland and 0.01 acres for scrub-shrub wetland, which represents substantially less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be low compared to the high amount of woody type wetlands.



## Prairie Willow Watershed (07010103)

The Project would cross approximately 31.47 miles of the Prairie-Willow Watershed.   The watershed is 1,333,830 acres in size, located in Northcentral Minnesota.  This watershed is located within the Mississippi River Headwaters Basin Watershed (HUC 0701) and within the Mississippi River Headwaters Service Area (BSA 5). The Prairie-Willow watershed is located in the Northern Lakes and Forest ecoregion of Minnesota and is predominantly forested.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Forest (42.6%), Wetlands (37%), Open Water (6.4%), and Grass Pasture/Hay (5.9%).  Land use within the watershed is modestly agricultural, accounting for approximately 10% of the available acres.

Corps permits for the calendar years 2010 through 2020 authorized 590 acres of fill and 3461 linear feet of fill in tributaries.

The Project would result in 1.42 acres of permanent loss of wetland and temporarily impact a total 123.66 acres of wetland along the mainline in this watershed. Construction of access roads would temporarily affect 16.36 acres of wetland.  Permanent and temporary impacts represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 54.27 acres of forested wetland and 14.28 acres for scrub-shrub wetland, which represents substantially less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would still be relatively low compared to the high amount of woody type wetlands.



**Saint Louis Watershed (04010201)**

The Project would cross approximately 44.25 miles of the St. Louis Watershed.   The watershed is 1,882,043 acres in size, located in Northeast Minnesota.  This watershed is located within the Western Great Lakes Watershed (HUC 0401) and within the Great Lakes Bank Service Area (BSA 1). The St. Louis watershed is located in the Northern Lakes and Forest ecoregion of Minnesota and is predominantly forested.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Forest (57.0%), Wetlands (23.5%), Grass Pasture/Hay (6.7%), and Shrubland (5.6%), and is modestly agricultural with 7% of available acres.

Corps permits for the calendar years 2010 through 2020 authorized 4701 acres of fill and 369,204 linear feet of fill in tributaries.

The Project would result in 5.16 acres of permanent loss of wetland and temporarily impact a total 260.66 acres of wetland along the mainline in this watershed. Construction of access roads would temporarily affect 31.65 acres of wetland.  Permanent and temporary impacts would represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert 57.11 acres of forested wetland and 35.20 acres for scrub-shrub wetland, which represents substantially less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be low compared to the high amount of woody type wetlands.

Construction of access roads would temporarily affect 6.30 acres of emergent wetlands, 6.98 acres of scrub-shrub wetlands, and 18.37 acres of forested wetlands.   All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

In addition to impacts described above for Line 3, the Line 4 relocation Project would temporarily impact a total of 80.94 acres of wetland in this watershed (PEM: 33.87 ac, PSS: 22.52 ac, PFO: 23.36 ac, and PUB: 1.19 ac).  Of the temporary impacts, 7.51 acres of forested (PFO) wetland and 5.83 acres of scrub-shrub (PSS) wetland would be permanently converted to an emergent wetland type.





**Kettle Watershed (07030003)**

The Project would cross approximately 1.56 miles of the Kettle Watershed.   The watershed is 673,462 acres in size, located in Northeast Minnesota.  This watershed is located within the St. Croix Watershed (HUC 0703) and within the St. Croix Bank Service Area (BSA 6). The predominantly forested watershed is in the Minnesota/Wisconsin Upland till plain portion of the Northern Lakes and Forest ecoregion of Minnesota.

Predominant land use or land cover, as identified in the NRCS Rapid Watershed Assessment, in this watershed includes: Forest (55%), Wetlands (19%), Grass Pasture/Hay (18%), and Residential/Commercial Development (3.4%). Agricultural land use within the Kettle River watershed accounts for approximately 20% of the available acres.

Corps permits for the calendar years 2010 through 2020 authorized 57.36 acres of fill and 1297 linear feet of fill in tributaries.

The Project would result in 10.34 acres of temporary wetland impact along the mainline in this watershed. Construction of access roads would temporarily affect 0.09 acres of wetland. Permanent and temporary impacts would represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type.

Construction and maintenance of the ROW of Line 3 through this watershed would convert no forested wetland and 0.21 acres of scrub-shrub wetland, which represents almost less than 1% of the forested and scrub shrub wetland combined within the watershed, to an emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.

Permanent conversion of the wetland types within this watershed would be low compared to the high amount of woody type wetlands.

In addition to impacts described above for Line 3, the Line 4 relocation Project would temporarily impact a total of 13.30 acres of wetland in this watershed (PEM: 9.64 ac, PSS: 1.46 ac, PFO: 0.92 ac, and PUB: 1.28 ac).  Of the temporary impacts,  0.01 acres of forested (PFO) wetland and 0.42 acres of scrub-shrub (PSS) wetland would be permanently converted to an emergent wetland type.





**Beartrap-Nemadji Watershed (04010301)**

The Project would cross approximately 6.46 miles of the 1,234,211 acre Beartrap-Nemadji Watershed in Northeast Minnesota and Northwest Wisconsin, of which 176,978 acres are in Minnesota. This watershed is located within the St. Croix Watershed (HUC 0703) and within the St. Croix Bank Service Area (BSA 6).

Corps permits for the calendar years 2010 through 2020 authorized 120.21 acres of fill and 19870 linear feet of fill in tributaries.

The Project would result in 3.88 acres of temporary wetland impact along the mainline in this watershed. Construction of temporary access roads would impact 0.01 acres of wetland. Permanent and temporary impacts would represent less than 1% of the total wetland in the watershed.  All temporary impacts for all wetland types would be restored to preconstruction elevations and allowed to naturally revegetate to the preconstruction wetland type

Construction and maintenance of the ROW of Line 3 through this watershed would convert 0.06 acres of forested wetland and 0.23 acres of scrub-shrub wetland, which represents less than 1% of the forested and scrub shrub wetland combined within the watershed, to an

emergent wetland type.  Maintenance of the ROW would be required for aerial inspection of Line 3 and to provide access to the line if needed.  Permanent conversion of the wetland types within this watershed would be low compared to the high amount of woody type wetlands.





## 9.4   DETERMINE ENVIRONEMTAL CONSEQUENCES

Wetlands along the Project corridor provide several functions and benefits. The wetlands within the Project area provide benefits to the hydrologic regime, flood storage capacity, wildlife habitat, and protection of downstream water quality.  The vast majority of the impacts would be temporary and those functions and benefits would return after construction and restoration.  As a result of ROW maintenance, some woody wetlands would be converted to an herbaceous/emergent wetland type.   As described in the watershed assessment above, conversion of woody wetlands would range from less than 1% to 5% of the total woody wetland types in a watershed.  The greatest function affected as a result of conversion is wildlife habitat.  Additional detail regarding wildlife habitat are included in Section 6.4.  While wildlife habitat would be impacted, the loss for each individual 8-digit HUC watershed would still be small within the watershed.

**9.5**   Discuss any mitigation to avoid, minimize or compensate for cumulative effects:

Measures that would be taken to minimize wetland and waterbody impacts are included in Section 6.8.  Compensatory mitigation would be required for the loss of wetland functions. The mitigation would ensure that the cumulative effects are mitigated and the environmental consequences of the loss of those resources is offset and is discussed in Section 8.0 of this document.

Table 6. Compensatory mitigation required by 8-digit HUC

| | | Normal Wetlands | | | Special Wetlands | | |
|---|---|---|---|---|---|---|---|
| | | Impact Acres | Ratio | Mitigation Credits Subtotal | Impact Acres | Ratio | Mitigation Credits Subtotal |
| **Bank Service Area 1** | | | | | | | |
| **04010201 - St. Louis** | | | | | | | |
| Emergent | Temporary Impact | 64.79 | 0.03 | 1.94 | 64.32 | 0.06 | 3.86 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.32 | 1.00 | 0.32 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 31.14 | 0.06 | 1.87 | 21.18 | 0.09 | 1.91 |
| | Permanent Conversion | 20.85 | 0.50 | 10.42 | 14.35 | 0.75 | 10.76 |
| | Permanent Fill | 3.56 | 1.50 | 5.34 | 0.51 | 1.75 | 0.89 |
| Forested | Temporary Impact | 51.27 | 0.10 | 5.13 | 27.02 | 0.25 | 6.75 |
| | Permanent Conversion | 24.86 | 0.75 | 18.65 | 8.45 | 1.00 | 8.45 |
| | Permanent Fill | 0.72 | 2.00 | 1.44 | 0.04 | 2.50 | 0.11 |
| | *04010201 - St. Louis SUBTOTAL* | *197.50* | | *45.11* | *135.88* | | *32.74* |
| **04010301 - Beartrap-Nemadji** | | | | | | | |
| Emergent | Temporary Impact | 0.27 | 0.03 | 0.01 | 2.86 | 0.06 | 0.17 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.18 | 0.06 | 0.01 | 0.48 | 0.09 | 0.04 |
| | Permanent Conversion | 0.16 | 0.50 | 0.08 | 0.07 | 0.75 | 0.05 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 0.00 | 0.10 | 0.00 | 0.10 | 0.25 | 0.03 |
| | Permanent Conversion | 0.00 | 0.75 | 0.00 | 0.06 | 1.00 | 0.06 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| | *04010301 - Beartrap-Nemadji SUBTOTAL* | *0.61* | | *0.10* | *3.57* | | *0.36* |
| | **BSA 1 SUBTOTAL** | **198.11** | | **45.21** | **139.45** | | **33.10** |
| **Bank Service Area 3** | | | | | | | |
| **09020303 - Red Lake** | | | | | | | |
| Emergent | Temporary Impact | 22.37 | 0.03 | 0.67 | 3.74 | 0.06 | 0.22 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.33 | 0.06 | 0.02 | 0.07 | 0.09 | 0.01 |
| | Permanent Conversion | 0.16 | 0.50 | 0.08 | 0.00 | 0.75 | 0.00 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 1.30 | 0.10 | 0.13 | 0.43 | 0.25 | 0.11 |
| | Permanent Conversion | 0.40 | 0.75 | 0.30 | 0.23 | 1.00 | 0.23 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| | *09020303 - Red Lake SUBTOTAL* | *24.56* | | *1.20* | *4.48* | | *0.57* |
| **09020305 - Clearwater** | | | | | | | |
| Emergent | Temporary Impact | 72.97 | 0.03 | 2.19 | 26.34 | 0.06 | 1.58 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 3.08 | 1.00 | 3.08 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 8.32 | 0.06 | 0.50 | 0.61 | 0.09 | 0.05 |
| | Permanent Conversion | 4.38 | 0.50 | 2.19 | 0.17 | 0.75 | 0.12 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 7.33 | 0.10 | 0.73 | 2.98 | 0.25 | 0.74 |
| | Permanent Conversion | 5.73 | 0.75 | 4.30 | 0.98 | 1.00 | 0.98 |
| | Permanent Fill | 0.03 | 2.00 | 0.06 | 0.00 | 2.50 | 0.00 |
| | *09020305 - Clearwater SUBTOTAL* | *101.86* | | *13.05* | *31.08* | | *3.49* |
| **09020306 - Grand Marais-Red** | | | | | | | |
| Emergent | Temporary Impact | 2.66 | 0.03 | 0.08 | 0.00 | 0.06 | 0.00 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.00 | 0.06 | 0.00 | 0.00 | 0.09 | 0.00 |
| | Permanent Conversion | 0.00 | 0.50 | 0.00 | 0.00 | 0.75 | 0.00 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 0.00 | 0.10 | 0.00 | 0.00 | 0.25 | 0.00 |
| | Permanent Conversion | 0.00 | 0.75 | 0.00 | 0.00 | 1.00 | 0.00 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **09020306 - Grand Marais-Red SUBTOTAL** | | **2.66** | | **0.08** | **0.00** | | **0.00** |
| **09020309 - Snake** | | | | | | | |
| Emergent | Temporary Impact | 14.99 | 0.03 | 0.45 | 1.67 | 0.06 | 0.10 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.02 | 1.00 | 0.02 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.56 | 0.06 | 0.03 | 0.34 | 0.09 | 0.03 |
| | Permanent Conversion | 0.29 | 0.50 | 0.14 | 0.00 | 0.75 | 0.00 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 0.12 | 0.10 | 0.01 | 0.04 | 0.25 | 0.01 |
| | Permanent Conversion | 0.14 | 0.75 | 0.10 | 0.05 | 1.00 | 0.05 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **09020309 - Snake SUBTOTAL** | | **16.11** | | **0.76** | **2.09** | | **0.19** |
| **09020311 - Middle Red** | | | | | | | |
| Emergent | Temporary Impact | 18.51 | 0.03 | 0.56 | 0.00 | 0.06 | 0.00 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.18 | 1.00 | 0.18 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.00 | 0.06 | 0.00 | 0.00 | 0.09 | 0.00 |
| | Permanent Conversion | 0.05 | 0.50 | 0.03 | 0.00 | 0.75 | 0.00 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 0.09 | 0.10 | 0.01 | 0.06 | 0.25 | 0.01 |
| | Permanent Conversion | 0.35 | 0.75 | 0.26 | 0.00 | 1.00 | 0.00 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **09020311 - Middle Red SUBTOTAL** | | **19.19** | | **1.04** | **0.06** | | **0.01** |
| **09020312 - Two Rivers** | | | | | | | |
| Emergent | Temporary Impact | 0.02 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.00 | 0.06 | 0.00 | 0.00 | 0.09 | 0.00 |
| | Permanent Conversion | 0.00 | 0.50 | 0.00 | 0.00 | 0.75 | 0.00 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 0.00 | 0.10 | 0.00 | 0.00 | 0.25 | 0.00 |
| | Permanent Conversion | 0.00 | 0.75 | 0.00 | 0.00 | 1.00 | 0.00 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **09020312 - Two Rivers SUBTOTAL** | | **0.02** | | **0.00** | **0.00** | | **0.00** |
| **BSA 3 SUBTOTAL** | | **164.40** | | **16.14** | **37.70** | | **4.26** |
| **Bank Service Area 5** | | | | | | | |
| **07010101 - Mississippi Headwaters** | | | | | | | |
| Emergent | Temporary Impact | 16.90 | 0.03 | 0.51 | 1.67 | 0.06 | 0.10 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.06 | 1.00 | 0.06 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 5.29 | 0.06 | 0.32 | 1.03 | 0.09 | 0.09 |
| | Permanent Conversion | 3.40 | 0.50 | 1.70 | 1.45 | 0.75 | 1.09 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 5.43 | 0.10 | 0.54 | 5.58 | 0.25 | 1.40 |
| | Permanent Conversion | 3.94 | 0.75 | 2.95 | 4.02 | 1.00 | 4.02 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **07010101 - Mississippi Headwaters SUBTOTAL** | | **35.01** | | **6.08** | **13.75** | | **6.69** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **07010102 - Leech Lake** | | | | | | | |
| Emergent | Temporary Impact | 0.01 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.09 | 0.06 | 0.01 | 0.00 | 0.09 | 0.00 |
| | Permanent Conversion | 0.00 | 0.50 | 0.00 | 0.00 | 0.75 | 0.00 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 0.21 | 0.10 | 0.02 | 0.13 | 0.25 | 0.03 |
| | Permanent Conversion | 0.26 | 0.75 | 0.19 | 0.20 | 1.00 | 0.20 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **07010102 - Leech Lake SUBTOTAL** | | *0.57* | | *0.22* | *0.33* | | *0.23* |
| **07010103 - Prairie Willow** | | | | | | | |
| Emergent | Temporary Impact | 22.72 | 0.03 | 0.68 | 38.71 | 0.06 | 2.32 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.11 | 1.00 | 0.11 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 9.92 | 0.06 | 0.60 | 8.23 | 0.09 | 0.74 |
| | Permanent Conversion | 6.86 | 0.50 | 3.43 | 7.41 | 0.75 | 5.56 |
| | Permanent Fill | 0.17 | 1.50 | 0.26 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 27.23 | 0.10 | 2.72 | 32.88 | 0.25 | 8.22 |
| | Permanent Conversion | 23.53 | 0.75 | 17.65 | 30.52 | 1.00 | 30.52 |
| | Permanent Fill | 0.89 | 2.00 | 1.77 | 0.25 | 2.50 | 0.64 |
| **07010103 - Prairie Willow SUBTOTAL** | | *91.44* | | *27.22* | *118.01* | | *48.00* |
| **7010105 - Pine** | | | | | | | |
| Emergent | Temporary Impact | 40.06 | 0.03 | 1.20 | 9.73 | 0.06 | 0.58 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 7.12 | 0.06 | 0.43 | 2.54 | 0.09 | 0.23 |
| | Permanent Conversion | 6.70 | 0.50 | 3.35 | 2.38 | 0.75 | 1.79 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 9.07 | 0.10 | 0.91 | 5.65 | 0.25 | 1.41 |
| | Permanent Conversion | 7.37 | 0.75 | 5.53 | 3.86 | 1.00 | 3.86 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **7010105 - Pine SUBTOTAL** | | *70.32* | | *11.41* | *24.16* | | *7.87* |
| **07010106 - Crow Wing** | | | | | | | |
| Emergent | Temporary Impact | 45.43 | 0.03 | 1.36 | 7.28 | 0.06 | 0.44 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 12.45 | 0.06 | 0.75 | 0.96 | 0.09 | 0.09 |
| | Permanent Conversion | 9.82 | 0.50 | 4.91 | 2.66 | 0.75 | 1.99 |
| | Permanent Fill | 0.02 | 1.50 | 0.03 | 0.00 | 1.75 | 0.00 |
| Forested | Temporary Impact | 6.47 | 0.10 | 0.65 | 3.78 | 0.25 | 0.95 |
| | Permanent Conversion | 6.45 | 0.75 | 4.84 | 3.41 | 1.00 | 3.41 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | 0.00 | 2.50 | 0.00 |
| **07010106 - Crow Wing SUBTOTAL** | | *80.64* | | *12.53* | *18.09* | | *6.87* |
| **BSA 5 SUBTOTAL** | | **277.98** | | **57.47** | **174.35** | | **69.67** |
| | | | | | | | |
| **Bank Service Area 6** | | | | | | | |
| | | | | | | | |
| Emergent | Temporary Impact | 8.19 | 0.03 | 0.25 | 1.11 | 0.06 | 0.07 |
| | Permanent Conversion | 0.00 | | 0.00 | 0.00 | | 0.00 |
| | Permanent Fill | 0.00 | 1.00 | 0.00 | 0.00 | 1.50 | 0.00 |
| Scrub-Shrub | Temporary Impact | 0.56 | 0.06 | 0.03 | 0.27 | 0.09 | 0.02 |
| | Permanent Conversion | 0.17 | 0.50 | 0.09 | 0.03 | 0.75 | 0.02 |
| | Permanent Fill | 0.00 | 1.50 | 0.00 | 0.00 | 1.75 | 0.00 |
| | Temporary Impact | 0.03 | 0.10 | 0.00 | 0.27 | 0.25 | 0.07 |

| Forested | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Permanent Conversion | 0.00 | 0.75 | 0.00 | | 0.00 | 1.00 | 0.00 |
| | Permanent Fill | 0.00 | 2.00 | 0.00 | | 0.00 | 2.50 | 0.00 |
| | *SUBTOTAL* | *8.96* | | *0.37* | | *1.67* | | *0.18* |
| | **BSA 6 SUBTOTAL** | **8.96** | | **0.37** | | **1.67** | | **0.18** |
| | **PROJECT TOTALS** | **649.45** | | **119.19** | | **353.18** | | **107.21** |

| HCVF Wetlands | | | | | | | | |
| Impact Acres | Ratio | Mitigation Credits Subtotal | Total Impact Acres | Mitigation Credits Subtotal | *Out of Kind Subtotal (+0.25)* | Enbridge Bank Credits Purchased | *Out of BSA Subtotal (+0.25)* | Total Required Mitigation Credits |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| 0.00 | 0.00 | 0.00 | 129.11 | 5.80 | 1.45 | | | 7.25 |
| 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.32 | 0.32 | 0.08 | | | 0.40 |
| 0.00 | 0.00 | 0.00 | 52.32 | 3.77 | 0.94 | | | 4.72 |
| 0.00 | 0.00 | 0.00 | 35.20 | 21.19 | 5.30 | | | 26.48 |
| 0.00 | 0.00 | 0.00 | 4.07 | 6.24 | 1.56 | | | 7.79 |
| 32.60 | 0.50 | 16.30 | 110.89 | 28.18 | | | | 28.18 |
| 23.80 | 1.50 | 35.70 | 57.11 | 62.79 | | 120.00 | 4.93 | 67.72 |
| 0.00 | 3.00 | 0.00 | 0.77 | 1.55 | | | | 1.55 |
| *56.40* | | *52.00* | *389.78* | *129.85* | *9.33* | *120.00* | *4.93* | *144.11* |
| | | | | | | | | |
| 0.00 | 0.00 | 0.00 | 3.12 | 0.18 | 0.04 | | | 0.22 |
| 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.66 | 0.05 | 0.01 | | | 0.07 |
| 0.00 | 0.00 | 0.00 | 0.23 | 0.13 | 0.03 | | | 0.17 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.10 | 0.03 | | | | 0.03 |
| 0.00 | 1.50 | 0.00 | 0.06 | 0.06 | | | | 0.06 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| *0.00* | | *0.00* | *4.18* | *0.46* | *0.09* | *0.00* | *0.00* | *0.55* |
| 56.40 | | 52.00 | 393.96 | 130.30 | 9.42 | 120.00 | 4.93 | 144.66 |
| | | | | | | | | |
| | | | | | | | | |
| 0.00 | 0.00 | 0.00 | 26.11 | 0.90 | | | | 0.90 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.40 | 0.03 | 0.01 | | | 0.03 |
| 0.00 | 0.00 | 0.00 | 0.16 | 0.08 | 0.02 | | | 0.10 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.50 | 0.00 | 1.73 | 0.24 | 0.06 | | | 0.30 |
| 0.00 | 1.50 | 0.00 | 0.64 | 0.54 | 0.13 | | | 0.67 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| *0.00* | | *0.00* | *29.04* | *1.78* | *0.22* | *0.00* | *0.00* | *2.00* |
| | | | | | | | | |
| 0.00 | 0.00 | 0.00 | 99.31 | 3.77 | | | | 3.77 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | 39.00 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 3.08 | 3.08 | | | | 3.08 |
| 0.00 | 0.00 | 0.00 | 8.93 | 0.55 | 0.14 | | | 0.69 |
| 0.00 | 0.00 | 0.00 | 4.55 | 2.31 | 0.58 | | | 2.89 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.50 | 0.00 | 10.31 | 1.48 | 0.37 | | | 1.85 |
| 0.00 | 1.50 | 0.00 | 6.72 | 5.28 | 1.32 | | | 6.61 |
| 0.00 | 3.00 | 0.00 | 0.03 | 0.06 | 0.02 | | | 0.08 |
| *0.00* | | *0.00* | *132.93* | *16.54* | *2.42* | *39.00* | *0.00* | *18.97* |
| | | | | | | | | |
| 0.00 | 0.00 | 0.00 | 2.66 | 0.08 | | | | 0.08 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | | 0.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 1.50 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| *0.00* | | *0.00* | *2.66* | *0.08* | *0.00* | *0.00* | *0.00* | *0.08* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 16.66 | 0.55 | | | 0.55 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | | | 0.02 |
| 0.00 | 0.00 | 0.00 | 0.89 | 0.06 | 0.02 | | 0.08 |
| 0.00 | 0.00 | 0.00 | 0.29 | 0.14 | 0.04 | | 0.18 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.16 | 0.02 | 0.01 | | 0.03 |
| 0.00 | 1.50 | 0.00 | 0.19 | 0.15 | 0.04 | | 0.19 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| *0.00* | | *0.00* | *18.20* | *0.95* | *0.09* | *0.00* | *0.00* | *1.04* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 18.51 | 0.56 | | | 0.56 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.18 | 0.18 | | | 0.18 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.05 | 0.03 | 0.01 | | 0.03 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.15 | 0.02 | 0.01 | | 0.03 |
| 0.00 | 1.50 | 0.00 | 0.35 | 0.26 | 0.07 | | 0.33 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| *0.00* | | *0.00* | *19.24* | *1.05* | *0.08* | *0.00* | *0.00* | *1.13* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | | | 0.00 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 1.50 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| *0.00* | | *0.00* | *0.02* | *0.00* | *0.00* | *0.00* | *0.00* | *0.00* |
| **0.00** | | **0.00** | **202.11** | **20.40** | **2.82** | **39.00** | **0.00** | **23.22** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 18.57 | 0.61 | | | 0.61 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | 294.97 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | | | 0.06 |
| 0.00 | 0.00 | 0.00 | 6.32 | 0.41 | 0.10 | | 0.51 |
| 0.00 | 0.00 | 0.00 | 4.85 | 2.79 | 0.30 | 1.57 | 3.09 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.00 | 0.50 | 0.00 | 11.01 | 1.94 | | | 1.94 |
| 0.00 | 1.50 | 0.00 | 7.96 | 6.97 | | 9.10 | 6.97 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| *0.00* | | *0.00* | *48.76* | *12.77* | *0.41* | *305.64* | *0.00* | *13.18* |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | | | | 0.00 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.09 | 0.01 | 0.00 | | | 0.01 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.34 | 0.05 | 0.01 | | | 0.07 |
| 0.00 | 1.50 | 0.00 | 0.45 | 0.39 | 0.10 | | | 0.49 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| *0.00* | | *0.00* | *0.90* | *0.45* | *0.11* | *0.00* | *0.00* | *0.57* |
| 0.00 | 0.00 | 0.00 | 61.43 | 3.00 | | | | 3.00 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.11 | 0.11 | | | | 0.11 |
| 0.00 | 0.00 | 0.00 | 18.15 | 1.34 | 0.33 | | | 1.67 |
| 0.00 | 0.00 | 0.00 | 14.27 | 8.99 | 2.25 | | | 11.24 |
| 0.00 | 0.00 | 0.00 | 0.17 | 0.26 | 0.07 | | | 0.33 |
| 0.31 | 0.50 | 0.16 | 60.43 | 11.10 | 1.48 | | | 12.58 |
| 0.21 | 1.50 | 0.32 | 54.27 | 48.49 | | 53.50 | | 48.49 |
| 0.00 | 3.00 | 0.00 | 1.14 | 2.41 | 0.60 | | | 3.01 |
| *0.53* | | *0.48* | *209.98* | *75.70* | *4.72* | *53.50* | *0.00* | *80.43* |
| 0.00 | 0.00 | 0.00 | 49.79 | 1.79 | | | | 1.79 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 9.66 | 0.66 | 0.16 | | | 0.82 |
| 0.00 | 0.00 | 0.00 | 9.08 | 5.14 | 1.28 | | | 6.42 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.50 | 0.00 | 14.72 | 2.32 | 0.58 | | | 2.90 |
| 0.00 | 1.50 | 0.00 | 11.23 | 9.39 | 2.35 | | | 11.74 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| *0.00* | | *0.00* | *94.49* | *19.29* | *4.38* | *0.00* | *0.00* | *23.66* |
| 0.00 | 0.00 | 0.00 | 52.71 | 1.80 | | | | 1.80 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 13.42 | 0.83 | 0.21 | | | 1.04 |
| 0.00 | 0.00 | 0.00 | 12.48 | 6.90 | 1.73 | | | 8.63 |
| 0.00 | 0.00 | 0.00 | 0.02 | 0.03 | 0.01 | | | 0.03 |
| 0.00 | 0.50 | 0.00 | 10.25 | 1.59 | 0.40 | | | 1.99 |
| 0.00 | 1.50 | 0.00 | 9.86 | 8.25 | 2.06 | | | 10.31 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| *0.00* | | *0.00* | *98.73* | *19.40* | *4.40* | *0.00* | *0.00* | *23.80* |
| 0.53 | | 0.48 | 452.86 | 127.62 | 14.02 | 359.14 | 0.00 | 141.64 |
| 0.00 | 0.00 | 0.00 | 9.30 | 0.31 | | | | 0.31 |
| 0.00 | | 0.00 | 0.00 | 0.00 | | 17.74 | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.83 | 0.06 | 0.01 | | | 0.07 |
| 0.00 | 0.00 | 0.00 | 0.20 | 0.11 | 0.03 | | | 0.13 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 0.50 | 0.00 | 0.30 | 0.07 | 0.02 | | | 0.09 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0.00 | 1.50 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| 0.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| *0.00* | | *0.00* | *10.63* | *0.55* | *0.06* | *17.74* | *0.00* | *0.61* |
| 0.00 | | 0.00 | 10.63 | 0.55 | 0.06 | 17.74 | 0.00 | 0.61 |
| 56.93 | | 52.48 | 1059.55 | 278.87 | 26.32 | 535.88 | 4.93 | 310.12 |

## 9.6   CONCLUSIONS REGARDING CUMULATIVE IMPACTS

When considering the overall impacts that would result from the proposed activity, in relation to the overall impacts from past, present, and reasonably foreseeable future activities, the incremental contribution of the proposed activity to cumulative impacts in the area described in Section 9.3, are not considered to be significant.

# 10.0 SPECIAL CONDITIONS

**WORK REQUIRING SECTION 10 AUTHORIZATION**

1. The following special condition is a part of all Corps of Engineers permits that provide authorization under Section 10 of the Rivers and Harbors Act, regardless whether the permit provides such authorization under Section 10 alone, or in combination with authorization under other laws. This condition applies to the installation of the Line 3 Replacement Pipeline below the bed of the Red River of the North (Mile Post 801.8), Red Lake River (Mile Post 864.3), and the Mississippi River (Mile Post 1069.7).

     a. Enbridge understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States.  No claim shall be made against the United States on account of any such removal or alteration.

**AUTHORIZED WORK**

2.     Enbridge is responsible for ensuring that whoever performs, supervises or oversees any portion of the physical work associated with the construction of the project has a copy of, is familiar with, and complies with all the terms and conditions of this permit.

RATIONALE:  This condition is required to ensure that whoever performs the work is familiar with and complies with the permit requirements.

**401 WATER QUALITY CERTIFICATIONS**

3.     All terms and conditions of the 401 Water Quality Certifications issued by the Minnesota Pollution Control Agency, Fond du Lac Reservation, and North Dakota Department of Health are hereby incorporated as terms and conditions of this permit (Attachment B).

RATIONALE: This condition is required to ensure the permitted activities in wetlands comply with Section 401 of the Clean Water Act.

**AVOIDANCE AND MINIMIZATION OF IMPACTS**

4.     Prior to commencing any of the Project's construction activities, Enbridge must flag or stake the boundaries of the authorized construction area limits in a manner that ensures all individuals can readily identify the boundaries of the authorized construction area limits and

ensures the construction activities will only occur in areas authorized by the permitting agencies. Enbridge must also ensure that all aquatic resources (wetlands, ditches, lakes, or streams) in the vicinity of the construction area that are not authorized to be impacted by the project are clearly identified.

5.      Prior to commencing the Project's construction activities in any wetland, Enbridge must install in-wetland BMPs that will prevent, during construction activities, impacts to aquatic resources outside of the area in which wetland impacts are authorized as described in the Environmental Protection Plan, dated November 2020, incorporated into this authorization. Enbridge must immediately repair, replace, or supplement all non-functional in-wetland BMPs with functional BMPs as needed to prevent any unauthorized impacts to waters of the U.S.

6.      Topsoil segregation shall occur in accordance with the procedures identified in the November 2020 Environmental Protection Plan incorporated into this authorization.

7.      To minimize the possibility of erosion and potential discharges to waterbodies caused by weather events, and to reduce temporal impacts, Enbridge must perform the authorized work in segments, referred to as spreads, as shown on the attached drawing 2014-01071-CLJ 1 of 525.  Enbridge must limit the cumulative amount of excavated open trench within each spread to no more than three days of anticipated welding production, which must not exceed more than 14,000 linear feet. The trailing end of each trench must be backfilled and BMPs must be in place as the leading edge of the trench is opened. Each open spread must be fully equipped and staffed to operate independently of any other open spread. Within each spread, site-specific activities, such as HDD, bores, road bores, valve work and pumping station construction activities, may be performed independent of open trench work.

8.      Enbridge must cross all streams and wetlands using the proposed crossing methods specified in Attachment A of this permit.  The use of an alternative crossing method specified in Attachment A requires prior approval of from the Corps.

9.      Enbridge must not conduct HDD stream crossing construction activities when the stream is covered with ice, unless otherwise pre-approved by the Corps on a case-by-case basis. Enbridge must not manually create open water conditions in streams that would otherwise be ice-covered at the HDD crossing locations, unless otherwise approved by the Corps and applicable State agencies.

10.     To minimize potential release of drilling mud into wetlands or waterbodies during HDD, Enbridge shall follow the procedures outlined in the November 2020 Environmental Protection Plan and November 2020 Site Specific HDD Inadvertent Release Response Plans incorporated into this authorization.

11.     Enbridge shall perform construction and restoration at the LaSalle Creek crossing (Mile Post 946.0) and the Spring Book crossing (Mile Post 1041.3) in accordance with the October 2020 LaSalle Creek Construction and Restoration Plan and the October 2020 Spring Brook Construction and Restoration Plan, respectively.

12.     When constructing under winter conditions, as defined in the November 2020 Winter Construction Plan, incorporated into this permit, Enbridge shall follow all BMPs and protocols outlined in the November 2020 Environmental Protection Plan and November 2020 Winter Construction Plan.

13.     Enbridge must ensure that all fill placed in wetlands and waterbodies to create temporary access roads as authorized by this permit, is removed and the wetlands and waterbodies are restored to their preconstruction conditions as outlined in the November 2020 Environmental Protection Plan. This permit does not authorize permanent impacts associated with temporary access roads in wetlands and waterbodies.

14.     There shall be no decrease in wetland areas as a result of this authorized work, except that authorized for the construction of pump stations, mainline valves, and permanent access roads as identified in Attachment A.

15.     In absence of a specific permit condition, Enbridge shall implement the procedures identified in the November 2020 Environmental Protection Plan.

16.     Enbridge must inform the Corps of any proposed additional discharge of dredged or fill material, permanent or temporary, not included in this authorization before the impacts occur. Enbridge must immediately notify the Corps of unauthorized impacts to waters of the U.S.

RATIONALE: These conditions are required to minimize impacts to adjacent wetlands and other waters as a result of the permitted activities and ensure no unauthorized impacts occur.

**RESTORATION OF TEMPORARY IMPACTS**

17.     All wetlands and waterways disturbed within the project corridor shall be restored to their pre-impact contours and exposed wetland soils must be revegetated as outlined in the November 2020 Environmental Construction Plan.

18.     All restored wetlands and waterbodies shall meet applicable performance standards outlined in the November 2020 Post Construction Wetland and Waterbody Monitoring Plan.

19.     All wetlands and waterways in the construction corridor shall be monitored per the protocols identified in the November 2020 Post Construction Wetland and Waterbody Monitoring Plan incorporated into this authorization. Reports documenting the findings of post construction monitoring shall be submitted to the Corps not later than December 31st of the year monitoring occurs.

RATONALE:  These conditions are required to ensure wetlands and waterbodies temporarily impacted are satisfactorily restored and continue to provide wetland functions provide prior to the project.

**COMPENSATORY MITIGATION FOR IMPACTS**

20.     As compensatory mitigation for the authorized activities, a minimum of 310.12 wetland credits shall be debited from the wetland bank accounts identified in the October 2020 L3R Compensatory Wetland mitigation Plan.  Debit of wetland types from Banks Service Areas throughout the project shall be completed in accordance with the October 2020 L3R Compensatory Wetland Mitigation Plan. Prior to undertaking the activities authorized by this permit, the permittee shall ensure that the Corps receives written notification that BWSR has initiated the withdraw transaction.  All documentation submitted shall include the file number MVP-2014-01071-CLJ, and be submitted to:

        U.S. Army Corps of Engineers

St. Paul District
ATTN: Craig Jarnot
4111 Technology Drive, Suite 295
Bemidji, Minnesota 56601.

21.     Financial assurances, as identified in the November 2020 Post Construction Wetland and Waterbody Monitoring Plan shall be provided to ensure restoration of temporary impacts to waters of the U.S. is achieved in accordance with performance standards set forth in the November 2020 Post Construction Wetland and Waterbody Monitoring Plan. The instrument in which financial assurances will be provided must be submitted to the Corps prior to commencement of the activities authorized by this permit.

RATIONALE: These conditions are required to ensure appropriate compensation to offset known direct impacts to wetlands caused by the permitted activities.

**INVASIVE SPECIES MANAGEMENT**

22.     To reduce the potential for spread of invasive species, Enbridge shall follow the protocols outlined in Appendix B (Invasive and Noxious Species Management Plan) of the November 2020 Environmental Protection Plan.

RATIONALE: This condition is required to reduce the potential for spread of invasive species.

**HISTORIC PROPERTIES**

23.     Enbridge shall comply with measures identified in the Avoidance, Mitigation, and Implementation Plan for Construction (AMIP), dated October 2020, for areas subject to Corps' regulatory authority.

RATIONALE: This condition is required to ensure no historic properties are affected during construction.

# 11.0  COMPLIANCE WITH ENVIRONMENTAL LAWS AND POLICIES

# 11.1 SECTION 401 OF THE CLEAN WATER ACT (33 USC SECTION 1342) WATER QUALITY CERTIFICATION (33 CFR 320.4(d))

The Project is in compliance with Section 401 of the CWA. The Water Quality Certification was issued by Fond du Lac on April 15, 2019 with conditions.  North Dakota Department of Health issued the individual 401 Water Quality Certification with conditions for the portion of the project within the state of North Dakota that is being reviewed by St. Paul District.  The MPCA issued its Individual 401 Water Quality Certification with conditions on November 12, 2020.  Section 401 Certifications are included in Appendix B. Pursuant to 33 U.S.C. 1341(d). Compliance with the Section 401 WQC is a special condition of the DA permit.

# 11.2 ENDANGERED SPECIES ACT OF 1973 (16 USC 1531)

The proposed Project is in compliance with Section 7 of the ESA. The consultation conducted for the Project is described in Section 6.4.1.

## 11.3 SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT (NHPA) (16 USC 470 et seq.)

## 11.3.1 SUMMARY OF EFFECT FINDINGS

The Corps' findings of effect summarized below are based on its review of reports submitted from 2013 to 2020, and consultation with consulting parties including dozens of consulting tribes and the Minnesota SHPO.  Enclosure 2 of the Corps' October 11, 2019, letter to Minnesota SHPO provides titles and dates of information considered by the Corps, including seventeen archaeological survey reports, two architectural survey reports, and four supplemental reports to include a consultation map book, results of geomorphic subsurface testing, information on access road investigations, and report of Phase II archaeological  investigations.

The Corps' March 20, 2020, letter to the Minnesota SHPO further identified the following documents that it reviewed to make informed eligibility determinations and effect findings:

- *Tribal Cultural Resources Management Survey of the Enbridge Line 3 Replacement Project, Fond du Lac Band of Lake Superior Chippewa Tribal Historic Preservation Office, Cloquet, MN, July 2019*;
- February 19, 2020, *Addendum 1 for the Tribal Cultural Resource Management Survey of the Enbridge Line 3 Replacement Project*;
- *2020 Phase II Investigations of Three Above-ground Resources* (Commonwealth, February 2020); and
- 201*9 Line 3 Replacement Pipeline Project Minnesota Archaeological Reconnaissance Studies Volume I: Final Report* (Merjent, Inc. & AECOM, February 2020) and accompanying map books (*Volumes 2-5*).

Findings of "no effect" were made for the following properties:   21KT0069 and the Bailey Farmstead (CA-MCT-010, CA-MCT-011, CA-MCT-012, CA-MCT-013, CA-MCT-014, CA-MCT-015, and CA-MCT-016).

Findings of "No Adverse Effect" to historic properties were made for the following properties: 21MA0039, 21HB0082, 21CE0098, drainage ditches (23 crossings) and railroads (10 crossings). Note that drainage ditches and railroads were treated as eligible rather than further assessing eligibility.

## 11.3.2 RATIONALE FOR EFFECT FINDINGS

**OVERVIEW**
The Corps identified areas of the overall project that are within its APE, as described above in Section 2, and identified areas where surveys were warranted to identify cultural resources. The applicant prepared and submitted the results of a multi-disciplinary survey approach to include archaeological surveys, tribal cultural resource surveys, architectural surveys, select

Phase II evaluations, viewshed analyses, and geomorphological investigations.  Results were submitted for areas within the Corps' APE as well as outside of the Corps' APE.

Archaeological investigations began in 2013 and continued through early 2020. The tribal cultural resources survey (TCRS) began October 2017 and was conducted for approximately one month before snowfall. The bulk of the TCRS survey, including elder interviews in several tribal communities, was conducted during 2018. In 2019, the TCRS team returned to select locations and also surveyed an additional 91 facility adjustment areas. Areas surveyed by traditional archaeologists coincided with areas surveyed by tribal cultural specialists. Over 100,000 shovel tests were dug within the approximate 5,600-acre corridor and a total of only nine acres were not surveyed within the corridor. The Corps believes the level of effort for this project surpasses the "reasonable and good faith" identification standard per 36 CFR Part 800 Protection of Historic Properties, Implementing Regulations of Section 106 of the NHPA.

As will be further described below, the applicant proposed avoidance of all eligible properties identified as a result of all surveys, therefore no properties would be adversely affected.  The applicant also proposed avoidance of other resources that were not evaluated for eligibility but treated as such. The Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) was developed by the applicant, with input from Fond du Lac Band THPO on the tribal monitoring component, and identifies tribal, archaeological, and geomorphological monitoring to occur during construction.  This plan is further described below under Additional Information.


**DETAILS OF RATIONALE FOR EFFECT FINDINGS**
A total of fifty-four (54) archaeological sites were identified in the Corps' APE and summarized in correspondence to the Minnesota SHPO on October 11, 2019. (See this letter in Attachment C.) Two sites identified in this report are further described below.  All other sites were determined not eligible or were not further assessed because they are located outside of the limits of disturbance and would not be impacted.

Site 21-MA-0039, located at the crossing of the Snake River in Marshall County, was evaluated during traditional archaeological investigation as well as the tribal cultural resource investigation for this project.  This site was previously determined eligible for inclusion in the NRHP during review of a past pipeline project. It was avoided by HDD during construction of the Lakehead Pipeline in 1994 and during construction of the Alberta Clipper Pipeline.  It will be avoided during L3R construction activities as well by using HDD construction methods. Information about avoidance of this site was provided in the Corps' letter to the SHPO on October 11, 2019. In the letter to the Minnesota SHPO on March 20, 2020, the Corps provided a finding of no adverse effect to this site based on avoidance of the site with HDD construction.

Site 21-HB-0082 is considered eligible for purposes of this project.  This site was evaluated during traditional archaeological investigation as well as the tribal cultural resource investigation for this project. It will be avoided and monitored during construction of the L3R project and the Corps made a finding of no adverse effect to this site in its letter to the Minnesota SHPO on October 11, 2019.

The 2019 archaeological investigation surveyed approximately an additional 789 acres not previously surveyed and described above.   A total of 18 new archaeological resources were

identified and the boundary of two previously identified sites were expanded.  Of the 18 new sites, nine are within the Project APE. The Corps determined eight sites are not eligible and one is potentially eligible, 21KT0069.   Based on planned avoidance of this site, the Corps determined no further intensive survey or evaluation is warranted, and the proposed Project activities would have no effect on 21KT0069.

Tribal survey re-visited previously recorded sites, expanded/changed boundaries of a few previously documented sites (two w/in project APE), and identified 22 archaeological resources. Of the 22, 16 are within the Corps APE.  A total of 15 locations were recommended for avoidance in the TCRS report as described in the table below (Table 6).

Of the 15 sites identified in the table below, the Corps determined based on review of the tribal cultural resource survey that one new site is eligible for listing on the NRHP, site 21CE0098. The applicant proposed a lateral shift to the east of the pipeline alignment in order to avoid any ground disturbance to the resource itself. The project APE clips the site boundary but there will be no direct effects on the site. Pipeline replacement will proceed with caution in the area of the site and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors.  Based on proposed avoidance and monitoring, the Corps determined in its letter to the Minnesota SHPO on March 20, 2020 that there would be no adverse effect to site 21CE0098.

In addition, site 21MA0085, the "Dakota Village" site is considered eligible for purposes of this Project.  The re-route proposed by the applicant avoids the resource entirely and places the site outside of the Project APE, so there is no effect to assess.  Enbridge has committed to avoiding the resources and has developed avoidance measures at each location and proposes to proceed with caution within these sensitive areas. Three of these resources are outside the Project APE. The Corps will require avoidance measures related to the sites within the Corps' APE, and other measures have been proposed voluntarily by the applicant (e.g., any permit issued by the Corps would require avoidance measures that are within our APE and that occur during construction activities, but would not require measures outside the Corps APE during construction or during future maintenance unless that maintenance results in regulated activities).

"Table 6. TCRS Resources Recommended for Avoidance, Planned Avoidance Measures

| Resource Type (details) | Tract County | OSA No. | TCRS Page No. | Avoidance Planned |
|---|---|---|---|---|
| Newly Identified; Pre-contact (IO: 1 L*, but assoc. RR CC) | T-1028 Kittson | 21KT0065 | 254, 256, 263 [Map book pg. 15] | Pipeline replacement will proceed with caution in the area of 21KT0065 and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors |
| Newly Identified; Historic (AS) | T-1028 Kittson | n/a | 255 [Map book pg. 15] | Pipeline replacement will proceed with caution in the area of T-1028 Historic site and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors |

| Resource Type (details) | Tract County | OSA No. | TCRS Page No. | Avoidance Planned |
|---|---|---|---|---|
| Previously Identified; Pre-contact (LS) | T-955 Marshall | 21MA0076 | 229 [Map book pg. 42] | Pipeline route has been realigned ensuring that the site will be avoided by all construction activities OUTSIDE APE |
| Newly Identified; Pre-contact ("Dakota Village") | T-955 Marshall | 21MA0085 | 231 [Map book pg. 42] | Pipeline route has been realigned ensuring that the site will be avoided by all construction activities OUTSIDE APE |
| Newly Identified; Pre-contact (LS) | T-955 Marshall | 21MA0084 | 231 [Map book pg. 42] | Pipeline route has been realigned to the western reroute, which is devoid of artifacts, ensuring that both sites identified by the TCRS will be avoided by all construction activities OUTSIDE APE |
| Previously Identified; Pre-contact (E) | T-909 Marshall | 21MA0039 | 235, 263 [Map book pg. 57] | The NRHP Eligible portion of site 21MA0039 will be avoided through HDD, crossing under Snake River. Additionally, timber matting used to cover workspace, no ground disturbance within site boundaries as expanded during TCRS survey. Pipeline replacement proceed with caution in area of 21MA0039 and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors. |
| Newly Identified; Pre-contact (IO: 1 L) (NE) | T-840 Pennington | 21PE0028 | 216 [Map book pg. 78] | Site 21PE0028 will be avoided, situated at the southwestern boundary of the workspace. Pipeline replacement proceed with caution in area of site and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors. |
| Newly Identified; Pre-contact (rock alignment) (consider E) | MN-CL-R05-017.000 Clear-water | 21CE0098 | 177 [Map book pg. 139] | In coordination with the TCRS team, Enbridge has developed a lateral reroute to the east of the rock alignment, which avoids the site. Pipeline replacement will proceed with caution in the area of the site and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors. |
| Newly Identified; Pre-contact (2 L:flakes) | MN-HU-C5-006.000 Hubbard | 21HB0100 | 152, 160 [Map book pg. 156] | Pipeline replacement will proceed with caution in the area of site 21HB0100 and all phases of site prep, pipeline installation, and future maintenance activities monitored by Tribal Monitors |
| Previously Identified; Pre-contact (AS) (considered E) | MN-HU-C5-082.000 Hubbard | 21HB0082 | 154 [Map book pg. 175] | 21HB0082, which is adjacent to the edge of an HDD workspace, but not within it, will be avoided. All phases of site prep, pipeline installation and future maintenance activities in the area of the site be monitored by Tribal Monitors. |

| Resource Type (details) | Tract County | OSA No. | TCRS Page No. | Avoidance Planned |
|---|---|---|---|---|
| **Previously Identified; Pre-contact (3 L, 1 fcr, TCRS expanded boundary) (NE)** | MN-HU-C5-090.000 Hubbard | 21HB0071 | 156 [Map book pg. 178] | Avoid site through combination of timber matting across workspace for equipment travel and limit ground disturbance, restricted to excavation of the trench. Entire site area, as intersected by the workspace will be mapped and considered "sensitive." All phases of site prep, pipeline install, future maintenance activities in the area of the site be monitored by Tribal Monitors. Monitoring will include placement of a pump at an existing well adjacent w/ workspace, completed by hand, involve no ground disturbance. |
| **Previously Identified; Pre-contact (AS) (NE)** | MN-HU-C5-122.000 Hubbard | 21HB0084 | 156 [Map book pg. 187] | Avoid 21HB0084 by use of an HDD crossing under the Straight River. Pipeline replacement will proceed with caution in the area of site 21HB0084 and all phases of site prep, pipeline installation, and future maintenance activities be monitored by Tribal Monitors. |
| **Previously Identified; Pre-contact/ Historic (NE)** | MN-HU-C5-176.000 Hubbard | 21HB0089 | 157 [Map book pg. 196] | 21HB0089 will be avoided through a proposed HDD. And all phases of site prep, pipeline install, any future maintenance activities be monitored by Tribal Monitors. |
| **Previously Identified; Pre-contact (LS) (NE)** | MN-WA-006.000 Wadena | 21WD0028 | 140 [Map book pg. 204] | HDD will avoid 21WD0028 on west side of Crow Wing River, which avoids site boundaries in their entirety. The path of HDD will be cleared as it crosses the site to cut trees to stump level w/ no ground disturbance. Vehicular traffic limited, confined to timber matting. Ensure pipeline replacement proceed with caution, all phases of site prep, pipeline install, future maintenance activities be monitored by Tribal Monitors. |
| **Newly Identified, across river from 21WD0028 (AS) (NE)** | **MN-WA-006.000 Wadena** | n/a | **140 [Map book pg. 204-205]** | Avoid site by extending HDD eastward beyond MN-WA-006.000 boundaries on east side of Crow Wing River, requested by TCRS. Path of HDD cleared as crosses site to cut trees to stump level w/ no ground disturbance. Vehicular traffic limited, confined to timber matting. Ensure pipeline replacement proceed w/ caution, all phases of site prep, pipeline install, future maintenance activities monitored by Tribal Monitors. |

*Note: L=lithic; AS=artifact scatter; LS=lithic scatter; IO=isolate; fcr=fire-cracked rock; RR CC= Red River Cultural Corridor; E=eligible; NE=not eligible; HDD=horizontal directional drill

**Above-ground resources/Architectural evaluation**

Sixty-seven farmsteads with land parcels were identified, with forty-eight of those in the direct APE. The majority have no buildings or structures in the APE, i.e., only the land parcels intersect the APE. Construction would occur in agricultural settings and within an existing pipeline corridor in most instances, and there would be little to no alterations to the character or setting of a property during or after construction. For these reasons, the Corps determined no further survey was warranted for any of the farmstead properties with associated land parcels, Enclosure 5 of the Corps' October 11, 2019 letter to Minnesota SHPO summarizes these properties.

A total of twenty-two farmsteads without associated land parcels were evaluated and are summarized in Enclosure 6 of the Corps' October 11, 2019, letter to Minnesota SHPO.  Eight farmsteads are in the direct APE, four of which include properties that will be demolished by the applicant.  Three of the four are less than 50 years old and the fourth, HB-ARG-009, is comprised of common building types found on most farms in Minnesota.  The Corps determined this site is not eligible for listing.  The Corps determined the project has no potential to impact other sites in the direct APE or sites in the indirect APE given their location on an existing pipeline corridor and in agricultural settings where there would be little to no alterations to the character or setting of a property during or after construction.

For three properties, the Minnesota SHPO disagreed with the Corps determinations that either they are not eligible or did not warrant additional intensive survey and evaluation: the Bailey Farmstead (CA-MCT-010, CA-MCT-011, CA-MCT-012, CA-MCT-013, CA-MCT-014, CA-MCT-015, and CA-MCT-016); the Jack Leemola House (SL-FWC-042); and, another potential historic farmstead (MA-VKC-020, MA-VKC-022-030). The Minnesota SHPO recommended intensive survey and evaluation of each property and its associated components to determine eligibility of the property and potential contributing status of associated resources. The applicant voluntarily prepared the Phase II investigation. The letter report contains the eligibility recommendations as a result of the Phase II evaluations and the updated Minnesota Multiple Property Inventory (MPI) Forms.

Based on additional information provided by the applicant, the Corps determined that the Jack Kleemola House and the other farmstead (MA-VKC-020, MA-VKC-022-030) are not eligible for listing, and that the Bailey Farmstead is eligible for listing in the NRHP. The Corps considered potential effects of the undertaking on the Bailey Farmstead as the proposed Project corridor traverses agricultural lands thought to be associated with the farmstead. The boundary of the property was "drawn to encompass the greatest number of elements that retain physical integrity and thereby contribute to the property's significance" and "to exclude noncontributing elements like fields that do not retain integrity and areas that were not historically associated with the studied property."  The Phase II evaluation has provided a defined historic boundary, and the Bailey Farmstead is no longer within or near the Project APE as it is situated approximately 2,000 feet north of the nearest APE.  In addition, there are no above-ground structures proposed in this area of the corridor The Corps determined in its letter to the Minnesota SHPO on March 20, 2020, that the undertaking would have no effect to the Bailey Farmstead history property.

**Drainage ditches**

The pipeline would be constructed under a total of 23 drainage ditches.  The pipe would be constructed at nine of these locations via HDD and bore methods, therefore the pipe would be installed below these ditches and there would be no impact.   The pipe would be constructed at 14 of the ditch locations utilizing the dry crossing technique.  Ditch banks would be restored to pre-construction conditions and project archaeological monitors would photograph the crossing locations before and after construction to demonstrate successful restoration. Rather than assessing eligibility of these ditches, the sites were presumed to be eligible for purposes of this project because effects would be avoided.  The Corps determined in correspondence to the Minnesota SHPO on March 20, 2020 that no drainage ditches would be adversely affected by the proposed undertaking based on avoidance and minimization measures.

**Railroad crossings**
The pipeline will be installed under 10 railroad crossings using the bore method. Rather than assessing eligibility of these ditches, because effects would be avoided, the sites were presumed to be eligible for purposes of this project. This method does not result in any surface disturbance or alteration to the feature crossed. There are no above-ground structures or facilities proposed at these railroad location crossings. The bore locations will be restored to pre-construction condition. The Corps determined in correspondence to the Minnesota SHPO on March 20, 2020, that no railroad properties would be adversely affected by the proposed undertaking.

## 11.3.3 ADDITIONAL INFORMATION

Correspondence related to the Section 106 review is included in Appendix C. In addition to correspondence to and from the Minnesota SHPO, representatives of Minnesota SHPO also attended tribal consultation meetings on December 10-11, 2019, and January 23-24, 2018.  The Corps extended this invitation to the Minnesota SHPO after coordinating this invitation with the consulting Tribes.

Following submittal of final eligibility determinations and effect findings to the Minnesota SHPO on March 20, 2020, the Corps hosted a virtual teleconference with Minnesota SHPO staff to discuss their preliminary review of the March submittal and answer any questions or provide clarification to assist in their review. Minnesota SHPO stated they would need more time to review and more information, particularly avoidance and minimization measures and monitoring plans during construction, e.g., unanticipated discoveries and monitoring, to agree with effect findings.

On April 16, 2020, Minnesota SHPO requested extension to the 30-day review period. Following coordination of this request with Corps Division and Headquarter offices, the 15-day extension was approved, i.e., the Minnesota SHPO had until May 7, 2020, to provide their comments.

On May 1, 2020, the Corps coordinated the draft Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) with Minnesota SHPO and consulting Tribes. This responds to the request Minnesota SHPO shared with the Corps on March 20, 2020 to receive more information on avoidance, minimization and monitoring.  The AMIP provides all the monitoring plans to include tribal and archaeological monitors, the unanticipated discoveries plan, processes and procedures to be carried out during construction should discoveries occur that would ensure proper treatment and evaluation of resources, for the protection of historic properties and sensitive resources of cultural importance to the Tribes.  .

On May 7, 2020 a letter response from the MN SHPO, concurred with the Corps' No Adverse Effect finding, contingent on permit conditions to ensure avoidance measures and monitoring.

On July 23, 2020, the Corps provided a revised AMIP to Minnesota SHPO, Minnesota DNR archaeologist and all consulting tribes. On October 1, 2020, the Corps held a virtual teleconference with the Minnesota SHPO to ask if the Corps should expect any comments on

the revised draft AMIP.  The SHPO responded that the AMIP is comprehensive and appropriate and exceeds expectations of any monitoring plan or unanticipated discoveries plan.

On October 20, 2020, the Corps provided the final AMIP and appendices to the Minnesota SHPO and all consulting parties for their information and records. The Corps clarified the applicant's compliance with the AMIP, in those areas subject to the Corps' control, would be a required special condition of any permit issued for the regulated activities in waters of the U.S. The Corps concluded that pursuant to 36 CFR 800.5(d)(1), it has fulfilled its responsibilities for the protection and preservation of historic and cultural properties and consultation.

## 11.3.4 TRIBAL TRUST RESPONSIBILITIES

Government-to-government consultation was conducted with Federally recognized Tribes. See Sections 7.8, 11.13, and Appendix D of this document for details of government to government consultation with Federally recognized tribes.

## 11.4 FISH AND WILDLIFE COORDINATION ACT (FWCA) (16 USC 661)

The proposed action is in compliance with the FWCA. Sections 6.4.1, 6.4.2, and 6.4.3 of this document identify the impacts of the proposed Project on fish and wildlife species. The Corps coordinated with the USFWS on the proposed action and worked closely with their designated State counterpart, Minnesota DNR, during interagency coordination.

## 11.5 NATIONAL ENVIRONMENTAL POLICY ACT of 1969 (42 USC 4321 – 4347)

The proposed action is in compliance with NEPA. The EA was completed to evaluate a reasonable range of alternatives and the direct, indirect, and cumulative effects associated with a reasonable range of alternatives. The Corps followed the NEPA process identified in 40 CFR Part 1500 et seq., 33 CFR Part 230, and 33 CFR Part 325 Appendix B, including noticing and timeline requirements, to produce an EA that discloses to the public the environmental impact of the proposed action. The EA is being utilized to make a permit decision on the proposed Project. Signature of this EA by the authorizing official completes the Corps NEPA requirements and responsibilities.

## 11.6 SECTION 176(C) OF THE CLEAN AIR ACT (CAA) GENERAL CONFORMITY RULE REVIEW (42 USC 7401 – 7671 Section 176(c))

The proposed action has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. The Corps has determined that direct emissions from the proposed activities that require a DA permit will not exceed de minimis levels of a criteria pollutant or its precursors and are exempted by 40 CFR 93.153. Any indirect emissions are generally not within the Corps' continuing program responsibility and generally cannot be practicably controlled by the Corps. For these reasons, a conformity determination is not required for this action.

The MPCA has issued a capped air emissions permit for the Project on November 12, 2020. The Corps finds the issuance of this permit to be conclusive with respect to air quality issues. Completion of the process and analysis contained within this document and signature by the authorizing official completes the Corps' Clean Air Act requirements.

## 11.7 MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT (MAGNUSON-STEVENS ACT), ESSENTIAL FISH HABITAT (EFH)

Not applicable, there is no essential fish habitat in the St. Paul District's area of responsibility.

## 11.8 COASTAL ZONE MANAGEMENT ACT (CZMA)

The Project does not require CZMA review as the Project does not cross a coastal zone.

## 11.9 WILD AND SCENIC RIVERS ACT

The Project is not located in or associated with a component of a National Wild and Scenic River System and the Project is not in a river officially designated by Congress as a "study river" for possible inclusion in the system.

## 11.10 EFFECTS ON CORPS CIVIL WORKS PROJECTS (33 USC 408)

The Project would cross the Lost River at milepost 885.8 in Red Lake County, Minnesota. The Flood Control Act of 1958 authorized a flood control project on the Lost River from the confluence of the Lost and Clearwater Rivers (river mile 0.0) and extending upstream to approximate river mile 43.3. An environmental assessment for the request to modify a federal project 33 U.S.C. 408 is included in Appendix E.

## 11.11 CORPS WETLAND POLICY (33 CFR 320.4(b))

The Project would result in wetland impacts. Based on the public interest review herein, the beneficial effects of the Project outweigh the detrimental impacts of the Project.

## 11.13 EXECUTIVE ORDER 13175: CONSULTATION WITH INDIAN TRIBES, ALASKA NATIVES AND NATIVE HAWAIIANS

On July 16, 2014, the Corps sent a letter to the Chairperson of 43 Tribes, signed by both the Omaha and St Paul District Engineers.  The letter included a map overview of the proposed Sandpiper pipeline (SPP) route, and explained Omaha's involvement in North Dakota and St Paul's involvement in Minnesota.  The proposed L3R was later co-located with SPP through a majority of Minnesota.  While the application for SPP was withdrawn in 2016, the review of the SPP proposal is relevant to the early L3R review history and is included here.  The Corps made follow-up phone calls in late July 2014, and attempted to talk with the Chairperson, THPO, and environmental contact at each tribe.  A total of 16 Tribes requested to consult.  Others expressed interest in being kept informed, others declined to consult, or did not respond.

On September 2, 2015, the Corps sent a letter to 43 Tribes, addressed to THPO, signed by both Omaha and St Paul District Regulatory Branch Chiefs. This letter included the SPP overview map, L3R overview map and a list of 16 Tribes wishing to consult.  The letter discussed a proposed consultation meeting for both pipeline projects. The Corps' follow-up resulted in 25 Tribes wishing to consult.  At least two Tribes expressed they did not want to consult, three requested to be kept informed, and the rest were no response.

On October 22, 2015, two letters were sent to 45 Tribes, addressed to THPO, signed by both Omaha and St Paul District Regulatory Branch Chiefs. One letter was sent to consulting tribes and tribes potentially interested in consulting, and one was sent to tribes who had declined to consult or those who did not respond to the above letters.  Both letters included a draft meeting agenda and DVD of archaeological investigations to-date for both pipeline projects.  The Corps asked Tribes for review and comment on the identification of resources, and stated it is seeking information from Tribes on the identification of historic and cultural properties. Follow-up resulted in 34 Tribes wishing to consult and attend the meeting.

In Fall 2015, the Corps tried to coordinate field visits with local Bands closest to the proposed corridor, to include White Earth, Red Lake, Fond du Lac, Mille Lacs and Leech Lake.  The Corps provided map books and shapefiles of the proposed route and followed up with calls to confirm interest and participation.  White Earth identified areas of concern and a field day was planned for October 27, 2015. Enbridge proposed a route alternative to avoid Wild Rice River Watershed on September 30, 2015, and this was coordinated with White Earth THPO. Field visits were canceled due to THPO lack of response or confirmation.  Because it was nearing the end of field season, the Corps communicated the potential to re-schedule for next year.

On December 2-3, 2015, a consultation meeting was held jointly by the Omaha and St. Paul Districts at White Earth's Shooting Star Hotel and Casino in Mahnomen.  Thirteen Tribes were represented. Information about the project proposals was shared.  On February 18, 2016, a meeting follow-up letter was sent to 36 Tribes, addressed to THPO, signed by the St. Paul Regulatory Branch Chief. The letter included a CD of the meeting transcript, sample maps with additional information as requested for map book revisions, next steps and request for review and comment.

On June 22, 2016, the Corps sent a letter to 37 Tribes, addressed to THPO and copy furnished to Chairperson, signed by St. Paul Regulatory Branch Chief. This letter included revised map books, Corps review of archaeological investigations with summary of archaeological resources within/adjacent its permit areas, summary of coordination status with SHPO and proposed timeframes (early to mid-August and September) for tribal field visits to known archaeological resources and any areas of concern Tribes identify.   On July 8, 2016, the Corps emailed consulting THPOs technical review tables as follow-up to the June 22nd letter.  Lac du Flambeau Band of Lake Superior Chippewa sent a letter to the Corps stating Section 106 responsibilities were satisfied.  Other Tribes expressed they had no concerns right now; and some stated interest in a later timeframe for field visits.

On August 31, 2016, the Corps sent a schedule to Tribes for September field visits.  One Tribe wished to visit all eligible sites, another all not eligible sites, and a few others specific sites of concern. One Tribe sent a list of areas they wanted to visit. For several reasons to include THPO illness and cancellations, the September field visits did not occur.

On September 30, 2016, the Corps sent a letter to 29 Tribes, addressed to THPO with copy furnished to Chairperson, signed by St. Paul Regulatory Branch Chief, to reschedule field visits before end of the field season.  The information was also emailed with "read receipt" on October 3 and 4, due to the small window of time before end of field season. Follow-up resulted in 10 Tribes planning to participate in the field visits.  Week 1 (October 26-27) six sites were visited by three Tribes; Week 2 (November 2-4) seven sites were visited by three Tribes. In total, four different Tribes were represented during the field visits.

On December 21, 2016, the Corps sent a letter to 39 Tribes, addressed to THPO with copy furnished to Chairperson, signed by St. Paul Regulatory Branch Chief. This letter states the SPP permit application was withdrawn, and the Corps' review of the L3R proposal will continue. The letter introduces the U.S. Institute for Environmental Conflict Resolution (Udall Foundation) and its contractor the Consensus Building Institute (CBI), which will work to conduct neutral, third party assessment of consultation and gather suggestions.  Notice was provided that the Corps intends to hold another consultation meeting in late February or early March 2017, to discuss additional cultural surveys in 2017.

On January 30, 2017, the Corps sent a letter to 39 tribes, addressed to THPO with copy furnished to Chairperson, inviting Tribes to the March 7-9 meeting at the White Earth Shooting Star Hotel and Casino in Mahnomen, MN.  The Corps conducted extensive follow-up to ensure letters were received, to coordinate participation in the March meeting, and provide any information requested.

In January and February 2017, phone interviews were conducted by Lucy Moore of Lucy Moore Associates, CBI. A list of 20 Tribes was provided to Ms. Moore for those interviews; the list included those Tribes that have more actively participated and consulted on the L3R Project (i.e., attended the December 2015 consultation meeting in Mahnomen, participated in site field visits, provided comments/discussion).

From March 7-9, 2017, a large group consultation meeting was conducted at White Earth to discuss tribal cultural surveys for historic and cultural property identification during upcoming 2017 field season. A proposal for tribal involvement was drafted and sent to Tribes prior the meeting, for discussion during the meeting to develop a path forward and to potentially form a Tribal Work Group to lead and coordinate tribal involvement in the identification of historic and cultural properties.  On March 15, 2017, the daily sign-in sheets from the March meeting were emailed to all L3R consulting Tribes.  On March 27, a list of interviewees that was provided to Lucy Moore (for the phone interviews in early 2017) was emailed to all consulting Tribes, in response to a request during the March meeting.

On April 11, 2017, all consulting Tribes were provided with the L3R Project shapefiles (geodatabase) and the draft detailed meeting notes from the March meeting, via email. The Corps requested comments, clarifications, or questions within 30 days. Final meeting notes were sent by the Corps on May 16, 2017.  Discussions continued with THPOs concerning their request during the March meeting for funding from the applicant for tribal survey training.  On-going discussions occurred with Minnesota Chippewa Tribe (MCT) THPOs, to coordinate their review of the proposed corridor and their proposal(s) for tribal survey of identified areas, elder interviews and archival research. On April 13, 2017, MCT THPOs met in Fond du Lac to review the proposal and provide areas identified for tribal survey.   Throughout May, the Corps continued discussions with local Band THPOs concerning their identified areas of concern and potential training, and with western Tribes concerning their identification efforts and potential training details.

On May 19, 2017, the Corps sent a letter to 39 Tribes, addressed to THPO, copy furnished to Chairperson, signed by St. Paul Regulatory Branch Chief. This letter was a follow-up to March meeting, provided Project consultation history and a brief overview of the proposal, a thank you for participation in the March meeting, responded to specific requests from the meeting caucuses, and discussed coordinating tribal survey effort going forward.

On June 15, 2017, the Corps sent a letter to 39 Tribes, addressed to Chairperson, copy furnished to THPO, signed by the St. Paul District Commander. This letter was a follow-up to the March meeting, provided brief Project overview of consultation history and coordination, an invitation from the District Engineer to the Chairperson for continued consultation and open communication, and extended thanks for participating in consultation.

During the Spring and Summer of 2017, the scoping of tribal surveys began with review, elder interviews, archival research, level of effort, methods, and working out logistics with Enbridge for rights-of-entry to those areas identified by Tribes for additional cultural survey. On June 29, 2017, the Corps began to host recurring conference calls with consulting Tribes to discuss tribal survey. The calls were established for the purpose of keeping lines of communication open between Tribes and between Tribes and Corps, coordinating the tribal survey effort (e.g., who will do what, who has survey personnel), who has reviewed and provided areas to survey, etc. The Corps takes notes on all calls and provides summary notes to all consulting tribes within a day or two of the call. In this first call, Tribes were asked if they wished to review the Corps-identified areas for tribal survey shapefile to assist with their review. Participants on the call agreed this would be helpful.

On July 5, 2017, the Corps provided Corps-identified areas for tribal survey shapefile and accompanying narrative. On July 6, 2017, a second conference call was held, which led to discussion of another face-to-face meeting for THPOs to identify areas along the proposed corridor for tribal survey, and a 3-day meeting possibly at Fond du Lac Corps drafted an Expectations and Deliverables document that outlined the minimum information that needs to result from this multi-day meeting. This document was emailed to all consulting Tribes on July 11, 2017, along with a general invite introduction to the multi-day meeting. The proposed dates for this meeting are August 1-3. Consultant Bill Latady, former THPO at Bois Forte, reached out to Tribes to discuss this THPO meeting and to help coordinate the tribal survey effort.

On July 13, 2017, a conference call was held to discuss the upcoming working THPO consultation meeting to be held Aug 1-3 at Fond du Lac. Information needs were discussed for the THPO meeting to include printer, projector screen and GIS layers. The Corps stated it would be present at the meeting whenever needed by Tribes to provide information and answer questions, especially to run the GIS to help review the corridor. Bill Latady would attend to help gather identified areas and information and help draft the work plan, working together with THPOs. Call participants discussed that tribal caucus would occur when Tribes determined they needed discussion without the Corps, other agencies or the applicant present. On July 14, 2017, the Corps emailed consulting tribes a draft agenda and hotel logistics.

On August 1-3, 2017, THPOs conducted a multi-day working consultation meeting to identify areas for tribal survey, develop and implement criteria, develop work plan, and provide to Corps for review. THPO workgroup meetings convened again on August 17-18 and September 5-8, 2017, to continue the effort. On September 18 – 22, a 40-hour Tribal Cultural Resource Management Training was held at Fond du Lac tribal college (classroom and field training). Representatives from at least six Tribes participated (Fond du Lac, Mille Lacs, Northern Arapaho, Rosebud Sioux, Santee Sioux, White Earth).

In October 2017, tribal survey started with management of the survey effort by Fond du Lac. The survey started in Carlton County with representatives of multiple Tribes on the survey crew and field managers. Principal Investigator was Sue Mulholland; Co-PI was Bill Latady and Project Manager was Ben Rhodd (Rosebud Sioux Tribe). The Tribal Cultural Resources Survey

(TCRS) was conducted for about a month before field season ended, due to arrival of winter weather.

In December 2017, the Corps received draft *Interim Report: Line 3 Corridor Tribal Cultural Survey* from Fond du Lac THPO.  On January 23-24, 2018, a consultation meeting was conducted at Fond du Lac, to discuss initial 2017 tribal cultural survey, elder interviews component and upcoming 2018 tribal cultural survey; discuss APE and update on-going work, including architectural surveys; composition of survey crews and management; phased reporting; and identification and evaluation of cultural properties.  The North Dakota portion of the Project was also reviewed at this meeting.

On February 13, 2018, The Corps received a progress report from Fond du Lac on the tribal surveys, titled *Tribal Cultural Resources Management Survey of the Enbridge/Applicant Preferred Line 3 Pipeline Route (L3 APR) Fall 2017: Progress Report*. The Corps emailed this report to all consulting tribes on February 22, 2018

On March 30, 2018, the Corps sent a letter to 39 Tribes, addressed to THPO, copy furnished to Chairperson, with enclosures and DVD of maps of the Project corridor.  Enclosure 1 was the Corps technical review and comments on the progress report; Enclosure 2, the Corps' most recent letter to the Minnesota SHPO, dated March 22, 2018.  This letter presents the Corps' review of the progress report and the oral history research plan submitted by Fond du Lac; the Corps' determination of the APE for the Project; and the proposed level for identification of historic properties of traditional and religious significance to Tribes within the APE.

Many consulting tribal historic preservation staff requested the Corps require tribal survey along the entire proposed pipeline corridor. The Corps recognized the value of tribal survey and based on the limitations of our authority over only those areas directly and indirectly impacted by regulated activities, the Corps determined 64 miles of permit areas had higher probability for containing cultural resources and that tribal survey was warranted in these areas. Discussions followed between the Corps, applicant, and historic preservation staff of consulting Tribes. A number of consultation meetings were held.  In April 2018,  Enbridge opened the entire line to tribal survey including areas outside of the Corps control and responsibility.

In May 2018, Tribal Cultural Resource Survey (TCRS) resumed. The Corps had discussions with Fond du Lac for phased reporting/progress reports.  During summer through autumn 2018, Fond du Lac managed field survey along the proposed corridor in North Dakota and Minnesota and formed an interview team to conduct elder interviews in those tribal communities that expressed interest. On July 19, 2018, the Corps received the first biweekly report from Fond du Lac. Fond du Lac tried to provide phased reporting and progress reports, but data were difficult to generate and present in a meaningful way. To best show the survey progress, shapefiles (drafted August 8th, 20th, and September 22nd) and maps were generated, and discussions occurred during the recurring Thursday morning tribal conference calls.  On September 25, 2018, Fond du Lac provided shapefiles of TCRS progress along the entire corridor.  On October 9, 2018, the Corps provided the progress shapefiles to all consulting Tribes.

On October 12, 2018, the Corps provided an updated geodatabase (L3R_Project_Data_20180913.zip) to all consulting Tribes, showing the Project corridor in Minnesota and North Dakota, and the status of tribal survey in Minnesota and the completed status of tribal survey in North Dakota. The Corps highlighted that the centerline layer ("L3R_Centerline_20180913") shows three changes in alignment in Minnesota and also shows the ~13 miles in North Dakota. Tribal cultural survey was now completed in North Dakota. In

Minnesota, the updated centerline layer shows the re-route north and east of the Upper Rice Lake Watershed near White Earth Reservation in Clearwater County, and then towards the eastern end of the Project in Aitkin County the centerline continues east into St. Louis County and then goes southeast traversing Fond du Lac Reservation following the existing pipeline corridor into Carlton County and then rejoins the previously proposed corridor southeast of the reservation.  At the end of October, the TCRS was essentially complete, with some access roads, slight alignment changes, and laydown yards that would continue to be investigated into the future.

The following three paragraphs are specific to the evaluation of properties in North Dakota. The St. Paul District permit evaluation includes work in North Dakota westward to the pump station on the west side the Red River of the North. Work west of the pump station was reviewed by Omaha District. However, for efficiency, St. Paul District conducted tribal consultation for all the work in North Dakota and coordinated the results with Omaha District. The Corps received the Line 3 North Dakota Letter Report from Fond du Lac on October 22, 2018 and sent out the Line 3 North Dakota Letter Report to all consulting Tribes, for review and comment.  On January 3, 2019, the Corps received the draft North Dakota Cultural and Archaeological Report for Corps comment from Fond du Lac.  On January 11, the Corps provided comments to Fond du Lac, via email.  On January 16, 2019, the Corps received the final *North Dakota Tribal Survey CRM Report v1.0*.pdf, from Fond du Lac.  On January 17, 2019, the Corps provided all consulting Tribes the North Dakota tribal survey report, and asked for review and comment. The Corps provided the opportunity to discuss the North Dakota investigations and findings during the next several Thursday morning recurring conference calls (e.g., January 31, February 12, February 21, March 7, etc.).

On February 6, 2019, the Corps provided all consulting Tribes, via email, the Corps' comments on the tribal survey North Dakota report.  On March 14, 2019, the Corps received revised North Dakota Tribal Survey Report from Fond du Lac, *North Dakota Tribal Cultural Survey Report_1.1*.pdf, incorporating most of the Corps' comments.  ON April 9, 2019, the Corps determined there would be No Adverse Effect to historic properties in North Dakota and sent this finding to North Dakota SHPO, with copy furnished to all consulting Tribes. Enclosures included all cultural resources investigations done along the proposed corridor, including 2013, 2014, and 2017 archaeological investigations; the TCRS North Dakota report, proposed avoidance plan, and unanticipated discoveries plan. Both a hard copy mailing and an email were sent to consulting Tribes.

On April 30, 2019, the Corps received concurrence with the Corps' No Adverse Effect finding, from North Dakota SHPO and emailed this letter to all consulting Tribes on May 6, 2019.  On April 30, 2019, the Corps received concurrence (via email) with the proposed avoidance and No Adverse Effect finding from Crow Creek Sioux Tribe THPO [Appendix D.] On May 15, 2019, the Corps received concurrence with the No Adverse Effect finding (via email pdf) from Northern Cheyenne THPO. [Appendix D]

Throughout Autumn/Winter 2018-Winter 2019, elder interviews in multiple tribal communities were conducted by the Fond du Lac interview team.  On July 24, 2019, the Corps received from Fond du Lac the Minnesota Tribal Cultural Resources Survey (TCRS) Report.  The Corps had waited for this report to schedule the next large-group consultation meeting, and began coordinating schedules of THPO meeting participants. On August 16, 2019, the Corps requested 50 flash drives from Enbridge with all cultural resource investigations completed along the proposed L3R corridor in Minnesota since 2013, to include the TCRS.  On September 27, 2019, the Corps sent a letter to 39 Tribes, sent to THPO and copy furnished to Chairperson,

with a flash drive of all cultural resource investigations in Minnesota along the proposed L3R corridor. The Corps requested Tribes review the information and provide comment.  The Corps stated there will be opportunity for discussion of the information at the upcoming consultation meeting. [Appendix D]

On October 11, 2019, the Corps resumed coordination with Minnesota SHPO, providing its review of all cultural resource investigations along the proposed route in Minnesota, with the exception of the TCRS. This coordination provided eligibility determinations for architectural/historical properties and some archaeological resources (not identified during tribal survey). [Appendix D].  The Corps provided a copy of this letter to the consulting tribes via email on October 22, 2019.  The email clarified that this letter to Minnesota SHPO does not include the Corps review of the TCRS submitted in July 2019 and sent to Tribes by the Corps on September 27, 2019.  The Corps stated it wants to ensure Tribes have opportunity to review and comment on that report, and that the Corps will wait until the upcoming tribal consultation meeting, discussion, and tribal comments before it makes any final eligibility determinations or findings of effect.

During October and November 2019, the Corps continued coordinating dates for the December meeting with participants and requested updated map books from Enbridge/Merjent to provide to participants.  The dates of December 10-12 were chosen.  On December 5, 2019, the Corps sent to all consulting Tribes the Minnesota SHPO response to the Corps' October 11, 2019 letter.  Also, on December 5, 2019, the Corps sent consulting Tribes a final agenda, after receiving comments on the draft agenda.

The Tribal Consultation Meeting was held December 10-11, 2019 (The group did not need the potential half-day on December 12, 2019).  The TCRS leadership team presented findings from the TCRS.  The team included: Field Director—Mr. Jim Jones (Leech Lake Band of Ojibwe); Principal Investigator—Mr. Jim Cummings (Consulting Archaeologist); Project Manager—Mr. Joe McFarlane (Consulting Archaeologist); and, Fond du Lac THPO—Ms. Jill Hoppe. Participants at the meeting asked questions and requested information requested, and the TCRS team, the Corps, Minnesota SHPO representatives, the Minnesota DNR archaeologist and Enbridge provided answers and information. Map books and reports were referenced while the TCRS team presented and discussed the investigation, findings, and recommendations. Much discussion occurred about one site, with questions from the group about avoidance. Enbridge had planned to avoid the site following the TSCRS recommendations, but meeting discussion led to Enbridge proposing an improved avoidance plan that would completely avoid any potential resources associated with the site.  Participants discussed that an Addendum to the TCRS report, for work conducted during the 2019 field season in direct response to the TCRS recommendations and new staging and laydown yards from the applicant, would be prepared by Fond du Lac and submitted to the Corps, and the Corps would then provide to all consulting tribes.

On December 17, 2019, the Corps emailed consulting THPOs a summary of the December 10-11 meeting including sign-in sheets.  The Corps asked consulting tribes to review the notes and provide any edits (no edits were requested).  Consulting tribes were reminded that the final 30-day comment period closes on January 10, 2020 and tribes were encouraged to finish their review of the TCRS report and Enbridge's proposed plan to avoid all resources and implement a tribal monitoring plan during construction.  The Corps suggested consulting tribes might want to consider the following as they complete review of the L3R TCRS report and submit comment: whether methods, investigations, level of effort, fieldwork, reporting was appropriate; and whether they agree with findings and recommendations (avoidance of identified resources and

tribal monitoring at sensitive locations).  The Corps provided a reminder of recurring Thursday morning conference calls, which will continue either biweekly or weekly.  The Corps included a reminder as well to expect the addendum to the TCRS report.  On December 19, 2019, the Corps provided all consulting Tribes the tribal consultation history for the L3R Project as requested during the December 10-11 meeting.

The Corps received comments from five THPOs on behalf of their Tribe and their historic preservation responsibilities, to include Rosebud Sioux Tribe, Northern Cheyenne, Lower Sioux Indian Community, Leech Lake Band of Ojibwe, and White Earth Band of the Minnesota Chippewa Tribe.  In general, comments expressed support and agreement with the TCRS and interview report findings and recommendations. Comments reflected discussion during the December 2019 consultation meeting, appreciation for the tribal perspective in the field, in the interviews, and in the report product ("it tells a story").  A couple of questions asked were site-specific or whether the recommended avoidance would be followed. Agreement was expressed with the *Recommendations* from the TCRS report for additional work at specific locations, which was discussed during the December 2019 consultation meeting (and provided in the forthcoming Addendum). The Corps' upcoming coordination with Minnesota SHPO, which will be provided to all consulting Tribe THPOs for their review and comment, will address those inquiries.  The Corps will make its final determinations of eligibility and findings of effect based on all the investigations for this Project: TCRS effort and the tribal perspective, including the pending Addendum; traditional archaeological investigations; architectural investigations; viewshed analyses; and geomorphological studies.

On January 7, 2020, the Lower Sioux Indian Community (THPO) submitted formal comment via email.  They stated the tribal cultural methods and investigations were appropriate and concurred with the TCRS avoidance recommendations. They requested the completion of survey and evaluation on warranted areas, from the TCRS report recommendations. Lastly, they requested additional information on the upcoming opportunity for tribal monitoring during construction activities.

**Response:** The survey and evaluation of the areas warranting additional work as recommended within the 2018 TCRS report was completed during the 2019 field work season and discussed during the DEC 2019 consultation meeting. The findings and recommendations were provided in report form in the Addendum. Additional information was provided to Lower Sioux THPO, as well as all consulting Tribes tribal historic preservation staff, of the opportunities for the upcoming tribal monitoring training during the Thursday morning recurring meetings, the notes of those meetings sent to all consulting Tribes, and also within additional email communications from the Corps Tribal Liaison.  The training was held the first three weeks of November, by the Fond du Lac Band, with participants representing a number of consulting Tribes.

On January 9, 2020, the Rosebud Sioux Tribe (THPO) submitted formal comment via email. They provided formal comment on the TCRS report as written and discussed during the December consultation meeting.  The THPO "has no issues with the content of the report nor recommendations listed therein.  Avoidance of sites recognized and recorded was and is the key factor of this endeavor as far as the RST-HPO is concerned. The next key step is the construction monitoring and monitoring of ground disturbance over all of the project corridor."

**Response:** The Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) was drafted in response to consultation with Tribes and the MN SHPO. The draft AMIP would be provided to consulting Tribes for their review and input. The AMIP implements the TCRS

recommended avoidance, minimization, and protection measures at identified resources of concern to Tribes, and the tribal monitoring plan for construction.

On January 10, 2020, the Leech Lake Band of Ojibwe (THPO) and the White Earth Band of the Minnesota Chippewa Tribe (THPO) submitted formal comments via email.  Both concurred with the TCRS report findings and recommendations for additional survey, avoidance of resources, and additional recommendations listed at conclusion of the TCRS report.  For example, mitigation efforts for fruit and nut-bearing trees and shrubs, effects on wild rice as a tribal cultural resource, and more information at crossings of ancient and historic trails.  In addition, White Earth THPO listed more concerns, to include already threatened and endangered plants and animals, water quality, concern with accelerated nature of this project review, the Band's opposition to the project, and the "lack of interest in meaningful tribal consultation that Enbridge has shown."

**Response:** The survey and evaluation of the areas warranting additional work, as recommended within the 2018 TCRS report, was completed during the 2019 field work season and discussed during the DEC 2019 consultation meeting. The findings and recommendations were provided in report form in the Addendum. Avoidance of resources and the protection measures as recommended within the TCRS report are included within the AMIP. The AMIP implements the TCRS-recommended avoidance, minimization, and protection measures at identified resources of concern to Tribes, and the tribal monitoring plan for construction. The recommended mitigation of fruit- and nut-bearing trees and shrubs is outside of the Corps control and responsibility.  Efforts to minimize the construction related impacts to wild rice are discussed in Section 6.8 above.   Detailed information was presented within the TCRS report and within the AMIP that outlines the process for construction at or near potential historic trail locations; tribal monitoring during construction is required at all potential trail locations.  Effects to threatened and endangered species and consultation with the USFWS are described in Section 6.4.1 of this document.

On February 19, 2020, the Corps received *Addendum 1 for the Tribal Cultural Resource Management Survey of the Enbridge Line 3 Replacement Project* from Fond du Lac THPO. The tribal survey team returned to select locations (recommended for further work in the TCRS report 2018) and surveyed an additional 91 facility adjustment areas.  In addition, the Addendum corrected errors from the TCRS report and provided the state-assigned OSA numbers for 22 tribal survey-identified resources in 2018. This work was discussed during the Thursday morning conference calls in 2019 and during the DEC 2019 consultation meeting at Black Bear.

The Corps prepared its eligibility determinations and findings of effect based on consideration of all reports received, all comments from consulting tribes, the applicant's proposed avoidance and minimization of impacts to identified significant resources, and discussion during the December 2019 consultation meeting.  As described above in Section 11.3, the Corps came to a finding of No Adverse Effect based on avoidance of significant resources. The tribal survey identified 22 new archaeological resources. The Corps provided its eligibility determinations for 20 resources, as at least two resources were now far removed from the Corps' APE (due to avoidance measures of re-route or alignment shifts).  The Corps determined that three sites (two previously identified - 21MA0039 and 21HB0082, and one newly identified - 21CE0098) are eligible for listing in the NRHP.  In total, 15 locations were recommended for avoidance in the TCRS report. Enbridge developed avoidance measures at each location. based on recommendations from the TCRS report, to include re-routes and alignment shifts of the pipeline corridor to avoid significant/eligible resources, tribal monitoring during construction, and

the traditional archaeological and geomorphological investigations and monitoring during construction.  On March 20, 2020, the Corps' submitted coordination of final eligibility determinations and effect finding (historic properties would not be adversely affected) for the proposed undertaking to Minnesota SHPO.

On March 26, 2020, the Corps sent to consulting Tribes, via USPS, a hard copy of THPO's letter, hard copy of coordination letter to the Minnesota SHPO, and flash drive with the enclosures and reports.  The Corps sent via email on March 27, 2020, its coordination letter (and all enclosures) to the MN SHPO of final eligibility determinations and effect finding (No Adverse Effect to Historic Properties) for the proposed undertaking, the THPO letter, and those recent reports (less any mapping that was too big for email, so on the flash drive) for their review and comment. [Appendix D]

In response to COVID-19, SHPOs and THPOs began teleworking, working limited hours, with some THPO offices closed for a short period of time beginning in late March. Tolling was invoked by some tribal historic preservation staff. Tolling was invoked by the Minnesota SHPO. On April 16, 2020, Minnesota SHPO emailed a request for extending its review period an additional 15 days to May 7, 2020. The Corps approved the 15-day extension granted on April 23, 2020.   On May 1, 2020, the Corps provided additional information to Minnesota SHPO, and consulting Tribes, consisting of the draft monitoring plans (tribal, archaeological, geomorphological), unanticipated discoveries plan, avoidance/protection measures of resources from the recommendations within the TCRS report, procedures and processes, monitoring forms, roles, etc. [Appendix D].  The draft document *Avoidance, Mitigation, and Implementation Plan for Construction* (AMIP) was provided for their review and comment, and to support the No Adverse Effect finding. Enbridge, its cultural resources consultants, and Fond du Lac (tribal monitoring plan portion) worked together to create this document.

By email on May 4, 2020, Bois Forte Band of the Minnesota Chippewa Tribe (THPO) submitted questions to the Corps.  They asked what precautions will be taken when construction encounters a historic location listed as NRHP Eligible (information indicates that construction would "Proceed with Caution" but what does this practically mean?)  They asked what happened or will happen with the artifacts that are "pre-contact" that are near or within the projected area of disturbance?   They also asked about the locations of the culture resources survey (when it breaks off from the projected route, was that that the old proposed routes?) and they asked if or how the Clean Water Act could be in effect in areas that pass by the Itasca State Park either with groundwater or subsurface water?

**Response:** No NRHP-eligible properties are planned to be impacted.  All known historic properties are avoided. Additionally, tribal cultural and archaeological properties not considered eligible for listing, are avoided or impacts minimized with protection measures proposed by the TCRS report and implemented within the AMIP.  Examples of "proceed with caution" include temporary matting and flagging known property boundaries to avoid equipment damaging the resource.  There are no direct impacts to these resources through the protection measures. Should inadvertent discoveries occur, including those significant enough to be considered eligible, the AMIP includes the Unanticipated Discoveries Plan (UDP).  During tribal monitoring, should discoveries occur, work-stop authority is outlined and then the process and procedures for evaluating the discovered resources would occur.  If the resources are deemed significant and considered eligible for listing, the mitigation process would occur. Should artifacts be discovered within a Corps permit area, State law (Minnesota Field Archaeology Act) defines custody and use of artifact and collected data.  Correct, locations within the map books that show a "break" in cultural resources survey may indicate portions of the formerly proposed SPP,

re-routes of the L3R corridor (e.g., avoidance of the Wild Rice River Watershed), and re-alignments of the L3R corridor to avoid significant resources. In some cases, archaeological and tribal survey occurred multiple times within an area to avoid resources, for example, surrounding the Dakota Village site. Lastly, groundwater or subsurface water effects are beyond our control and authority under Section 404 of the Clean Water Act.

By email on May 6, 2020, Northern Cheyenne (THPO) submitted formal comment.  The THPO stated they were able to get a better idea of the importance of the avoidance measures for sites in the addendum, many of which were discussed during the December meeting. Their office concurred with the TCS monitoring measures for avoidance in Addendum 1 for the following: Waukenabo Lake Trail, MN-CA-C5-067.000 stone feature, and 21CE0098. Additionally, due to the large number of pre-historic sites, it is critical that monitoring occur at each site throughout the entirety of the pipeline. Essentially, TCS will need to be on-site throughout majority of the pipeline construction. Regarding the reconnaissance study information including 18 newly identified sites, the THPO advises that all mitigation and/or avoidance measures be taken, along with TCS monitoring during construction.

**Response:** The applicant's AMIP proposes to implement the recommendations and avoidance/protection measures at these resources, and implement the tribal monitoring plan.

On May 7, 2020, the Minnesota SHPO provided its review and comment of the Corps' March 20, 2020 coordination with its office, and consulting Tribes. In summary, it concurred with the Corps' eligibility determinations and finding of effect (No Adverse Effect), based on the proposed avoidance and minimization efforts and the monitoring during construction. On May 8, 2020, the Corps provided the SHPO concurrence letter to all consulting Tribes, via email. [Appendix D]

ON May 14, 2020, three THPOs asked if the review comment period could be extended. The first 15-day extension put the due date at May 12, 2020. Based on past submitted comments on the L3R Project and the complications of everyone's schedules due to COVID-19, the Corps made the decision to extend the review period to June 11, 2020 and communicated this to the THPOs via email.

On May 18, 2020, Fond du Lac Band of the Minnesota Chippewa Tribe (THPO) submitted formal comment via email.  They stated that "Considering the contribution from Consulting Tribes and the comprehensive identification efforts associated with this Section 106 review, combined with the collective results of the multi-disciplinary investigations spanning several years emphasize the value of the cultural/natural resources within the Ceded Territories crossed by the proposed Enbridge L3R to the Ojibwe Nation and all Tribes ancestral to this geographic region….The multi-disciplinary approach encompassed both standard archaeology and Tribal input. This all-inclusive identification effort adds meaning and increased awareness in regard to the value of cultural resources within the Ceded Territories and offers a platform for future Tribal Cultural Resource Survey and involvement."  Fond du Lac stated they concur with the Corps' finding that the Federal undertaking, as it is currently proposed, would not adversely affect historic properties.  Fond du Lac made several recommendations, some of which will be incorporated as special conditions of any permit issued and others that the Corps does not have the authority to require. Their recommendations and the Corps response follow:

**Recommendation:**  The installation of the Enbridge L3 proceed with caution around all water crossings, including those intended for hydro-testing, and all phases of site preparation, pipe installation and any future maintenance activities be monitored by Tribal Monitors.

**Response:**  The applicant's AMIP proposes to implement the recommendations and protection measures at these resources.

**Recommendation:**  It is recommended that the Enbridge L3 Project proceed with caution around all ancient and historic trail crossings listed in this report and all phases of site preparation, pipe installation and any future maintenance activities be monitored by Tribal Monitors.

**Response:** The applicant's AMIP proposes to implement the recommendations and protection measures at these resources.

**Recommendation:**  It is recommended that the Enbridge L3 Project proceed with caution around pre-contact archaeological sites and all phases of site preparation, pipe installation and any future maintenance activities be monitored by Tribal Monitors.

**Response:**  The applicant's AMIP proposes to implement the recommendations and protection measures at these resources.

**Recommendation:** It is recommended that the Enbridge L3 Project proceed with caution in areas of historic sites and all phases of site preparation, pipeline installation and any future maintenance activities be monitored by Tribal Monitors.

**Response:** The applicant's AMIP proposes to implement the recommendations and protection measures at these resources.

**Recommendation:**  The following sites contain cultural materials that demonstrate an extended history of Tribal cultural use in the area and are contributing elements to the cultural corridors. Enbridge has taken measures to avoid these sites: 21KT0065, 21MA0076, 21MA0085, 21MA0084, 21MA0039, 21PE0028, 21CE0098, 21HB0100, 21HB0082, 21HB0071, 21HB0084, 21HB0089, 21WD0028, 21WD0069.

**Response:**  Enbridge considered the recommendations and protection requests from the TCRS recommendations, and has taken measures to minimize potential impacts and avoid these resources.


**Recommendation:** Mitigation is recommended for stands of fruit and nut bearing trees and shrubs that are identified during the timber assessment on state forest and federal lands where harvesting is allowed. Trees and shrubs lost to construction should be replaced to allow Tribal harvests to continue. Plantings should be in clusters to accommodate harvesting. Consultation with Tribal Resource Managers to determine the best location for replacement is recommended.

**Response:**  This is outside of the Corps control and responsibility to require mitigation for stands of fruit and nut bearing trees and shrubs. Requests for additional mitigation measures outside of the Corps' regulatory authority could be directed to the applicant to consider as a voluntary measure.

**Recommendation:**  The pipeline corridor right-of-way permanently removes forest cover, which

fragments the forest and encourages the overgrowth of invasive species such as wild parsnip. Wild parsnip contains chemicals that cause severe dermatitis, making it problematic for harvesting/gathering medicinal plants, berries, and other forest products in infested areas. Pipeline construction and maintenance activities have also introduced purple loosestrife, sweet clover, tansy, and spotted knapweed to new areas along the pipeline corridor in areas that may be difficult to access for proper control efforts. The presence of invasive species diminishes resources on the Reservations and in the Ceded Territories. It is recommended that Enbridge continue to work closely with Tribes in regard to on-reservation and Ceded Territories control of invasive species.

**Response:** Enbridge has also developed an invasive and noxious species management plan, included as Appendix B of the Environmental Protection Plan, which identifies BMPs and measures that will be taken to reduce the potential for the spread of invasive species. Management of invasive species is also included in the Post Construction Monitoring Plan which is included by reference as a special condition of the DA permit.  In addition to managing invasive species, Enbridge will also be required to restore wetlands and waterbodies, and meet vegetative performance standards to ensure successful restoration, thus reducing the potential for establishment of invasive plant species.

**Recommendation:** The pipeline corridor has altered hydrological flow in specific areas. It is recommended that Enbridge continue to work closely with Tribal Resource Managers and credentialed experts in regard to resolution and restoration of hydrological flow.

**Response:** It is outside of the Corps control and responsibility to require Enbridge to resolve secondary effects of previous pipelines.  The Line 3 Replacement project does include robust post construction monitoring to ensure there are no secondary effects to vegetation or hydrology as a result of the project.  Unanticipated effects would be required to be remediated or mitigated.

**Recommendation:** The emphasis on extractive industries has displaced the traditional lifeways of Indigenous People in many areas of North America. Any diminishment of natural resources or access to those resources in certain Ceded Territories amounts to a diminishment of Treaty-protected rights. It is recommended that Enbridge continue to work closely with Tribes in regard to mitigation of resources that have been diminished by the pipeline corridor.

**Response:** Effects to Corps-regulated resources are primarily temporary and would be avoided and minimized as detailed in this document. Compensatory mitigation would be provided to offset unavoidable effects.

**Recommendation:**  The increase in capacity for pumping oil and bitumen will result in impacts to the climate, which must be accounted for through quantification of climate change impacts. Any new oil transportation infrastructure will lead to increasing greenhouse-gas emissions, reducing the chance of meeting pollution-reduction targets worldwide. It is recommended that Enbridge consider contributions towards alternative energy and sustainable development.

**Response:** This is outside of the Corps control and responsibility to request a third party to consider investing in alternative energy and sustainable development.

**Recommendation**:  The Enbridge L3 traverses numerous wetlands, streams, lakes, and fisheries in lands ceded by the Ojibwe in Minnesota. The quality of these waters is vitally important to Band members. Possible effects from contaminated water include disruption of the

Bands' traditional lifeways based on the harvest of fresh water fish, game, wild rice and other aquatic plants and animals that are culturally significant to the Bands. It is recommended that Enbridge continue to consult with Tribal Resource Managers to ensure protection of these irreplaceable resources.

**Response:**  With respect to the discharge of dredged and fill material into waters of the U.S., measures to minimize effects from activities regulated by the Corps are described in earlier sections of this document. These measures would ensure that discharges of dredged and fill material do not adversely impact water quality. On April 15, 2020 the Fond du Lac reservation issued the Section 401 Water Quality Certification for the portion of the Project that crosses the Fond du Lac reservation and on January 31, 2019 the North Dakota Department of Health issued the individual Section 401 Water Quality Certification for the portion of the project within the state of North Dakota that is being reviewed by St. Paul District.   On November 13, 2020, the MPCA issued a Section 401 Water Quality Certification for the discharge of dredged and fill material into waters. Individual water quality certifications are included in Appendix B of this document. Overall, impacts to water quality are not expected to exceed regulatory limits. Discharges from construction and appropriation are subject to the MPCA NPDES permit.

The MPCA Individual Section 401 Water Quality Certification prohibits Enbridge from conducting in-channel work in waters in close proximity to known wild rice waters, identified in Table 5.4-1 in Enbridge's Antidegradation Assessment for Section 401 Water Quality Certification, from April 1 through July 15.

Effects to water quality are expected during construction; however, these effects are anticipated to be minor and temporary.  Water quality would return to normal after construction and restoration of the impacted areas

**Recommendation:**  The pipeline right-of-way permanently removes forest cover which fragments the forest and leaves unnatural open spaces which may lead to reduction of wildlife habitat and animal pattern/migration changes. It is recommended that Enbridge continue to consult with Tribal Resource Management staff in regard to mitigation efforts.

**Response:**   Enbridge is required to provide compensatory mitigation for conversion of forested and scrub-shrub wetlands. See Section 8.0 of this document for additional details on compensatory mitigation.  Requests for additional mitigation measures outside of the Corps' control and responsibility could be directed to the applicant to consider as a voluntary measure.

**Recommendation:**  The United States is currently dependent on crude oil, but it would be advantageous to reduce this dependence on a non-renewable fuel source to the greatest degree possible. The construction of new crude oil pipelines and the increase in capacities of existing pipelines instead encourage an increase in dependence. It is recommended that Enbridge consider investing in alternative energy in addition to oil production.

**Response:** This is outside of the Corps' control and responsibility.

**Recommendation:**  The 2015 Earth Economics eco-system valuation of the St. Louis River Watershed found it provides an estimated $5 billion to $14 billion in ecosystem service benefits yearly. It is recommended that a similar study of eco-systems that could be impacted by Line 3 be done by an independent third party.

**Response:** This is outside of the Corps' control and responsibility.

In May and June, 2020, the Corps provided weekly reminders, either during the Thursday morning conference call or the emails with the call notes, or an email during the week with no conference call, to submit comment by June 11, 2020.  No additional comments from consulting Tribes were submitted during the additional 30-day extension. Comments submitted were addressed as described above.

In early July 2020, the Corps received the revised AMIP, incorporating Corps and Fond du Lac comments.  Most notably, the AMIP was reorganized, making it more direct and easier to understand and better describing processes and procedures such as work-stop authority, the tribal monitoring plan and the unanticipated discoveries plan.

On July 23, 2020, the Corps provided the revised draft AMIP to all consulting parties: the Minnesota SHPO, MDNR, and Tribes, for review and comment. The Corps asked for comments to be submitted by August 31, 2020.  No comments or concerns received.  The AMIP includes the Tribal Monitoring Plan and unanticipated discoveries plan, to ensure participation of interested Tribes, via Fond du Lac THPO as Fond du Lac has contracted with Enbridge similar to the tribal survey effort, to manage the tribal monitoring component during construction activities. Three one-week tribal monitoring trainings, hosted by Fond du Lac, were proposed. Should discoveries occur within the Corps permit areas, the Corps remains the responsible Federal agency. Special Condition language to be developed to ensure Enbridge complies with its commitment of avoidance measures and minimization efforts of significant resources, the construction monitoring plans (a State requirement), and unanticipated discoveries plan and process procedures.

In September 2020, Fond du Lac finalized the first three weeks in November for the tribal monitoring training.  Three one-week (40-hour) trainings were planned to train up to 20 participants per session, for a total of up to 60 tribal monitors for potential upcoming work on the L3R Project. This was discussed during the Thursday morning meetings.

On October 1, 2020, the Corps held the 86th recurring Thursday morning tribal L3R consultation conference call using a WebEx meeting.   October 20, 2020, the Corps provided the final AMIP and appendices to all consulting parties including Tribes, via letter submittal to the Minnesota SHPO.

Any permit issued by the Corps will contain a special condition that requires the permittee's compliance with the Avoidance, Mitigation, and Implementation Plan for Construction.  This plan:

- Requires implementation of avoidance, minimization, and protection measures before and during construction as recommended by the tribal investigations
- Requires tribal monitoring throughout construction and
- Outlines a process to follow should discoveries be made during construction.

Following issuance of any Section 10/404 permit, the Corps will continue to host biweekly recurring Thursday morning meetings, with the next meeting to be held on December 10. These meetings will continue in order to keep consulting tribes informed and channels of communication open should construction begin.

## Government to Government Tribal Consultation

Government to government tribal consultation, beyond tribal consultation under the Section 106 process of the NHPA, was offered for local Ojibwe Bands (of the Minnesota Chippewa Tribe, or MCT) and the Red Lake Nation (not part of the MCT), those residing closest to the proposed L3R corridor and within which the proposed pipeline would traverse ceded lands. Early initial meetings were held summer 2014, while the Project was still the proposed Sandpiper pipeline (SPP). St. Paul District Regulatory staff and leadership (Branch Chief, Cultural Resources Manager, Project Manager) met with White Earth Band and Red Lake Nation. During the following years, tribal consultation was continually occurring under the NHPA.  In fall 2019, the St. Paul District Regulatory Tribal Liaison began reaching out to local Bands (Leech Lake Band of Ojibwe, Red Lake, White Earth, Mille Lacs, Fond du Lac, and Bois Forte) to ask if tribal leadership was interested in meeting with Corps leadership to consult on the proposed L3R Project, hear their concerns, answer their questions, and provide information of our involvement in the potential permitting of the proposal. The following provides some dates and details of contacts with tribal leadership.

On November 26, 2019, the Corps' Tribal Liaison contacted (phone and email attempts) leaders of the six local Bands, and confirmed Red Lake would like a consultation meeting and began working on scheduling. The Corps left voicemail messages with five other Tribes. In addition, the Tribal Liaison contacted the THPO of each Band, prior to these calls, to provide notice of reaching out to their Chairpersons/Executive Admins.

The District Engineer and Regulatory Branch Chief attended a half day of the two-day tribal consultation meeting conducted on December 10-11, 2019.

On January 15, 2020, the Corps' Tribal Liaison contacted Chairpersons of the five Bands that did not respond to the November 26, 2019 contact, leaving voicemails.  The Tribal Liaison continued working on scheduling the Red Lake meeting. On February 5, 2020, the Tribal Liaison attempted to contact Chairpersons, or the point of contact directed to contact for this Project, of the five Bands that had not yet responded.

On March 9, 2020 the District Engineer, Tribal Liaison, Technical  Services Section Chief and Northwest Section Chief met with the Red Lake Nation at the tribal headquarters in Red Lake, MN. The Red Lake Nation expressed that the project as proposed would adversely impact their treaty rights.  The Corps provided information on the limits and responsibilities of its authorities, specifically that the Corps cannot control the entire pipeline construction or operation, but rather has responsibility to evaluate effects from the activities that are within its control, i.e.., regulated activities in waters and activities in nearby upland impacted in association with waterbody crossings.

On March 26, 2020, the Corps sent a letter to the five Bands that had not yet responded to formally invite them to participate in a consultation meeting.  The letter was sent via USPS to Band leaders and copy furnished, via email, to the THPO. The Corps requested the Chairperson respond within 15 days if they wish to meet and offered the option to meet via teleconference due to COVID-19 potential impacts and restrictions. The Corps did not receive any response to this letter.

On May 29, 2020,the Tribal Liaison emailed a copy of the March 26, 2020 letter to the Chairperson or the designated point of contact for L3R for the Band (for Mille Lacs) and asked for response if they wished to meet.  No email address was available for the Chairpersons of the Bois Forte Band or the Leech Lake Band of Ojibwe, so the Tribal Liaison left a voicemail message for the Chairperson. No response was received from tribal leadership.

June 5, 2020 The Tribal Liaison emailed the Chairpersons of the Bois Forte and Leech Lake Band of Ojibwe the March letter and asked for response if they wished to meet, after obtaining their email addresses from the THPO. No response was received from tribal leadership.

# 11.14 EXECUTIVE ORDER 11988: FLOODPLAIN MANAGEMENT

The Project has been evaluated consistent with the intent of EO 11988.  Portions of the Project would cross FEMA mapped 100-year floodplains. Impacts to floodplains are discussed in detail in Sections 7.11 and 7.12 of this document.

# 11.15 EXECUTIVE ORDER 12898: ENVIRONMENTAL JUSTICE

Executive Order (E.O.) 12898 directs federal agencies to identify and address, as appropriate, any disproportionately high adverse human health or environmental effects of federal actions to minority and/or low-income populations. Its purpose is to focus federal attention on the environmental and human health effects of federal actions on minority and low-income populations with the goal of achieving environmental protection for all communities.  Public involvement, via Public Notices, as well as Tribal coordination and consultation concerning the Project, has been an integral part of planning for this Project to ensure that concerns of all people are considered in the decision-making process. As informed by CEQ's Environmental Justice Guidance Under the National Environmental Policy Act (1997), the identification of a disproportionately high and adverse impact on minority and low income populations does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory. If an agency determines there is a disproportionately high and adverse impact to minority populations and low-income populations, an agency may wish to consider heightening its focus on meaningful public engagement regarding community preferences, considering an appropriate range of alternatives (including alternative sites), and mitigation and monitoring measures.

The methodology, consistent with E.O. 12898, to accomplish this Environmental Justice (EJ) analysis includes identifying low-income and minority populations within the Enbridge Line 3 replacement Project corridor using the EJ Screen Mapper Tool (https://ejscreen.epa.gov/mapper/) developed by the Environmental Protection Agency as well as information provide in Chapter 11 of the State EIS completed by the Minnesota Department of Commerce (MDOC).  The MDOC conducted the analysis using National guidance including, the Council on Environmental Quality's (CEQ's) "Environmental Justice: Guidance Under the National Environmental Policy Act" (1997) and the U.S. Environmental Protection Agency's (EPA's) "Promising Practices for EJ Methodologies in NEPA Reviews" (EPA Promising Practices) (2016).  See Chapter 11 of the State EIS for specific details on the methodology of this analysis.

The following guidelines below were used by the MDOC in the State EIS to compare census tract data to county data and is consistent with the EPA Promising Practices guiding principles:

- Minority populations were determined to be present in an area when the percentage of minority group or low-income population exceeded 50 percent of the county population, or was "meaningfully greater" than the general population of the county.
- A difference of 10 percentage points or more was used to determine whether the percentage of a minority or low-income group in a census tract in the Region of

Interest (ROI) was "meaningfully greater" than that group's percentage in the respective county.

- Minority populations were calculated as the populations excluding those persons who self-reported as being white (and no other race) and not Hispanic or Latino. The minority population includes persons who self-reported as Black or African American, American Indian or Alaska Native, Asian, Native Hawaiian or Pacific Islander, some other race, having two or more races, or being of Hispanic or Latino origin.

- Low-income populations were determined to be present in an area when the percentage of minority group or low-income population exceeded 50 percent of the county population, or was "meaningfully greater" than the general population of the county.

  - Department of Commerce utilized recommendations from the MPCA for determining low-income populations. Low-income populations are those individuals with income below 185 percent of the poverty level. The analysis used a difference of 10 percentage points or more to establish the "meaningfully greater" measure consistent with the comparison of minority populations.

The Project would cross through a total of 13 Counties and a total of 128 census tracts, which are predominantly rural. The Project would cross census tracts with a meaningfully higher minority population than the surrounding county including one tract in Cass County (Tract 9400.2), one tract in Clearwater County (Tract 2), one tract in Polk County (Tract 207), and seven tracts in St. Louis County (Tracts 112, 12, 131, 155, 156, 16, 18, and 19). Of the census tracts crossed that contain a meaningful higher minority population, a total of six tracts contain Native American populations that exceeds the County level by more than 10%: Carlton County (46.9%), Cass County (69.2%), Clearwater County (23.2%), and St. Louis County (16.5%, 21.9%, and 17.5%). The census tract in Clearwater County (Tract 2) includes a portion of the White Earth Reservation. While the Project crosses the tract, the Project does not cross the reservation itself. The Project does cross the Fond du Lac Reservation and also crosses ceded lands on which tribes exercise their treaty rights to access tribal resources.

None of the census tracts crossed by the Project has a meaningfully greater proportion of the population with income less than 185 percent of the poverty level compared to their respective county level.

The Project would cross the Lost River at Mile Post 885.8, which is a federal Project and requires Section 408 permission from the Corps. Details regarding the Federal Project are included in the Section 408 Environmental Assessment, Appendix E, of this document. This crossing is not located in a Tract with meaningful higher minority populations or low-income populations.

**Conclusion:**
Most of the impacts associated with the Project would be construction-related and would be considered short term and localized primarily along the pipeline. Long-term impacts associated with operation would generally be limited to maintenance of a permanent pipeline right-of-way and presence of pump stations.

Based on information available to the Corps, including the information provided in the State EIS, as well as the details of the Project that is within the Corps' regulatory authority, the Project would not have disproportionately high and adverse impacts to minority populations.

Construction, operation, or an accidental release at the Lost River crossing would not result in disproportionate and adverse effects to meaningful higher minority populations or low-income populations. See Section 408 discussion in Appendix E.  Review of the Project included robust coordination with Tribes to ensure mitigative measures would be taken to reduce any adverse effects to Tribal resources.  Please see Section 11.13 for details regarding Tribal coordination and consultation.  In addition, public input was sought through the issuance of two separate Public Notices.  See Section 4 of this document for details regarding public involvement.

## 11.16 EXECUTIVE ORDER 13112, AS AMENDED BY EXECUTIVE ORDER 137511, INVASIVE SPECIES

Enbridge has also developed an invasive and noxious species management plan, included as Appendix B of the Environmental Protection Plan, which identifies BMPs and measures that will be taken to reduce the potential for the spread of invasive species.  Management of invasive species is also included in the Post Construction Monitoring Plan which is included by reference as a special condition of the DA permit.

## 12.0 FINAL CORPS DECISION

Having reviewed the information provided by the Applicant and all interested parties and an assessment of the environmental impacts, I find that this permit action and the Section 408 permission action will not have a significant impact on the quality of the human environment. Therefore, an EIS will not be required.

Having completed the evaluation above, I have determined that the proposed discharges comply with the Section 404(b)(1) Guidelines, with the inclusion of the appropriate and practicable special conditions to minimize pollution and adverse effects to the affected ecosystem.

Having reviewed and considered the information above, I find that the Project is not contrary to the public interest.

I find that the issuance of the Corps permit, as described by regulations published in 33 CFR Parts 320 through 332, with the scope of the project as described in this document, is based on a thorough analysis and evaluation of all issues set forth in this EA. There are no less environmentally damaging, practicable alternatives available to the Applicant to construct the Project. The issuance of this permit is consistent with statutes, regulations, guidance, and policy and on balance, issuance of a Corps' permit to construct the Project is not contrary to the public interest. As explained above, all practicable means to avoid and/or minimize environmental harm from the selected, permitted alternative have been adopted and required by terms and conditions of this permit.

Approving Official:

Karl D. Jansen
Colonel, Corps of Engineers
District Engineer

23 NOV 2020
Date

Appendix A

Public Notice Comments and Responses

2014-01071-CLJ

**FIRST PUBLIC NOTICE COMMENTS AND RESPONSES**

*Several commenters requested a PN extension as well as a public hearing.*

**Response:**  The Corps granted an extension of the public notice from January 21, 2019 to February 21, 2019.  The Corps has considered the request for a public hearing and reviewed the public hearing requirements set forth in 33 CFR 327, and has made a determination that they will not be conducting a public hearing. 33 CFR 327(b) states the Corps shall grant a public hearing request, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing. The applicant has retained a qualified consulting firm and several agencies have been involved in the review of the application. The Corps does not believe a public hearing would generate new information that would change or inform the review process.

*Several commenters provide support for the project and indicated approximately 8,600 potential jobs would be connected to the project.*

**Response:**  Comment noted

*Multiple commenters requested the Corp prepare an Environmental Impact Statement/ Decision to jump to EA and indicted that the Corps Cannot Adopt the State-Level EIS Prepared by the Minnesota DOC.*

**Response:**  The National Environmental Policy Act (NEPA) requires federal agencies to determine if their federal action is a "major federal action" and, if so, whether impacts to the human environment are significant. A major federal action "includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." (40 CFR 1508.18). If the effects of the action are determined to be significant, the agency must prepare an Environmental Impact Statement. The Council on Environmental Quality (CEQ) regulations state that an Environmental Impact Statement (EIS) "…shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." (40 CFR 1502.1). Generally, oil pipeline projects are not "major federal actions" for USACE since USACE has limited jurisdiction over activities associated with pipeline construction.

The USACE evaluated the application for construction-related impacts to waters of the U.S. and one crossing of a federal project. Construction-related impacts of utility line projects to waters of the US are, in general, mostly temporary in nature and can be adequately assessed in an EA that is compliant with NEPA. Elevation of the environmental review from an EA to an EIS is not necessary to adequately disclose and address the environmental and public interest impacts of the project that are within our regulatory authority.

Information regarding effects of the overall project were disclosed in the State EIS, approved by the PUC on May 1, 2018. Proposed construction impacts to aquatic resources and to other public interest factors within the scope of our regulatory purview were reviewed or evaluated independently by the Corps, as well as by the USFWS, BIA, USEPA, consulting Tribes, and state agencies (DNR, PCA, SHPO).  The Corps did not adopt a State-level EIS, rather, utilized information provide in the State EIS that was within the Corps' regulatory authority, as well as

coordinated with State agencies, as to not duplicate additional review requirements to the maximum extent practicable.

*Several Commenters questioned the applicant's purpose and need.*

**Response:**  The applicant's purpose and need statement provides the basis for developing a range of alternatives, the criteria for comparative evaluation of alternatives, and the basis of criteria for selecting the preferred alternative. It dictates the range of alternatives which may be considered reasonable, prudent, and practicable, consistent with the environmental process requirements of NEPA and the 404 (b)(1) guidelines. The purpose and need statement and the alternatives to the designated route were examined throughout the State EIS and project development processes. The Corps does not consider the applicant's purpose and need statement for the designated route to be so narrow in definition or so specific that it predetermines the outcome or eliminates otherwise reasonable alternatives, nor does it consider it to be too vague that evaluation criteria or measurable objectives cannot be determined.  See section X of the EA for additional details on the applicant's purpose and need

*Two commenters asserted that the Corps must evaluate all connected actions, including those that cross federal jurisdictions and/or control (Federal Actions listed: 404, 408, BIA ROW).  The Corps must also include reasonably foreseeable projects or expansions, including the reasonably foreseeable expansions of other pipelines to transport the expanded capacity of the Line 3.*

**Response:**  The following connected federal actions are addressed in the EA: Evaluation of an Individual DA Permit application for the discharge of dredged or fill material into waters of the United States under Section 404 of the Clean Water Act and to conduct work in navigable waters of the United States under Section 10 of the Rivers and Harbors Act; and Permission from the Corps to alter a federal project (Lost River flood control project) under Section 408 of the Rivers and Harbors Act.  Issuance of an ROW Grant to cross BIA tracts within the exterior boundaries of the FDL Reservation is not within the Corp's regulatory authority and was evaluated individually by the BIA.

*Multiple commenters indicated the Corps must evaluate oil spills and consider oil spill risk for other route alternatives.*

**Response:**  At the time of the Public Notice, no spill analysis was completed. Since then, a spill analysis has been completed as required by the PUC. Congress has not authorized the USACE, or any other federal agency, to regulate the overall construction or operation of oil pipelines. Our regulatory authority and jurisdiction is limited to the construction-related impacts to aquatic resources.   USACE does not regulate the siting of any type of pipeline/utility line or any substance being transported within a pipeline.  The potential for oil spills is beyond the scope of our regulatory authority as is the citing of pipelines/utility lines.  USACE's authority under §404 is limited to construction-related impacts to jurisdictional waters of the US. The environmental consequences of oil spills of varying types over representative terrains, which are outside of the regulatory authority, are disclosed in the State EIS.  Line 3 is subject to the U.S. Department of Transportation Standards under 49 USC Chapter 601.  The Office of Pipeline Safety administers the national regulatory program to ensure the safe transportation of hazardous liquids by pipeline.

*One commenter indicated the Corps must evaluate climate change impacts and, including Greehhouse Gas Emission impacts from increased tar sands development.  The commenter also requested the social cost of carbon pollution be evaluated.*

**Response:**  USACE involvement in utility line and pipeline projects is limited in scope. USACE does not regulate the overall construction or operation of pipelines, nor does it regulate the siting of any type of pipeline/utility line, or any substance being transported within a pipeline. However, the Corps reviewed proposed construction activities within and adjacent to waters of the US and determined that they would not be expected to affect climate. There are no anticipated direct changes to hydrology that could potentially trigger changes in temperature, precipitation, evaporation rates and other climate variables, as well as dependent basin responses to climate drivers, such as sedimentation loadings. Construction impacts which may have some potential to effect climate are largely temporary in nature.  Social costs of carbon pollution are not with the Corps' regulatory authority.  See Section 7.5 of the Environmental Assessment for additional discussion about climate change.

*Two commenters asserted the Corps must evaluate impacts to waterways, including but not limited to impacts to forested wetlands, specific water crossings, and sensitive areas.     Earth Justice (February 21, 2019) Honor the Earth (February 21, 2019)*

**Response:**  Impacts to all aquatic resources were evaluated, including forested wetlands, specific water crossings, and sensitive areas as identified during interagency coordination. Impacts an associated compensatory mitigation are discussed in the EA.  See Sections 6 and 8 of the EA for more details regarding aquatic resource impacts and compensatory mitigation.

*Two commenters indicated the Corps must evaluate impacts to species.*

**Response:**  At the time of the Public Notice, the ESA Section 7 review had not been completed. Section 7 consultation was completed on August 6, 2019 with the USFWS concurring with all determinations.  Section 10.1 of the Department of the Army Environmental Assessment and Statement of Findings includes additional information on the ESA Section 7 review.

*The Corps Must Evaluate Alternatives all alternatives, including the No Action alternative, utilization of other pipeline upgrades, replacement or repair of damaged sections of the existing Line 3, route alternatives, as well as verify the demand for increased capacity.*

USACE does not regulate the siting of any type of pipeline/utility line or any substance being transported within a pipeline. Construction-related project impacts to WOUS associated with the Designated Route were avoided and minimized to the extent practicable.  Impacts and effects associated with alternative route segments and system alternatives were reviewed in the State EIS. The review of impacts associated with system and route alternatives is outside the scope of the USACE's regulatory authority. The environmental effects of the No-Action Alternative and of the Designated Route are disclosed in the EA.  Demand for petroleum resources was addressed in PUC's Certificate of Need. The purpose and need of the project is outlined in the Section X of this document.  This does not include future forecasts for demand as that is not within the Corps' regulatory authority.

*Several commenters indicated Enbridge's Preferred Route is not the least environmentally damaging practicable alternative and other alternatives, including alternative routes and systems alternatives would fulfill the project's purpose.*

**Response:**  Proposed discharges of dredged or fill material into waters of the US associated with construction of the designated route and associated facilities were evaluated in the EA for compliance with the 404(b)(1) Guidelines and determined to be the LEDPA.  The EA considered the No Action and Designated Route Alternatives, including maintenance of the existing Line 3, in its analysis.  Other route and system alternatives evaluated by the State were not evaluated in the EA since the USACE does not regulate the siting of pipelines/utility lines. See Section 5.0 the EA for the LEDPA determination and assessment of alternatives.

*Two commenters questioned the proposed individual crossing methods as the LEDPA.*

**Response:**  The Corps worked closely with Enbridge and State agencies to review proposed pipeline construction methods at waterbody and wetland crossings.  Construction-related project impacts to WOUS associated with the Designated Route were avoided and minimized to the extent practicable. This review took into account site characteristics which may have led to a trenched crossing method potentially being less environmentally damaging than a bore method. In general, and with respect to the 404(b)(1) guidelines, the HDD method would be viewed as the Least Environmentally Damaging Practicable Alternative (LEDPA).  However, for site specific reasons (geo-tech, water table, etc.) an HDD might pose too high of risk for frac-outs (release of drilling mud) potentially effecting the waterbody or biota. Therefore, a trench method was requested by the agencies. In general, the HDD method is not practicable at every waterbody crossing because of site specific concerns, availability of HDD equipment, and costs.

Specifically, extensive geotechnical studies and other multi-year analyses of site-specific conditions at the sensitive water/wetland complexes at the MN DNR public water LaSalle Creek, and the MN DNR public water Spring Brook and the neighboring MN DNR pubic water wetland Scout Camp Pond, the MN DNR determined an HDD had a significant potential to adversely affect the aquatic environment at both locations. Enbridge and MN DNR determined, in coordination with the MPCA and the Corps, that the least damaging practicable alternative crossing method for both LaSalle Creek and Spring Brook is a dry crossing dam and pump.

Details of construction methods are included in Enbridge's November 2020 Environmental Protection Plan.  LEDPA determination is included in Section 5.0 of the EA.

*Two commenters indicated Line 3 likely would cause unacceptable impacts to the aquatic ecosystem and the application does not demonstrate that discharges form the project will comply with water quality standards.*

**Response:**  The majority of the impacts to aquatic resources are temporary for this project. Enbridge is required to restore temporary impacts to preconstruction conditions and monitor the restoration post project.  Impacts to the aquatic ecosystem, compensatory mitigation, and post construction monitoring are discussed in the EA, as well as an analysis of cumulative effects in Section 9 of the EA.  Enbridge has applied for a 401 water quality certification from the Fond du Lac Reservation which was granted on April 15, 2019, State of North Dakota which was granted on January 31, 2019, and the MPCA which was granted on November 12, 2020.

*One commenter identified that the project would cross sensitive areas and result in a loss of wetland.*

**Response:**  Sensitive areas have been identified through interagency collaboration.  Crossing methods in these areas have been identified and discussed with Enbridge to reduce impacts to

aquatic resources in these areas as well as throughout the project.   Special wetlands, as identified by the agencies, will be compensated at a higher ratio as a result of the uniqueness or sensitivity of the wetland. See the EA for additional discussion regarding compensation ratios. The majority of the impacts associated with the project are temporary in nature as a result of excavating a trench, laying the pipe, and backfilling the trench.  Enbridge will be required to monitor all aquatic resources after construction to ensure sites are properly restored and impacts are minimized. Due to the nature of most of the impacts, restoration requirements, compensatory mitigation, post construction monitoring, and financial assurances, losses of wetland as a result of installation of the pipeline are not anticipated.

*Several commenters indicated there is no showing that the project is in the Public Interest.*

**Response:** The public Interest review is included in the EA.

*One commenter asserted that the Corps must independently verify the information Enbridge has provided.*

**Response:** The Corps has independently reviewed all information supplied by Enbridge and its consultant.  Much of this information had also been reviewed and coordinated with State agencies during interagency coordination.

*One commenter indicated information regarding waterbody and wetland crossings is not complete due to use of the National Wetlands Inventory data and other off-site resources.*

**Response:**  At the time of the Public Notice Enbridge had not field delineated all waterbodies and wetlands. Complete field level delineation or verification of any field level delineations are not required for a complete application.  Since the Public Notice, Enbridge delineated all waterbodies and wetlands in the field. All delineation boundaries were reviewed through delineation reports submitted by Enbridge's consultants. A sub-sample of boundaries, as determined through interagency coordination, was reviewed in the field by agency staff.

*Several commenters identified the need to assess direct, indirect, and cumulative impacts.*
**Response:** Direct, indirect, and cumulative impacts are discussed in the EA.

*Several commenters identified effect to treaty usufructuary rights and indicated the project would violate the 1855 & 1854 Treaties.*

**Response**: Please see Section 11.3 of the EA for details on compliance with Section 106 of the National Historic Preservation Act.  Section 11.13 of the EA documents the process the Corps took to comply with Tribal Treaty Rights which included government to government consultation with several tribes.

*Two commenters identified concerns with potential effects to wild rice as a result of an oil spill.*

**Response**:   The potential for oil spills is beyond the scope of our regulatory authority under Section 10 and Section 404 as is the siting of pipelines/utility lines.  USACE's authority under §404 is limited to construction-related impacts to jurisdictional waters of the US. The environmental consequences of oil spills of varying types over representative terrains, which are outside of the regulatory authority, are disclosed in the State EIS.

*One commenter indicated the Corps must comply with Section 106 of the National Historic Preservation Act prior to permitting the pipeline.*

**Response**: Please see Section 11.3 of the EA for more details on compliance with Section 106 of the National Historic Preservation Act.

*One commenter identified the need for the Bureau of Indian affairs to grant right of way through Fond du Lac reservation is a major federal action triggering NEPA.*

**Response**:  The requirement for the Bureau of Indian Affairs (BIA) to assess granting right-of-way to Enbridge is not within the Corps' regulatory authority.  Any NEPA requirements for right-of-way would be assessed by the BIA.   The need for right-of-way from the BIA does not affect the review of impacts or NEPA review under Section 404.

*The Army Corps Must Consider the Social, Economic, Ecological and Environmental Justice Impacts Raised by Line 3, Proposed Mitigation Measures, and Alternatives to Avoid These Impacts.*

**Response**:  These issues are addressed in the EA.

*Several individuals identified concerns with the project's potential to impact private property, generally related to crop production*.

**Response:**  The use of private property and effects to the private property for a pipeline would be accounted for in easement negotiations between Enbridge and the landowners.
Any grievances regarding impacts to private property would be between the landowner and Enbridge and are not within the Corps authority.

*One commenter asserted that Impacts from frac-outs and unrecovered drilling mud need to be assessed*.

**Response:**  Enbridge has developed drilling fluid response, containment, and notification procedures, included in the Environmental Protection Plan. Areas where drilling mud has been released in wetlands or waterbodies would be required to be restored and drilling mud removed to the maximum extent practicable. Enbridge will consult with the appropriate regulatory agencies to evaluate the circumstances of the release, discuss additional containment or cleanup requirements, and determine whether and under what conditions the HDD may proceed. Any losses to wetlands or waterbodies as a result of a release would need to be compensated for.  Compensation would be determined through inter-agency coordination.

*Two commenters claimed that the Corps had not used an early, orderly process to include the public and cited Part §325.1 Applications for Permits, Section (b) Pre-application consultation for major applications instructs the Corps District Engineer to assure early and orderly involvement by appropriate Federal, state and local agencies and the public.*

**Response:**  The Public Notice serves as the early coordination process with the public.   The public notice provided the project proponents proposal.  Prior to the receipt of a complete application as outlined in *33 CFR 325.1(d) and 325.3(a).)*, the Corps had numerous discussions with other agencies.  Pre-application discussions are not a requirement for a Section 10 or Section 404 authorization.   These discussions provide the potential applicant with helpful

information necessary in pursuing the application, including factors which the Corps must consider in its permit decision making process.

*One commenter indicate that the Corps is obligated to coordinate permit and environmental review with the State review and such coordination had not happened.*

**Response:**  The Public Notice identifies the applicant's proposal and it was early in the review process.   The Corps coordinated numerous times with state agencies prior to the issuance of the public notice as well as during the review process after the public notice.  Coordination included participating in weekly agency meetings as well as participating in inter-agency review of specific plans submitted by the applicant.

*Two commenters asserted that the Corps must apply extra-jurisdictional authority to this project based on the magnitude of the project. The commenters indicated that the Corps needs to expand the typical narrow focus of stream and wetland crossings and should include non-jurisdictional areas.*

**Response:**  Corps scope of review is not dictated but the magnitude of the project and cannot be expanded based on the type of project.  Discussion about the Corps' NEPA scope, action area, and permit area are included in Section 2.0 of the EA.

*One commenter cited inappropriate limiting of public comment scope by statements in the public notice related to the Corps' regulatory authority.*

**Response:**  The public notice included the statement, "Under the authorities listed above, the USACE does not regulate the overall construction or operation of pipelines, nor does it regulate the siting of any type of pipeline/utility line or any substance being transported within a pipeline." to clarify the Corps regulatory authority under Section 404 and Section 10 and to solicit substantive comments that are within the Corps' regulatory authority.

*One commenter asserted that a Federal EIS was needed to resolve deficiencies in the State EIS.*

**Response:** The state FEIS and decisions on state permits, including the PUC's decisions on the requests for a certificate of need and route permit, were used to inform aspects of our federal review.  The Corps did not evaluate the adequacy of the FEIS, but rather incorporated relevant parts of the FEIS documentation into our evaluation as appropriate.  There is no requirement to conduct a Federal EIS to supplement a State EIS.

*A few individuals indicated that a Section 404 permit cannot be issued until a Section 401 water quality certification decision has been made.*

**Response**:  Certification under section 401 of the Clean Water Act is required prior to a valid Section 404 authorization. The individual 401 water quality certification was issued on April 15, 2019 by the Fond du Lace reservation, January 31, 2019 by the State of North Dakota, and on November 12, 2020 by the Minnesota Pollution Control agency.

*One commenter indicated they would be requiring any construction excavations be conducted with a Tribal Historic Preservation Office representative or approved consultant present to identify any potential sacred or archaeological sites found during construction-related excavations.*

**Response:**  Tribal monitoring during construction will occur.  The tribal monitoring component will be managed by the Fond du Lac Band of the Minnesota Chippewa Band (Fond du Lac Band) Tribal Historic Preservation Office (THPO).  The Fond du Lac Band managed the tribal cultural resources survey (TCRS) and the elder interviews for the proposed project corridor. There was participation within the tribal survey and elder interviews by a number of consulting Tribes, and opportunity was provided for involvement to all consulting Tribes throughout consultation.  The same invitation to participate in the tribal monitoring training was provided to all consulting Tribes, via our recurring Thursday morning meetings and coordination with Tribes. Tribal monitoring training is occurring the first three weeks of NOV 2020, open to all consulting Tribes to participate, and Fond du Lac plans to train up to 90 tribal trainees for future work on the L3R construction.  Enbridge's cultural resource management consultants drafted an Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) spring 2020, which is composed of the Unanticipated Discoveries Plan (UDP), tribal monitoring component, archaeological monitoring component, geo-archaeological component, avoidance/protection measures of resources from the recommendations within the TCRS report, procedures and processes, monitoring forms, roles (stop-work authority, for example), and so on.  It is a robust, multi-disciplinary, comprehensive document.  We provided the draft AMIP to all consulting Tribes, MN SHPO, and MN DNR archaeologist on 01MAY20.  Our agency and the Fond du Lac THPO, who was heavily involved in the development of the tribal monitoring section, provided comments on the draft.  No other comments were received.  A second draft AMIP, incorporating our and Fond du Lac's comments, was provided to all consulting parties (Tribes, SHPO, DNR) on 23JUL20.  No comments or concerns received.  On 20OCT20, we provided the final AMIP to all consulting parties.  A Special Condition of our permit will reference the AMIP, for areas subject to our authority.  Tribal monitoring during construction is also a State requirement.  See Sections 11.3 and 11.13 of the EA for detailed discussion on tribal coordination and coordination of the AMIP.

*Multiple commenters identified concerns with the compensatory mitigation and mitigation ratios proposed by the applicant.  Some commenters also indicated compensatory mitigation should occur as close to the impact as possible.*

**Response**:  At the time of the original PN the Corps provided a description of what Enbridge proposed for compensatory mitigation. Enbridge proposed compensatory mitigation for unavoidable permanent fill and for wetland type conversions of scrub-shrub and forested wetlands, as well as temporary loss of functions through the purchase of wetland credits. Enbridge proposed to restore all temporarily impacted wetlands to pre-construction conditions. The proposed compensation ratios for temporary and permanent conversion (0.5:1 for PFO and PSS, 0.10:1 for PSS, and 0.03:1 for PEM, PUB) were based on previous Enbridge pipeline projects and District procedures. Permanent wetland losses were identified, but no Mitigation ratios were proposed at the time of the public notice.  Enbridge indicated that the ratios for permanent losses of wetland would be determined by the Corps based on evaluation of the wetland impacts. Since the public notice, there was a substantial amount of work done with the applicant and state agencies to refine the wetland compensatory mitigation. Revisions included identifying sensitive resources and developing mitigation ratio for the sensitive resources, and identifying where credits would be purchased to satisfy compensatory mitigation requirement based on a revised proposal.  Enbridge provided their revised Compensatory Mitigation Plan in January 2019 which was included in the second public notice on February 4, 2020.  See section 8.0 of the EA for additional details on the final compensatory mitigation.

*One organization included 42,896 individuals who signed onto the general response of denying the permit, of which, 10,978 individuals included personal comments. The commenter requested that each individual who signed onto the statement be counted.*

**Response:**  Comment and request noted.

*One commenter indicated using only the 4 general classes from Cowardin (PSS, PFO, PEM, and PUB) oversimplified potential impacts and requested an explanation on the potential impacts, including wetland type conversion, to all wetlands types.*

**Response**:  The general classes of wetlands continued to be used throughout the review. However, as a result of inter-agency coordination, certain wetland types were identified and used to assess impacts and compensatory mitigation requirements.  Wetland categories are identified in Enbridge's Compensatory Wetland Mitigation Plan dated October 2020.

*One commenter requested further explanation and justification of how avoidance and minimization measures have taken place and how no further avoidance and minimization can be achieved for ATWS corridors for specific bodies of water.*

**Response:**  Pre-application coordination was held with the applicant to identify potential areas where ATWS impacts to wetlands may be minimized. The applicant has made efforts to minimize the ATWS to the maximum extent practicable while taking into account site conditions and construction requirements.  Specific minimization efforts are outlined in the EPP as well as 6.8 of the EA.

*One commenter requested long term monitoring to assess any unforeseen impacts for the life of the line and suggested financial assurances for wetland mitigation and remediation.*

**Response:**  Monitoring of impacts and restoration site will be required as outlined in the Post Construction Monitoring Plan, and would generally be conducted for a period of 5 years after construction.  Monitoring would no longer be required once restoration sites have met performance standards outlined in the plan and permit.  Financial assurances are also required and included in the plan to allow for remediation or mitigation of any unanticipated impacts identified during the monitoring period.  See November 2020 Post Construction Monitoring Plan for details regarding post construction monitoring, performance standards, and financial assurances.

*Two commenters recognized certain wetlands had not been field verified via a wetland delineation and questioned how the 404 application could be considered complete.*

**Response:**  At the time of the public notice, not all wetland boundaries had been field verified. During project review, the applicant completed field verifications for 99% of the wetland boundaries.  A sub-set of the wetland sites were selected through interagency coordination for confirmation of wetland delineation boundaries which represented a cross-section of various types and wetland plant communities that the proposed project would impact.  The remaining 1% of wetlands were field delineated during the 2020 growing season.  In total, field crews conducted wetland and waterbody surveys on all 36,788.4 acres of the environmental survey corridor

*One commenter indicated that many of the wetland surveys had been completed late in the growing season and were concerned that key wetlands species or wetland types such as seasonal ponds may have been missed.*

**Response:**  A sub-set of the wetland sites were selected by the Corps and State agencies for confirmation of wetland delineations which represented a cross-section of various types and wetland plant communities that the proposed project would impact. Enbridge completed a desktop review of seasonal ponds shapefiles provided by the Minnesota DNR and compared the known areas to the field delineated areas. As a result of the desktop review, Enbridge indicated they had adequately identified all seasonal ponds during the field delineations.

*One commenter recognized the need for close interagency coordination to prevent conflicting permitting recommendations.*

**Response:**  We agree with the need for close agency coordination to prevent any permitting conflicts and to reduce redundant regulatory requirements.   The Corps participated in many coordination efforts with State agencies during the entire project review.

*One commenter recommended a vegetation management plan be developed to address impacts during construction as well as vegetation maintenance activities during the life of the pipeline. They also recommended a hydrological and wetland recovery monitoring plan be developed.*

**Response:**  Vegetation management and monitoring are outlined in Section 7.0 of the EPP. Enbridge has also developed an invasive and noxious species management plan, included as Appendix B of the EPP.  Hydrologic and wetland monitoring after construction is outlined in Enbridge's November 2020 Post Construction Monitoring Plan.  In addition, Enbridge has committed to acquiring pre and post construction color infra-red imagery of the entire route within Minnesota.  This will assist in identifying any ponding or other hydrologic changes on and off ROW after construction and initial restoration are completed.

*One commenter requested the Corps consult with the USFWS and use all avian friendly power line equipment on all lands and develop an Avian Mitigation Plan.*

**Response:**  Coordinating avian concerns with the USFWS, aside from any Section 7 review requirements, is outside of the Corps' regulatory authority.

*One commenter recommended placement of vehicle traffic barriers and placement of no-trespassing signs during revegetation and as necessary during the life of the line as monitoring demonstrates the need. In addition, retaining or replacing riparian shrubby vegetation would be important for stream bank stability and to discourage cross-river ATV traffic.*

**Response:**  Limiting of access to property is outside of the Corps' regulatory authority.   A Department of Army permit does not convey any property rights to Enbridge.  Issues with revegetation or stream stability in areas under the Corps' authority will be identified during post construction monitoring.

*One commenter recommended heavy and frequent investigation by environmental monitors, long term monitoring for direct and indirect permanent wetland impacts, as well as mitigation for any long-term impacts in new corridors.*

**Response:** Environmental monitoring protocols for third party monitors are outlined in Enbridge's November 2020 Environmental Monitoring and Control Plan to ensure that the project will be constructed in compliance with the applicable regulatory authorizations. Compensatory mitigation requirements for all impacts are outline in the October 2020 Compensatory Wetland Mitigation Plan.  The November 2020 Post Construction Monitoring Plan identifies the post construction monitoring protocols and identifies the need for additional compensatory mitigation or financial assurances if unanticipated impacts are identified.

*One commenter requested working in frozen conditions to minimize impacts to the environment.*

**Response:** Enbridge will be utilizing winter construction methods for the majority of the project where feasible. Winter Construction methods are outlined in Enbridge's November 2020 Winter Construction Plan.

*One commenter requested minimizing the length of open trench to a maximum of 3 miles within any one construction spread to prevent massive erosion from storm events and minimize potential for wildlife entrapment, and to fill trenches as soon as possible. The commenter also requested a maximum of 72 hours of open trench.*

**Response:** Enbridge will be limited to a total of 14,000 linear feet of open trench per construction spread (total of 6 construction spreads) through a special condition in the DA permit.  The duration of the open trench is limited to no more than three days.  These limitations do not apply to HDD, bore, road bore crossings, or valve and pump station construction.

*One commenter requested the company power wash all equipment and mats to prevent the spread of invasive species. The commenter also recommends numerous additional BMPs to reduce the spread of invasive species.*

**Response:** The Invasive and Noxious Species Management Plan, Appendix B of the November 2020 EPP, identifies BMPs and measures that will be taken to reduce the potential for the spread of invasive species.

*One commenter recommended no use of salt on all lands.*

**Response:** Use of salt is not within the Corps' regulatory authority. However, Enbridge has committed to using no salt, and would only use sand to reduce icy conditions.

*One commenter recommended siting valves and pumps, and ATWS in previously disturbed upland locations*

**Response:** Aquatic resource impacts associated with the discharge of fill material for the construction of valves and pumps, and siting of Additional Temporary Work Space (ATWS) to aquatic resources have been minimized to the maximum extent practicable.  Enbridge has sited these features in upland or disturbed locations as much as possible while still meeting construction requirements or operating requirements.  See Section 6.8 of the EA for additional minimization measures Enbridge is taking.

*One commenter requested topsoil be separated to ensure successful reclamation and recommended using matting to store soil in areas of rare species and communities.*

**Response:**  Topsoil segregation is outline in Enbridge's November 2020 Environmental Protection Plan.

*One commenter indicated wetlands and areas with hydric soils may need multiple layers of matting to support weight of equipment and reduce compaction, or construct during frozen conditions depending on soil conditions and other considerations such as rare plant species and communities.  The commenter also recommended construction when water levels in wetlands are lower to avoid challenges with trench backfilling under frozen conditions.*

**Response:**  Construction methods and BMPs for construction under frozen conditions are included in Enbridge's Winter Construction Plan.

*One commenter recommended lowest impact crossing method for all stream and wetland flowages, minimizing disturbance and impacts to riparian vegetation, avoiding hard armoring (rock riprap) for stream bank protection, and burying the pipeline 4-feet below the deepest pool feature to reduce potential impacts to the stream or the flood plain.*

**Response:**  Enbridge has crossing method information for all water body crossings.  This information was used during interagency coordination to determine the appropriate crossing method for a particular waterbody. This review took into account site characters which may have led to a trenched crossing methods potentially being less environmentally damaging than a bore method.  In general, and with respect to the 404(b)(1) guidelines, the HDD method would be viewed as the Least Environmentally Damaging Practicable Alternative (LEDPA).  However, for site specific reasons (geo-tech, water table, etc.) an HDD might pose too high of risk for frac-outs (release of drilling mud) potentially effecting the waterbody or biota. Therefore, a trench method was requested by the agencies.  Impacts to riparian vegetation have been minimized to the maximum extent practicable through a reduction in the width necessary to facilitate construction as well as no ground disturbance through clearing activities outside of the trenched areas.  Minimum depth-of-cover requirements are established by federal regulation, specifically 49 C.F.R. § 195.248.  Concerns related to depth of cover were discussed between State agencies and Enbridge.  To avoid and minimize hydrotechnical hazard impacts on the pipe, Enbridge has committed to a minimum depth of cover of 48 inches at all surface water crossings (i.e., watercourses and wetlands). In saturated conditions where there is a floating mat or vegetation over a water layer, the depth of cover will be measured starting at the bottom of the water resource substrate as illustrated in Figure 18 of the EPP. This exceeds the federal mandated depth at inland bodies of water less than 100 feet wide by 18 inches (1.5 feet). Enbridge has also agreed to additional depth of cover greater than its 48-inch standard at some public waters to address MDNR concerns.  Details of construction methods, including crossing types, clearing of riparian vegetation, and depth of pipe are included in Enbridge's November 2020 Environmental Protection Plan.  See Section 6.8 of this EA for additional information on minimization efforts Enbridge is taking.

*One commenter provided recommendations for different types of crossing methods including HDD, Open-Cut, Dry-Crossings, and Wet Crossings.*

**Corps Response:**  The recommendations were taken into consideration during review of the proposal as well as discussed during interagency coordination meetings. Some of the recommendations presented are not within the Corps' regulatory authority, such as requiring the applicant to notify the MNDNR if in-stream construction lasted more than 24 hours, or prohibiting crossing or bridging of streams at all HDD locations. Specific information regarding crossing types is include in Enbridge's November 2020 Environmental Protection Plan.

*One commenter identified groundwater concerns and identified the need to properly seal wells per Minnesota Department of Health well rules. The commenter also identified the need for ditch plugs at appropriate locations to reduce the potential for groundwater to flow along the pipe.*

**Response:**  Sealing of wells would need to be completed per the Minnesota Department of Health well rules as noted in the comment and is not within the Corps' regulatory authority. Trench breakers were discussed during interagency coordination and details of trench breakers can be found in Enbridge's November 2020 Environmental Protection Plan.

*One commenter identified concerns with potential groundwater impacts in large peatland complexes and provided recommendations for construction in these areas.*

**Response:**  Recommendations for construction in peatland areas were discussed during interagency coordination and with Enbridge. The majority of the peatlands will be crossed during frozen conditions to reduce potential impacts.  Enbridge's November 2020 Post Construction Monitoring Plan identifies protocols for monitoring any potential indirect impacts to the hydrology which includes placement of monitoring wells in certain areas of peatlands and detailed peatland/wetland complex vegetation monitoring at 11 different sites.

*One commenter requested an exclusion of construction from April 1 to June 30 to reduce impacts to wildlife.*

**Response:**  Excluding construction windows to reduce impacts to wildlife is too broad and not within the Corps' regulatory authority.  However, Enbridge has agreed to not conduct construction activities in any wetland not permitted for permanent fill from April 11 through June 1 for non-sensitive waters and from April 1 through June 15 for sensitive waters to protect aquatic life use during sensitive periods, at the request of the MN DNR and MPCA. Enbridge will also not be conducting in-channel work during the MN DNR in-channel exclusion dates for MN DNR public waters, unless specifically approved by the MN DNR.  See Section 6.4.3 for discussion on impacts to wildlife and Section 6.8 for additional minimization measure that will reduce impacts to wetlands as well as wildlife.

*One commenter provided recommendations for types of erosion blankets and mulch and hydromulch to be used.*

**Response:**  Dictating the types of erosion blankets and mulch is not within the Corps' regulatory authority.  Stabilization and reseeding efforts after construction is outline in Enbridge's November 2020 Environmental Protection Plan.

*One commenter identified concerns with the use of hazardous chemicals, refueling, and potential spills of fuel.*

**Response:**  Enbridge has outlined their spill prevention, containment, and control measures in their November 2020 Environmental Protection Plan.

*One commenter provided recommendations on replanting and seed mixes.*

**Response:**  Enbridge has outlined their seeding protocols and seed mixes in their November 2020 Environmental Protection Plan.

*One commenter provided recommendations for work through sensitive wetland types.*

**Corps response:**   This information was used during interagency coordination as well as coordination with the applicant, resulting in additional mitigation measures employed by the applicant such as winter construction, use of additional timber mats, and strategic placement of trench breakers.

*One commenter identifies special areas of concern which included all water and wetland crossings; in particular, trout streams, calcareous fens, biological diverse areas, peatland complexes, old growth forest, threatened and endangered species, and rare native plant communities.*

**Response:**  This information was used to identify preferred crossing methods which may reduce impacts to the resource.  Enbridge will be following the MN DNR in-stream work exclusion dates for cold-water streams (trout streams) and warm-water streams, unless specifically approved by the MN DNR.   Wetland types, including certain wetland types of concern were assess during the interagency effort of developing compensatory mitigation requirements.  See Section 6.5.2 of the EA for details about special wetland categories.  Section 6.4.1 of the EA includes information regarding federally threatened and endangered species. State listed threatened, endangered, and special concern species are not within the Corps' regulatory authority.

*One commenter indicated the application implies that the permanent conversion of wetlands will only occur to forested (i.e. PFO) and scrub scrub (i.e. PSS) wetlands and fails to consider potential permanent impacts to other wetland types within PEM and PUB.*

**Response:**  Permanent impacts associated with the placement of valves and pump stations have been accounted for.  No permanent impacts to PEM or PUB for the installation of the pipe have been proposed as these areas will be restored after pipe installation.  No wetland type conversion impacts are anticipated to PEM or PUB type wetlands as these areas do not need to be maintained free of woody vegetation.  Temporary impacts to PEM and PUB have been identified and compensation will be provided to account for the temporary losses in wetland function. All wetland types will be monitored post construction to identify any unanticipated impacts.

*One commenter indicated the proposed Project has the potential to result in secondary impacts to adjacent aquatic resources; however, the Application does not account for secondary impacts as required by the Guidelines.*

**Response:**  The proposal identifies all known or reasonably predictable impacts and assumes the construction procedures and will occur as planned.  It is impossible to assess all impacts that might occur.  However, post construction monitoring will be required. Along with monitoring of the ROW, off-site (off ROW) monitoring post construction will be conducted to aide in determining if any secondary or unanticipated impacts do occur. Enbridge's November 2020 Post Construction Monitoring report details the monitoring protocols.

*One commenter requested additional information regarding the quality of streams to be crossed by the project, recommended post construction monitoring of streams crossed by the project, and requested compensatory mitigation for the temporary impacts (i.e. disrupted floodplain connectivity, disturbed groundwater and surface water interactions and instream flow dynamics, changes in water quality, temperature, nutrients, and disturbance to fish and macroinvertebrate*

*communities due to instream changes and elimination of riparian buffer) to the streams crossed by the project.*

**Response:**  The project includes temporary impacts to waterbodies during the duration of trenching, pipe installation, backfilling, and initial restoration. Based on information included in Enbridge's November 2020 EPP, the anticipated duration for pipe installation through water bodies would typically range from 24 to 48 hours.  As identified in the EPP, Enbridge would restore the streams banks that had been disturbed by construction to as near as possible to pre-construction conditions utilizing civil survey data collected pre-project.  Unstable banks may require bio-engineering which would be accomplished in consultation with the appropriate agencies.  Restoration of the area impacted by the stream crossing should return any functions temporarily lost during the relatively short construction period.   Site specific restoration plans, completed in consultation with the appropriate agencies, as well as post construction monitoring will reduce the potential for any long-term effects at waterbody crossing sites.  Financial assurances are required to ensure adequate restoration of the waterbody crossings and prevent impacts that would warrant compensatory mitigation. Additional details regarding financial assurances are included in the October 2020 Compensatory Mitigation Plan.

**Second Public Notice Comments and Responses**

*Many commenters requested denial of the permit without any regulatory rationale.*

**Response:**  The Corps cannot simply deny a permit without any rationale that is within the Corps' regulatory authority.

*Many commenters cited concerns with water quality as a result of a potential oil spill as well as the type of crude oil (Tar Sand Oil) that would be transported through the pipe.*

**Response:**
Congress has not authorized the USACE, or any other federal agency, to regulate the overall construction or operation of oil pipelines. Our regulatory authority and jurisdiction is limited to the construction-related impacts to aquatic resources.  USACE does not regulate the substance being transported within a pipeline.  The potential for oil spills is beyond the scope of our regulatory authority.  USACE's authority under §404 is limited to construction-related impacts to jurisdictional waters of the US.  A spill analysis has been completed as required by the PUC.  The environmental consequences of oil spills of varying types over representative terrains, which are outside of the regulatory authority, are disclosed in the State EIS.  Line 3 is subject to the U.S. Department of Transportation Standards under 49 USC Chapter 601.  The Office of Pipeline Safety administers the national regulatory program to ensure the safe transportation of hazardous liquids by pipeline.

*Multiple commenters identified the need to develop alternative energy sources and address the effects of the project on climate change and greenhouse gas emissions.*

**Response:**  Requiring development of alternative energy sources is not within the Corps' regulatory authority**.**  Climate change and greenhouse gas emissions is addressed in Section 7.5 of the EA.

*One commenter requested approval of the project due to the potential of an oil spill as a result of the existing line being 60 years old.*

**Response:**  Comment noted

*Many commenters expressed their general support for the project.*

**Response:**  Comment noted

*One commenter indicated the project would violate treaty rights.*

**Response:**  This comment is addressed in the Section above.

*Multiple commenters indicated the revised information did not meet the requirements of Section 404 and indicated that the revised information still did not provide a description of all reasonable alternatives, detailed analysis aquatic impacts for all alternatives, detailed analysis of practicability for all alternatives, and detailed feasibility analysis for each crossing, wetland delineation reports for all wetlands proposed for impact, including in-field alpha numeric flagging.*

**Response:**  All reasonable alternatives that are within the Corps' regulatory authority are include and discussed in the EA.  Enbridge has provided information for each waterbody crossing that was used to determine the LEDPA crossing methods for each site.  Wetland delineation reports have been completed and provided to the regulatory agencies.  There is no regulatory requirement to include flagging of boundaries for agency review of the delineations.  However, Enbridge is required to flag and sign all wetland and sensitive areas for construction purposes to reduce the potential for any unauthorized impacts.  This included as a special condition in the Department of Army permit.

*Many commenters requested a Federal EIS be prepared and two commenters requested a public hearing.*

**Response:**  This comment is addressed in the section above.

*One commenter resubmitted their comments in response to the December 2018 Public Notice.*

**Response:**  Substantive comments within the Corps' regulatory authority were addressed above in Section 4.2.

*One commenter questioned the completeness of the application and recommend that once a complete Clean Water Act Section 404 application is submitted to the Corps by Enbridge that that project be public noticed, and all components of the application be made available for review.*

**Response:**  Enbridge submitted a Revised Department of Army permit application on September 21, 2018, which included a withdrawal request of the Sept 2015 and February 2018 applications.  The revised application was submitted as a result of changes to designated route and anticipation of MPUC granting of route permit. Enbridge was notified of the completeness determination on November 16, 2018.

The Public Notice for this application and additional information was issued on December 20, 2018.  While the application was determined complete for the purpose of issuing a public notice pursuant to 33 CFR 3254.1(d), Enbridge and the Corps recognized additional information would be needed to reach a permit decision.   Since the revised Sept 2018 application was submitted,

Enbridge continued to provide additional supplemental information to the Sept 2018 application, generally as a result of coordination with permitting agencies.  None of this information changed the November 16, 2018 completeness determination.

On December 2019, Enbridge submitted additional and revised information, mostly as a result of initial Public Notice comment and agency input.  Revisions since the original Public Notice include minor changes to the Project workspace resulting in a reduction of 0.8 acre of temporary wetland impact, a reduction of 2.3 acres of permanent wetland fill, and the re-characterization of 7 crossings from wetlands to waterbodies based on agency review. Additionally, Enbridge provided a detailed Compensatory Wetland Mitigation Plan and Post-Construction Wetland and Waterbody Monitoring Plans based on extensive interagency input. Additional revised information included updated Water Body Crossing Table, Wetland Impact Tables for mainline crossings, and access and haul routes, detailed route maps, and a revised Environmental Protection Plan. The revised information was made available to the public for comment.

*One commenter recommend the Wetland Mainline Impact Table detail the specific impacts proposed for all features marked null (i.e.'- -') under the "Crossing Method" column.*

**Response:**  Enbridge modified the information to describe the impacts where there is no crossing method.  This is a result of temporary impacts (matting, etc.) but no actual pipe being placed into the ground.  Separate access and haul road table exists.

*One commenter recommend the waterbody impacts be properly summarized (i.e. linear feet or acreage) consistent with how impacts have been summarized for wetlands (impacts by stream type, by impact type and by permanency of impact (i.e. temporary or permanent) for both the 'proposed crossing method' and the 'alternative crossing method') in the Waterbody Crossing Table.*

**Response:**  Enbridge has updated the waterbody table to include the length and width of the waterbody crossings. The alternative crossing method would be used if the proposed crossing method is determined to not be feasible at the time of construction due to site conditions.  In this case, the contractor would be required to receive written approval from Enbridge prior to implementing an alternative crossing method.  The request to a proposed crossing method would follow the process outlined in Section 6.0 of the October 2020 Environmental Monitor Control Plan.  This plan also details that no crossing method may be changed from the proposed crossing until all applicable agencies review and approve an alternative crossing method.  This requirement is also a special condition in the Department of Army permit.

*One commenter recommended information on the following be included in the proposed Mitigation Plan: evaluation or discussion of Enbridge's efforts to seek in-kind and in-watershed mitigation options over out-of-kind, out-of-Bank Service Area mitigation, and provide condition or functional assessments of all resources being impacted.*

**Response:**  The January 2020 L3R Wetland Compensatory Mitigation Plan (Plan) that was included in the public notice discusses the evaluation and effort to seek in kind and in-watershed (in BSA) mitigation with respect to the preference hierarchy outlined in the Federal Mitigation Rule. This information is provided in the final October 2020 L3R Wetland Compensatory Mitigation Plan.

The Mitigation Rule and the District Mitigation Policy both specify a preference for mitigation banking over project-specific compensation. An approved banking instrument must be in place

before credits can be used to compensate for authorized impacts. Mitigation banks can reduce risk and uncertainty, as well as temporal losses of wetland functions. Mitigation banks typically involve larger tracts of wetlands/uplands/riparian areas that are more ecologically diverse and resilient than typical project-specific compensation (District Mitigation Policy, pp. 7-8). It is also important to note that for linear projects, such as pipelines, the Mitigation Rule gives district engineers flexibility to determine that consolidated compensatory mitigation projects, including but not limited to mitigation banks, are environmentally preferable to requiring numerous small permittee-responsible compensatory mitigation projects along a linear project corridor.  As described in the October 2020 L3R Compensatory Wetland Mitigation Plan, Enbridge has agreed to use the special wetland categories, differentiated baseline compensatory wetland mitigation ratios, and mitigation ratio multipliers recommended in the Interagency Compensatory Wetland Mitigation Guidance.

Table 5.1-1 of the October 2020 L3R Compensatory Wetland Mitigation Plan identifies the number and type of credits Enbridge owns within each BSA.  Table 5.2-1 of the October 2020 L3R Compensatory Wetland Mitigation Plan includes all impacts broken out by wetland type, wetland category, and BSA.  As shown in this table, 24.66 credits of the 144.66 total credits required for impacts in BSA 1 would come from outside of the BSA. Enbridge has purchased additional wetland bank credits in two BSAs (BSA 5 and BSA 6) adjacent to BSA 1 to cover the deficiency in BSA 1. As a result of purchasing outside of the BSA, the impact acreage is subject to an additional 0.25:1 mitigation requirement.

No functional assessment method was utilized pre-project. However, as a result of interagency coordination, special wetland categories were developed to recognize categories of higher functioning or higher value wetlands warranting higher compensatory mitigation ratios to better reflect the temporal loss of functions and services provided by these wetlands.   The identification of the Special Wetland Categories ensures that both temporary losses to the functions provided by these aquatic resources, and the additional functions and services are appropriately mitigated.   Section 3.0 of the October 2020 L3R Compensatory Wetland Mitigation Plan discusses the Special Wetland Categories and provides information regarding the mitigation ratios.

While no functional assessment was used pre-project, a Floristic Quality Assessment (FQA) would be completed for special wetland communities identified in Section 2.5.2 of the November 2020 Post Construction Monitoring Plan. Enbridge will assume pre-impact condition to be "Exceptional" which will be that standard for restoration.  As Enbridge determines it necessary, a reference site may be established in the undisturbed area adjacent to the construction workspace of the same wetland community type to serve as an acceptable FQA comparison domain for vegetation performance standards. Results of the FQA comparison would be used to determine if additional restoration measures need to be implemented or if additional compensatory mitigation would be required.

*One commenter recommend the Mitigation Plan include the rationale for using the proposed ratios and a discussion of why the mitigation proposed in the Mitigation Plan is considered a commensurate amount of compensation to offset the loss of function and quality of the impacted wetlands*

**Response:**  Information utilized for previous utility line projects was used for baseline ratios and provided in the September 2018 application.  Through numerous discussions and direction from agency staff, Enbridge revised their ratios based on agency input.  As discussed in the previous comment response, special wetland categories were identified by the agencies to ensure both

temporary losses to the functions provided by these aquatic resources, and the additional functions and services are appropriately mitigated.

*One commenter recommend the Corps require compensatory mitigation for impacts to waterbodies; which would be consistent with the approach for wetlands and ensure compliance with the Guidelines.*

**Response:**  Minimization efforts at waterbody crossings include a 25-foot neck-down of the construction work space (from 120 feet wide to 95 feet wide) beginning 20 feet from the OWHM. The full 95-foot workspace would include the removal of vegetation during construction and a 10-foot wide swath would be maintained free of trees and woody shrubs.  Outside of the 10-foot wide swath, 20 additional feet (a total of 30 feet wide over the centerline) would be maintained for trees but other woody vegetation such as shrubs would be allowed to grow.  Clearing of vegetation includes mowing and shearing at ground level but would not result in any other ground disturbing activities.  Root wads and stumps from woody vegetation would not be removed except for the area of the trench.   In riparian areas where and HDD would be utilized, a 30-foot wide area above the pipe would be cleared to allow for monitoring during the drilling activity.  This same 30-foot wide area would be maintained free of all woody vegetation to facilitate aerial inspection of the pipeline. Minimizing the area maintained free of woody vegetation will reduce any long-term impacts associated with the removal of woody vegetation but still allow for operational monitoring of the pipeline.

The project includes temporary impacts to waterbodies during the duration of trenching, pipe installation, backfilling, and initial restoration. Based on information included in Enbridge's EPP, the anticipated duration for pipe installation through water bodies would typically range from 24 to 48 hours which is substantially less time than some of the temporal loss of functions to some wetlands, especially where access roads (matting) need to be left in-place for a longer period of time to facilitate final restoration.   As identified in Section 2.0 of the November 2020 Environmental Protection Plan, Enbridge would contact the MN DNR if any crossings of a Public Water would take longer than 24 hours.  Of the 227 waterbodies being crossed by the Project, 95 of the waterbodies are ditches, many of which are roadside ditches.  74 of the ditches would be crossed via a trench method and 21 would be crossed via bore method.   The proposal would cross 132 streams ranging from perennial to ephemeral flow regimes, of which 21 would be crossed via HDD or bore method, and 111 would be crossed via a trench method.

As identified in the November 2020 Environmental Protection Plan, Enbridge would restore the streams banks that had been disturbed by construction to as near as possible to pre-construction conditions utilizing civil survey data collected pre-project.  Unstable banks may require bio-engineering which would be accomplished in consultation with the appropriate agencies.  Restoration of the area impacted by the stream crossing should return any functions lost during the relatively short construction period.   Site specific restoration plans, completed in consultation with the appropriate agencies, as well as post construction monitoring will reduce the potential for any long term effects at waterbody crossing sites.  Financial assurances will be required to ensure adequate restoration of the waterbody crossings and prevent impacts that would warrant compensatory mitigation.

*One commenter recommend the Corps require monitoring of adjacent wetlands as a condition of the permit to determine the exact extent of secondary impacts and require additional mitigation if the analysis reveals adverse impacts to adjacent resources by the proposed activities.*

*Response:*  Enbridge will install monitoring wells in nests to allow for the determination of groundwater flow direction and to assess if there are changes in groundwater conditions upgradient and downgradient of the pipeline at 15 different peatland locations, identified in Table 2.4-1 of the November 2020 Post Construction Monitoring Plan (PCMP).  In addition to direct hydrology monitoring, the applicant will be conducting long-term vegetative sampling in select wetlands that were determined by the MNDNR. The long-term vegetation sampling is intended to asses any potential hydrologic effects, up and down-gradient of the pipeline, through an assessment of changes in vegetation over time.  Protocols for the long-term monitoring are outlined in 2.5.3 of the PCMP.

The PCMP also identifies potential corrective actions that may be required due to unexpected ponding from peat compaction and alterations to groundwater flow that could result in unexpected drainage or damning.

*One commenter recommended existing performance standards for use in compensatory mitigation projects in Minnesota be used to establish performance standards for this project, including limitations to the presence of invasive species.*

**Response:**  Post-construction monitoring will begin during the first growing season after construction restoration work is complete and be conducted in years 1, 3, and 5.  The post construction monitoring protocols would apply to all wetlands and waterbodies identified during field surveys included in the USACE Permit Application, including surface waters of the state, and Minnesota Public Water Inventory ("PWI") waters and wetlands regulated by the MDNR and non-PWI wetlands and waterbodies located on MDNR-Administered state lands.

Corrective actions identified during monitoring will generally be completed in the even years (years 2 and 4) and as needed after the monitoring conducted in years 1 and 3. Enbridge proposes to conduct on-the-ground monitoring efforts and restoration activities (e.g., corrective actions) supported by review of color infrared imagery as described in the November 2020 Post Construction Wetland and Waterbody Monitoring Plan (PCMP).  Monitoring will not be considered complete until the performance standards have been met and reviewed by the applicable Agencies (see Section 4.0 of PCMP).

Performance standards, similar to those used for mitigation sites, are included in Section 4.0 of the PCMP.  In the case that the performance standards have not been met by year 5 of monitoring, Enbridge, in consultation with the Agencies, will either extend monitoring at those sites, or provide additional mitigation.

Along with standard post construction monitoring for all wetlands, Enbridge will conduct MPCA Rapid Floristic Quality Assessment monitoring at wetlands with Sate designated S1, S2, or S3 Native Plant Communities, wetlands with High or Outstanding biodiversity, wetlands with known occurrences of MN DNR State listed plant species, and sensitive waters as identified by the State agencies..  This effort would compare adjacent off-workspace FQA scores to FQA scores in the disturbed workspace during the restoration and monitoring period. FQA would be conducted in years 1, 3, and 5 at the selected sites.

The PCMP also provides details for financial assurances for wetland and waterbody monitoring. Enbridge will provide no less than $27,377,298 in financial assurances in a manner acceptable to the Agencies to ensure a high level of confidence that the restoration of wetlands and waters to pre-construction conditions will be successfully completed in accordance with the performance standards specified in the PCMP. The financial assurances approved by the

Agencies will be in place before Enbridge commences the activity permitted by the Corps Section 404 Clean Water Act ("CWA") and Section 10 Rivers and Harbors Act Permit, and the MPCA Section 401 CWA water quality certification and applicable MDNR license and leases. The permits, certifications and authorizations or the approved financial assurances instrument will clearly specify the conditions under which the financial assurances will be released to Enbridge and/or other financial assurance provider, including, as appropriate, linkage to achievement of performance standards, adaptive management, or compliance with Corps permit special conditions.

The March 6, 2019 comment letter from EPA identifies the need to assess conversion impacts to PEM and PUB type wetlands, and recommends monitoring of the adjacent areas to determine if any secondary impacts occur.   PEM and PUB type wetlands are included in the protocols in the PCMP as well as in the subset of wetlands that will be assessed utilizing the FQA.

The proposal would cross the area of the Gully 30 Fen. A Fen Management Plan has been developed by Enbridge and was approved by the MDNR on October 19, 2020.  Along with construction details and requirements, the Fen Management Plan identifies restoration and post construction monitoring requirements.

Invasive species management is addressed in Appendix B of the November 2020 Environmental Protection Plan. Invasive species in the workspace would be compared to invasives adjacent to workspace.

*One commenter identified numerous functions provided by wetlands, including production of food items, medicinal benefits, protection from infectious disease, and carbon sequestration.*

Response:   The majority of the impacts as a result of the project area temporary.  All wetland functions will be replaced after construction and restoration.  However, there may be some changes to certain functions.  Enbridge is providing compensatory mitigation after taking all measure to avoid and minimize to the maximum extent practicable.  Enbridge will be required to provide 307 acres of compensatory mitigation through the purchase of wetland bank credits. The mitigation plan will not only ensure that the vast majority of wetland functions are restored at the impact sites but also that 307 acres of wetland will be protected in perpetuity.

*One commenter cited potential impacts to wild rice.*

**Response**:  Enbridge used desktop and field survey methods to identify waters that support natural wild rice stands that could potentially be affected by construction.  Enbridge also conducted wild rice surveys in 2018, 2019, and 2020 at waterbody crossings and water appropriation sources near the proposed appropriation point.  Table 5.4-1 in Enbridge's Antidegradation Assessment for Section 401 Water Quality Certification identifies receiving waters that support natural wild rice beds.  The project would cross eight waters identified on the MNDNR Wild Rice Waters list or MPCA draft wild rice list.  However, as a result of the field surveys a total of 15 waters had wild rice present during the surveys. Of the 15 waters with wild rice present during the field surveys, 10 crossings would be conducted via HDD, two waters would not be crossed, one water would be impacted by an access road, one would be crossed by a dry crossing method, and another crossed by a standard wet open cut method. Impacts to waters that support natural wild rice stands will be localized and are anticipated to affect only those that are crossed via a trench method.  The MPCA water quality certification prohibits Enbridge from conducting in-channel work in waters in close proximity to known wild

rice waters, identified in Table 5.4-1 in Enbridge's Antidegradation Assessment for Section 401 Water Quality Certification, from April 1 through July 15.  Enbridge plans a dry crossing of the Lost River where wild rice has been documented. Enbridge will largely avoid the sensitive floating leaf stage of wild rice (typically May through June, depending on weather conditions) at the Lost River through compliance with MPCA's 401 water quality certification special condition identified above. The section of the Lost River that will be crossed has previously been disturbed by alterations connected with USACE flood control efforts in the 1960s and installation of seven crude oil pipelines within Enbridge's mainline corridor, most recently by the Alberta Clipper Pipeline constructed in 2009-2010 using a dry crossing method. Despite this previous disturbance, wild rice is present there today. Current data shows that wild rice has re-established itself and flourished after those projects were completed. After completion of the river crossings, Enbridge will restore each crossing location and wild rice vegetation will be expected to reestablish. The pipeline trench will be backfilled with the spoil material and parent streambed excavated from the trench. The in-stream trench will be backfilled so that the stream bottom is similar to its pre-construction condition, with no impediments to normal water flow. No permanent impacts on wild rice vegetation at any of the crossings are anticipated.

*One commenter requested the project purpose be more broad and public-focused, and is too narrow focusing only on one company's needs and goals.*

**Response**: Reponses to comments regarding the purpose and need are addressed in the section above.

*One commenter asserted that the project misrepresents the actual amount of wetland impacted and indicated many more acres would be permanently impacted outside of the project right-of-way.*

**Response:**  Direct impacts as a result of the project have been accounted for through identifying the construction limits through wetlands and waterbodies.  Generally, impacts to wetlands do not extend far past the actual trenched or impacted area.  Minimization as well as BMPs, such as adequate depth of pipe, will reduce the potential for any unanticipated impacts. In addition to BMPs, Enbridge will be required to monitor restoration of the ROW for a period of at least 5 years, as well as conduct hydrology monitoring off-ROW at select locations as determined by the regulatory agencies.  Any unanticipated impacts would be identified during the monitoring period.  The impacts would need to be remedied on-site.  If the impacts cannot be remedied, Enbridge will be required to provide additional compensatory mitigation or utilize the financial assurances to ensure the impacts are adequately compensated for.

*One commenter asserted that the project's impacts are contrary to and inconsistent with achieving the goals and objectives of the Federal Clean Water Act which aims to protect and restore the physical, chemical and biological integrity of the nation's waters. The projects construction and operation will admittedly violate state water quality standards.*

**Response:**  The goal of Section 404 of the Clean Water Act is to protect the Nation's aquatic resources, while allowing reasonable development through fair, flexible and balanced permit decisions.  On April 15, 2020 the Fond du Lac reservation issued the Section 401 Water Quality Certification for the portion of the Project that crosses the Fond du Lac reservation and on January 31, 2019 the North Dakota Department of Health issued the individual Section 401 Water Quality Certification for the portion of the project within the state of North Dakota that is being reviewed by St. Paul District. On November 12, 2020, the MPCA issued a Section 401 Water Quality Certification for the discharge of dredged and fill material into waters.

*One commenter requested the applicant prepare and submit an end-of-project-life abandonment and/or removal plan such that the Section 404 and 401 analyses can include these foreseeable project impacts and how these impacts might be avoided or minimized by the no-action or other project alternatives.*

**Response:**  Potential future abandonment of L3 replacement is well outside the Corps' regulatory authority as any impacts and effects of those impacts as a result of and abandonment are uncertain.   In addition, abandonment of any pipe may not require Section 404 or Section 10 authorization. However, fills authorized by the current permit would need to be maintained for the life of the permit. Abandonment of maintaining the authorized fill could result in suspension or the revocation of the permit.

*One commenter cited concerns with Environmental Justice and indicated route alternatives would result in disproportionate impacts to Native American communities.*

**Response:**  Environmental Justice and compliance with Executive Order 12898 is discussed in Section 11.15 of the EA